IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

LEMONT MABLES, LARISSA
HENDERSON-MABLES and
EARLENE CALVIN on behalf of
themselves and others similarly situated,

Plaintiffs,

v.

INDYMAC BANK, F.S.B.,

Defendant.

C.A. No. <u>FILED</u>: APRIL 17  ,2008
08CV 2216    NF
JUDGE LINDBERG
MAGISTRATE JUDGE COX

JURY TRIAL DEMANDED

## CLASS ACTION COMPLAINT

Plaintiffs Lemont Mables, Larissa Henderson-Mables and Earlene Calvin ("Plaintiffs"), by and through their attorneys, bring this action on behalf of all others similarly situated, against Defendant IndyMac Bank, F.S.B. ("Defendant IndyMac" or "IndyMac") seeking redress for racially discriminatory lending practices under the Equal Credit Opportunity Act, 15 U.S.C. § 1691, et seq. ("ECOA") and the Fair Housing Act, 42 U.S.C. § 3601 et seq. ("FHA").

## INTRODUCTION

1.    This class action challenges Defendant IndyMac's racially discriminatory mortgage lending practices. As described below, Defendant IndyMac established a specific, identifiable and uniform credit pricing system, a component of which, referred to herein as the "Discretionary Pricing Policy," authorized an unchecked, subjective surcharge of additional points and fees to an otherwise objective risk-based financing rate.

2.    These subjective, additional finance charges directly lead to minorities receiving home loans with higher interest rates and higher fees and costs than similarly situated non-minority borrowers.

3.     As used in this Complaint, "minority" or "minorities" shall refer to all non-Caucasians and other minority racial groups protected under 42 U.S.C. § 3604 and 15 U.S.C. § 1691.

4.     Plaintiffs bring this action on behalf of all minorities who have entered into residential mortgage loan contracts that were originated, financed or purchased by Defendant IndyMac, and who have been subjected to racial discrimination (the "Class").

5.     Plaintiffs seek injunctive, declaratory, and equitable relief, punitive damages, and other monetary and non-monetary remedies for Defendant IndyMac's racially discriminatory conduct.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which gives this Court original jurisdiction over civil actions arising under federal law.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).  Plaintiffs Lemont Mables and Larissa Henderson-Mables reside in this District and Defendant IndyMac originated and financed their purchase of property located in this District. Defendant IndyMac regularly does business in this District and Plaintiff Lemont Mables and Larissa Henderson-Mables' residential mortgage transaction is one of a number of financings which Defendant IndyMac originated in this District, secured by properties located in this District.

## PARTIES

8.     Lemont Mables and Larissa Henderson-Mables ("Plaintiffs Mables" or "Mables") are African-American homeowners who reside in Chicago, Illinois 60639.

9.     Earlene Calvin ("Plaintiff Calvin" or "Calvin") is an African-American homeowner who resides in Apple Valley, California.

10.     Defendant IndyMac Bank, F.S.B., is a hybrid thrift/mortgage bank insured by the FDIC, with principal executive offices located at 888 East Walnut Street, Pasadena, California 91101.  Defendant IndyMac originates mortgages in all

50 states of the United States.  According to representations in its parent corporation's recent SEC filings, Defendant IndyMac is the seventh largest savings and loan nationwide based on its assets, and the ninth largest residential mortgage originator in the United States.  Defendant IndyMac is a wholly owned subsidiary of parent holding company IndyMac Bancorp, Inc., a Maryland corporation reincorporated in Delaware in 1987, which trades publicly on the New York Stock Exchange under the symbol IMB.

## FACTS

## I.    HISTORICAL DISCRIMINATION IN AMERICAN MORTGAGE LENDING: A LONG LEGACY

11.    Racial discrimination in America's mortgage lending industry has a long legacy.  As this Complaint attests, that unfortunate history continues to this day due to discriminatory treatment of minority borrowers by mortgage lenders such as Defendant IndyMac.

12.    According to the Joint Center for Housing Studies at Harvard University's 2005 study called "The Dual Mortgage Market: The Persistence of Discrimination in Mortgage Lending," "[i]n the immediate post-World War II period, racial discrimination in mortgage lending was easy to spot. From government-sponsored racial covenants in the Federal Housing Administration (FHA) guidelines to the redlining practices of private mortgage lenders and financial institutions, minorities were denied access to home mortgages in ways that severely limited their ability to purchase a home. Today, mortgage lending discrimination is more subtle. . . . [M]ore than three decades after the enactment of national fair lending legislation, minority consumers continue to have less-than-equal access to loans at the best prices and on the best terms that their credit history, income, and other individual financial considerations merit."

13.    The passage of civil rights legislation and fair lending laws in the 1960s and 1970s brought an end to the most virulent forms of overt racial discrimination in

the housing markets, but throughout the 1980s and 1990s, mortgage lenders found more subtle ways to discriminate, including maintaining offices only in Caucasian neighborhoods and engaging in practices such as redlining (refusing to lend on properties in predominantly minority neighborhoods).

14.    After redlining practices were challenged in the 1990s, mortgage lenders changed tactics once again.  Lenders began making loans to minorities, but charged them higher interest rates and loan-related fees than they charged to similarly-situated Caucasian borrowers.  Loan data that mortgage lenders must now compile under the federal Home Mortgage Disclosure Act ("HMDA") reveals profound loan pricing disparities between minority borrowers and similarly-situated Caucasian borrowers.

15.    The HMDA requires mortgage lenders to report information about the home loans they process each year.  In 2005, lenders reported information on more than 30 million home loan applications pursuant to HMDA.  In 1989, Congress required lenders to begin disclosing information about mortgage borrowers' race and ethnicity.  In 2004, concerned with potential racial discrimination in loan pricing, and recognizing that racial or other types of discrimination can occur when loan officers and mortgage brokers have latitude in setting interest rates, the Federal Reserve Board began requiring lenders to also report information concerning rates, points, and fees charged to borrowers on high-cost loans.

16.    According to the Federal Reserve, both 2004 and 2005 HMDA data revealed that "Blacks and Hispanics were more likely . . . to have received higher-priced loans than non-Hispanic whites. . . . [which has] increased concern about the fairness of the lending process."  Robert B. Avery, Kenneth P. Brevoort and Glenn B. Canner, "Higher-Priced Home Lending and the 2005 HMDA Data," Federal Reserve Bulletin, A124, A159 (revised Sept. 18, 2006) (http://www.federalreserve.gov/pubs/bulletin/2006/hmda/bull06hmda.pdf (last viewed April 2, 2008).)

17.    HMDA data for 2004 reveals profound loan pricing disparities between Hispanic borrowers and non-Hispanic whites even after controlling for borrowers' gender, income, property location, and loan amount.  After accounting for those differences in the 2004 HMDA data, Hispanic borrowers were still almost twice as likely to receive a higher-rate home loan as non-Hispanic whites. (http://www.responsiblelending.org/pdfs/Testimony-Ernst061306.pdf (last viewed April 2, 2008).)  In a speech last year, the Vice-Chairman of the Federal Deposit Insurance Corporation, Martin Gruenberg, discussed the 2004 HMDA data and observed that that data "clearly indicated" that Hispanics are more likely to receive high-cost home loans than are non-Hispanic whites. (http://www.fdic.gov/news/news/speeches/archives/2006/chairman/spoct1806.html (last viewed April 2, 2008).)

18.    Likewise, HMDA data for 2005 shows that "for conventional home-purchase loans, the gross mean incidence of higher-priced lending was 54.7 percent for blacks and 17.2 percent for non-Hispanic whites, a difference of 37.5 percentage points."  Avery, Brevoort, and Canner, Federal Reserve Bulletin, at A159.  The situation is similar for refinancings, where there is a difference of 28.3 percentage points between blacks and non-Hispanic whites.  Id. at A124, A159.

19.    A growing number of research studies and investigations show that significant racial disparities still exist.  California Reinvestment Coalition, et al., "Paying More for the American Dream: A Multi-State Analysis of Higher Cost Home Purchase Lending" (March 2007) (http://www.nedap.org/pressroom/documents/2007_Report-2005_HMDA.pdf (last viewed April 2, 2008); Ross, "The Continuing Practice and Impact of Discrimination" (Revised July 2006) (Univ. of Connecticut, Working Paper 2005-19R) (http://www.econ.uconn.edu/working/2005-19r.pdf) (last viewed April 2, 2008).

20.    Just this month, the California Reinvestment Coalition, jointly with several other non-profit and housing advocacy groups, published another report.  The

organizations examined the impact of lending by subprime, high-risk lenders in 7 metropolitan areas – Boston, Charlotte, Chicago, Cleveland, Los Angeles, New York City and Rochester, NY.  California Reinvestment Coalition, et al., "Paying More for the American Dream: A Multi-State Analysis of Higher Cost Home Purchase Lending" (March 2008) ("March 2008 CRC Report") (available at http://www.nedap.org/resources/reports.html) (last viewed April 2, 2008).  The CRC Report focuses on a subset of 35 lenders (among a larger group of 228 subprime lenders that, since late 2006, have either closed, gone bankrupt, or been sold) who specialized in subprime, high-risk lending.

21.    The study showed that subprime high-risk lenders are concentrated in minority neighborhoods.  Data supporting this finding demonstrated that subprime high-risk lenders had 20% of the market share in predominantly minority neighborhoods in these metro areas, compared to a 4% market share in predominantly white neighborhoods.  March 2008 CRC Report at 5.  In addition, over 40% of the loans made by subprime high-risk lenders were in neighborhoods where 80% or more of the residents were minorities.  Id.  In stark contrast, less than 10% of subprime high-risk lender loans were in areas where less than 10% of the residents were minorities.  Id.

22.    In the Chicago metro area, where Plaintiffs Mables  reside, the same study shows that the subprime, high-risk lender market share in predominantly minority neighborhoods was 3.7 times the high-risk lender market share in predominantly white neighborhoods.  March 2008 CRC Report at 6.  Further, in metro Los Angeles, home to Plaintiff Calvin, the study shows that the high-risk lenders' market share in predominantly minority neighborhoods was a whopping 9.5 times higher than their market share in largely white neighborhoods.  Id.  By a substantial margin, the Los Angeles metro area had the greatest high-risk lender market share disparity surveyed in the March 2008 CRC Report.

23.    The Association of Community Organizations for Reform Now (ACORN) released a report entitled "The High Cost of Credit: Disparities in High-priced Refinanced Loans to Minority Homeowners in 125 American Cities," dated September 27, 2005, that found that "[i]n every metropolitan area where at least 50 refinances were made to African-American homeowners, African-Americans were more likely to receive a high-cost loan than White homeowners." (http://acorn.org/uploads/media/High_Cost_of_Credit_Report_02.doc (last viewed on April 2, 2008).

24.    The aggregate HMDA data discussed above is representative of IndyMac. According to the Form 10-K for year end 2006 filed by Defendant IndyMac's parent holding company, IndyMac Bancorp, Inc., Defendant IndyMac is the ninth largest residential mortgage originator in the United States.

25.    Based on HMDA data, minorities who borrowed from IndyMac between 2004 and 2006 are over 50% more likely than Caucasian borrowers to have received a high-APR loan to purchase or refinance their home.

26.    Importantly, consistent with the consensus that the HMDA data reveals profound loan pricing disparities between minorities and Caucasians even after controlling for income and other objective factors, research studies have also generally suggested that borrowers' credit profiles cannot fully explain why some borrowers, and not others, are saddled with higher cost loans.

27.    As an example, research by Howell Jackson of Harvard Law School, detailed in the article *Kickbacks or Compensation: The Case of Yield Spread Premiums* (Harvard Univ.), H. Jackson and J. Berry, available at (http://www.law.harvard.edu/faculty/hjackson/pdfs/january_draft.pdf) (last viewed April 2, 2008), concluded that the substantially higher mortgage broker compensation received as the result of yield spread premiums could not fully be explained when controlling for variables associated with creditworthiness.

28.    In short, a number of researchers have raised "doubts that risk can adequately explain racial differences" in high-cost loans.  Bradford, Center for Community Change, "Risk or Race? Racial Disparities and the Subprime Refinance Market" (May 2002) (http://www.knowledgeplex.org/kp/report/report/relfiles/ccc_0729_risk.pdf) (last viewed April 2, 2008).  In other words, evidence "suggests that weak borrower credit profiles do not fully explain why some borrowers get stuck with higher-cost home loans."  California Reinvestment Coalition, et al., "Paying More for the American Dream: A Multi-State Analysis of Higher Cost Home Purchase Lending" (March 2007).

## II.    PAST AS PROLOGUE: DEFENDANT INDYMAC'S DISCRIMINATORY LENDING POLICY

### A.    DEFENDANT INDYMAC'S RELATIONSHIPS WITH ITS MORTGAGE BROKERS AND CORRESPONDENT LENDERS

29.    Defendant IndyMac is among America's leading mortgage lenders, originating and funding mortgage loans through loan officers, through authorized mortgage brokers and through a network of correspondent lenders.

30.    On information and belief, Defendant IndyMac's loan officers, mortgage brokers and correspondent lenders broker and fund loans in collaboration with Defendant IndyMac, and in conformance with Defendant IndyMac's Discretionary Pricing Policy.

31.    In addition to instruction in its credit-pricing policies and procedures, Defendant IndyMac provides its loan officers, brokers and correspondents with marketing support and materials, including an online library of "private label" materials such as flyers, brochures, print advertisements, and "program highlights." (https://new-e-mits.IndyMacb2b.com/login/login.asp?goto=marketingMaterials&popup (last viewed on April 2, 2008).)

32.     Defendant IndyMac also maintains a "Corporate Blog" on the Internet, which it uses to communicate to its broker force, correspondents and loan officers as well as the investing community.  (http://www.theimbreport.com (last viewed on April 2, 2008).)   Among other things, the "Corporate Blog" updates Defendant IndyMac's partners on delinquencies in its loan portfolios, formulates attacks upon whatever investment analyst reports may be critical of Defendant IndyMac's lending operations, and links visitors to articles with titles like "Booms and Busts: The Case of Subprime Mortgages."  (Id.)

33.     Defendant IndyMac has established, implemented and continues to implement its Discretionary Pricing Policy, causing minority borrowers to pay subjective fees such as yield spread premiums and other mortgage-related finance charges at higher rates than similarly situated non-minority borrowers.  By its Discretionary Pricing Policy, Defendant IndyMac has intentionally discriminated against Plaintiffs and Class Members, systematically channeling Plaintiffs and other Class members into mortgage loans with less favorable conditions than those given to similarly situated non-minority borrowers.  This pattern of discrimination is not the result of random or non-discriminatory factors.  Rather, it is the direct and intended result of Defendant IndyMac's business model and loan-funding practices.

34.     Defendant IndyMac's loan officers, authorized mortgage brokers and correspondent lenders receive part or all of their compensation from Defendant IndyMac based on the interest rate charged to the borrower.  Defendant IndyMac's loan officers, authorized brokers and correspondent lenders receive more compensation from Defendant IndyMac when they steer their clients into IndyMac loans with higher interest rates, and less compensation when they place their clients into IndyMac loans with lower interest rates.  These same incentives apply when Indymac's loan officers, authorized mortgage brokers and correspondent lenders place borrowers into loans which include prepayment penalties and other onerous conditions.

35.    Defendant IndyMac intentionally and actively implements its Discretionary Pricing Policy in a variety of ways, including actively educating loan officers and brokers about IndyMac's credit policies and procedures and directing its loan officers and brokers regarding the marketing of IndyMac loan products.

36.    Defendant IndyMac evaluates its loan officers, authorized brokers and correspondents to ensure that they comply with Defendant IndyMac's Discretionary Pricing Policy.  Because the Discretionary Pricing Policy is designed to discriminate, Defendant IndyMac has not taken precautions to ensure that application of the Policy will avoid discrimination against minorities.

37.    Defendant IndyMac's Discretionary Pricing Policy permits its loan officers, authorized mortgage brokers and correspondent lenders subjectively to charge minority loan applicants yield spread premiums and other discretionary charges, and indeed provides financial incentives for them to do so.

38.    This pattern and design of discrimination cannot be justified by business necessity, and could be avoided through the use of alternative policies and procedures that have less discriminatory impact and no less business efficacy.

**B.    DEFENDANT INDYMAC'S DISCRETIONARY CREDIT PRICING SYSTEM:  DESIGNED TO DISCRIMINATE**

39.    Defendant IndyMac discriminates through its authorized mortgage brokers.  Authorized mortgage brokers act as Defendant IndyMac's agents in originating mortgage loans.  Authorized mortgage brokers enter into agreements with Defendant IndyMac to accept loan applications on behalf of Defendant IndyMac; communicate to loan applicants financing terms and rates set by Defendant IndyMac; tell loan applicants about Defendant IndyMac's various financing options; and ultimately originate mortgage loans funded by Defendant IndyMac using Defendant IndyMac's forms and in accordance with Defendant IndyMac's policies and procedures.

40.    Likewise, Defendant IndyMac's authorized correspondent lenders and loan officers, acting as Defendant IndyMac's agents, work with Defendant IndyMac to make loans in accordance with Defendant IndyMac's credit policies and procedures.  Defendant IndyMac funds correspondent-generated loans before or shortly after they go to closing.

41.    Defendant IndyMac then funds loans originated by its loan officers, authorized mortgage brokers and correspondent lenders, sets the terms and conditions of credit on those loans, and shoulders part or all of the risk on such loans.  Defendant IndyMac actively and intentionally enforces its credit policies through its loan officers, authorized mortgage brokers and correspondent lenders in a variety of ways. Among other things, Defendant IndyMac supplies its loan officers, mortgage brokers and correspondent lenders with an array of loan-related forms and agreements, including loan contracts, loan applications, and instructions on completing loan applications and contracts.  And, as noted above, Defendant IndyMac actively trains its authorized brokers to follow its policies and procedures, and reinforces that training with marketing support.

42.    Once a loan applicant has provided credit information through a loan officer, mortgage broker or correspondent lender, Defendant IndyMac performs an initial objective credit analysis.  Defendant IndyMac, at this point, evaluates numerous risk-related credit variables, including debt-to-income ratios, loan-to-value ratios, credit bureau histories, debt ratios, bankruptcies, automobile repossessions, prior foreclosures, payment histories, credit scores and the like.

43.    Defendant IndyMac derives a risk-based financing rate from these objective factors, which Defendant IndyMac and others in the mortgage industry simply call the "par rate." (Defendant IndyMac's brokers and correspondent lenders can also estimate the par rates by referring to an applicant's credit bureau-determined credit score.)

44.     Although Defendant IndyMac's initial analysis applies objective criteria to calculate this risk-related interest rate, Defendant IndyMac's Discretionary Pricing Policy authorizes and provides incentives to its loan officers, mortgage brokers and correspondent lenders to mark up that rate later and also impose additional non-risk-based charges, including yield spread premiums and other discretionary fees. Defendant IndyMac regularly communicates applicable par rates, authorized yield spread premiums, and other discretionary fees to its loan officers, mortgage brokers and correspondent lenders via "rate sheets" and other communications.

45.     Defendant IndyMac gives its loan officers, authorized mortgage brokers and correspondent lenders discretion to impose yield spread premiums and other subjective fees on borrowers.  When borrowers pay yield spread premiums, Defendant IndyMac shares in additional income generated by the premium because the yield spread premium-affected borrower is locked into a higher interest rate going forward on their IndyMac loan than they would be if they had been placed in a par rate loan without a yield spread premium.

46.     Defendant IndyMac's borrowers pay yield spread premiums and other discretionary fees that inflate their finance charges not knowing that a portion of their finance charges are non-risk-related.  Moreover, Defendant IndyMac's policies make it more difficult for a borrower to get out of such an unfavorable loan, by including substantial prepayment penalties.

47.     Defendant IndyMac's Discretionary Pricing Policy causes persons with identical or similar credit scores to pay differing amounts for obtaining credit.  Such subjective loan pricing - which by design imposes differing finance charges on persons with the same or similar credit profiles - disparately impacts Defendant IndyMac's minority borrowers.

48.     While Defendant IndyMac's use of its Discretionary Pricing Policy for all loan applicants might appear to be racially neutral, Defendant IndyMac's use of yield spread premiums and other discretionary fees disproportionately and adversely

affects minorities (relative to similarly situated non-minorities). Defendant IndyMac's Discretionary Pricing Policy causes minorities to pay disparately more finance charges than similarly situated non-minorities, and Defendant takes no precautions to avoid this result. As the HMDA data cited herein indicates, minorities, after controlling for credit risk, are substantially more likely than similarly situated non-minorities to pay such charges.

49.     Defendant IndyMac's Discretionary Pricing Policy is in fact intentionally discriminatory. In an attempt to insulate itself from the discriminatory decision-making, Defendant IndyMac intentionally designed its subjective Discretionary Pricing Policy to allow and encourage its lending agents to obtain greater profits from minority borrowers. As described above, Defendant IndyMac's Discretionary Pricing Policy by design discriminates against minority borrowers and directly causes this disparate impact.

**III.    DEFENDANT INDYMAC IMPOSED DISCRIMINATORY FEES ON PLAINTIFFS**

50.     Defendant IndyMac's discriminatory Discretionary Pricing Policy directly damaged Plaintiffs and the Class.

51.     On or about April 11, 2007, Plaintiff Lemont Mables and Larissa Henderson-Mables entered into a mortgage transaction with Defendant IndyMac, borrowing $370,800.00 to refinance their home loan for their residence in Chicago, Illinois. The financing was arranged through a mortgage broker, Westlake Mortgage Corp. ("Westlake"), which on information and belief is one of Defendant IndyMac's authorized mortgage brokers and/or correspondent lenders.

1      52.    Plaintiff Mables' HUD-1 Settlement Statement indicates that in
2 connection with his loan, that Defendant paid a yield spread premium in the amount of
3 $1,854 to Westlake, paid outside of closing ("POCL") which was based in whole or in
4 part on mark-up of Plaintiffs' loan rate.  In addition, Plaintiffs paid the following fees,
5 among others, in connection with the transaction:  a "broker origination fee" of $3,708
6 to Westlake; a "broker processing fee" of $450 to Westlake, an "application fee" of
7 $450 to Westlake, and a $700 "funding fee" to Defendant IndyMac. On information
8 and belief, each of these fees were assessed pursuant to Defendant IndyMac's
9 Discretionary Pricing Policy, and were higher than fees charged by IndyMac to non-
10 minority borrowers with objective credit risk factors similar to Plaintiff Lemont
11 Mables'.

12      53.    On or about April 30, 2007, Plaintiff Calvin entered into a mortgage
13 transaction with Defendant IndyMac to refinance her home loan for her residence in
14 Apple Valley, California.  The principal balance of the loan was $416,000.  The
15 financing was arranged through Windsor Capital Mortgage Corporation ("Windsor
16 Capital"), a mortgage company which on information and belief is one of Defendant
17 IndyMac's authorized mortgage brokers and/or correspondent lenders.

18      54.    The "LENDER'S CLOSING INSTRUCTIONS" issued by Defendant
19 IndyMac evidence that Defendant paid a yield spread premium to Windsor Capital  in
20 the amount of $10,400, paid outside of closing (POC) which was based in whole or in
21 part on a markup of Plaintiff's loan rate.   Plaintiff Calvin also paid the following
22 charges, among others, in connection with the transaction: a $8,320 loan origination
23 fee to Windsor Capital, a $630 "broker processing fee" to Windsor Capital, a $495
24 "administration fee" to Windsor Capital; and a $725 "funding fee" to Defendant
25 IndyMac.  On information and belief, all of these fees were assessed pursuant to
26 Defendant IndyMac's Discretionary Pricing Policy.  These fees were higher than fees
27 charged by IndyMac to non-minority borrowers with objective credit risk factors
28 similar to Plaintiff Calvin's.

55.     Plaintiffs' loans with Defendant IndyMac also included rates and terms, including significant prepayment penalties, which were significantly less favorable than rates and terms imposed on non-minority borrowers with objective credit risk factors similar to Plaintiffs'.

56.     As described herein, as a result of Defendant IndyMac's discriminatory conduct, Plaintiffs received loans on worse terms, with higher costs, than similarly situated non-minority borrowers.

## CLASS ACTION ALLEGATIONS

57.     Plaintiffs repeat and re-allege each allegation above as if set forth herein in full.

58.     This class action is brought pursuant to the ECOA and the FHA by Plaintiffs on behalf of themselves and all minority borrowers who entered into residential mortgage loan contracts that were originated, financed or purchased by Defendant IndyMac, and who were harmed by Defendant's discriminatory conduct (the "Class").

59.     Plaintiffs sue on their own behalf, and on behalf of a class of persons under Rule 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure.

60.     Plaintiffs do not know the exact size of the Class or the identities of the members of the Class, since that information is in the exclusive control of Defendant IndyMac. Plaintiffs believe that the Class includes many thousands, or tens of thousands of individuals, who are geographically dispersed throughout the United States. Therefore, the Class is so numerous that joinder of all members is impracticable.

61.     All members of the Class have been subject to and affected by Defendant IndyMac's practice of assessing yield spread premiums and other discretionary fees on mortgage loans. There are questions of law and fact that are common to the Class, and that predominate over any questions affecting only individual members of the Class. These questions include, but are not limited to the following:

a.   the nature and scope of Defendant IndyMac's policies and procedures concerning the assessment of yield spread premiums and other discretionary fees on mortgage loans it funds;

b.   whether Defendant IndyMac is a creditor under the ECOA because, in the ordinary course of business, it participates in the decision of whether or not to extend credit to consumers;

c.   whether Defendant IndyMac's policies and procedures regarding yield spread premiums and other discretionary fees are a facially neutral credit pricing system that has effected racial discrimination in violation of the ECOA;

d.   whether there are statistically significant disparities between the amount of the discretionary charges imposed on minorities and the amount of the discretionary charges imposed on Caucasians that are unrelated to creditworthiness;

e.   whether Defendant IndyMac has any legitimate business justification for its policies and procedures;

f.   whether there is a less discriminatory alternative to these policies and procedures;

g.   whether the Court can enter declaratory and injunctive relief; and

h.   the proper measure of disgorgement or monetary relief.

62.   Plaintiffs' claims are typical of the claims of the Class, and do not conflict with the interests of any other members of the Class, in that Plaintiffs and the other members of the Class were subjected to the same yield spread premiums and other discretionary fees that have disproportionately affected minority borrowers.

63.   Plaintiffs will fairly and adequately represent the interests of the Class. Plaintiffs are committed to vigorous prosecution of the Class's claims, and have

retained attorneys who have extensive experience in consumer protection and credit discrimination actions and in class actions.

64.    A class action is superior to other methods for the speedy and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

65.    In the alternative, Defendant IndyMac has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## COUNT I
## VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT
## (15 U.S.C. §§ 1691 - 1691f)

66.    Plaintiffs repeat, re-allege and incorporate the allegations contained in paragraphs 1 through 65 above as if fully set forth herein.

67.    Defendant IndyMac engages in credit transactions through its offering, granting, and purchasing of residential mortgage loans.

68.    By imposing higher interest rates and other discretionary fees and terms on residential mortgage loans to Plaintiffs and the Class than it imposes on non-minority mortgage borrowers, Defendant IndyMac has discriminated and continues to discriminate against Plaintiffs and members of the Class with respect to a credit transaction on the basis of race in violation of the ECOA.  15 U.S.C. § 1691(a).

69.    In addition, Defendant IndyMac's pricing policies and procedures (including yield spread premiums), which provide financial incentives to its loan officers, mortgage brokers and correspondent lenders to make subjective decisions to increase interest rates and charge additional fees and costs, have a disparate impact on Plaintiffs and the Class.

70.    As a proximate result of Defendant IndyMac's violation of 15 U.S.C. § 1691, Plaintiffs and members of the Class have been injured and are entitled to injunctive and declaratory relief and damages, or make whole equitable relief.

71.    In addition, Defendant IndyMac's conduct as alleged herein was intentional, willful, wanton, reckless, malicious, outrageous, or otherwise aggravated beyond mere negligence.    Defendant IndyMac acted with malice and reckless indifference to the federally protected rights of Plaintiffs and the Class.    As a result, Plaintiffs and the Class are entitled to punitive damages.

72.    Moreover, Defendant IndyMac continues to discriminate in violation of the ECOA against Class Members every time Defendant IndyMac provides a home mortgage loan as described herein.    If not enjoined from such violation by the Court, Defendant IndyMac will continue to engage in conduct that disregards the rights of Plaintiffs and members of the Class, and cause Plaintiffs and the Class irreparable injury for which there is no adequate remedy at law.    15 U.S.C. § 1691(e).

73.    Plaintiffs and the Class ask this Court to declare the rights of the parties herein regarding Defendant IndyMac's obligation to enter into credit transactions without discriminating against applicants for credit on the basis of the applicants' race.

## COUNT II

## VIOLATION OF THE FAIR HOUSING ACT (42 U.S.C. §§ 3601 – 3619)

74.    Plaintiffs repeat, re-allege and incorporate the allegations in paragraphs 1 through 73 above as if fully set forth herein.

75.    Mortgage lending and the providing of residential mortgage loans is a "residential real estate-related transaction" within the meaning of the FHA.  42 U.S.C. § 3605(b).

76.    By imposing higher interest rates and other discretionary fees and terms on residential mortgage loans to Plaintiffs and the Class than it imposed on non-

minority mortgage borrowers, Defendant IndyMac has discriminated against Plaintiffs and the Class concerning their ability to participate in real estate-related transactions, and in the terms and conditions of such transactions, in violation of the FHA.  42 U.S.C. § 3605(a).

77.    In addition, Defendant IndyMac's pricing policies and procedures (including yield spread premiums), which provide financial incentives to its loan officers, mortgage brokers and correspondent lenders to make subjective decisions to increase interest rates and charge additional fees and costs, had a disparate impact upon Plaintiffs and the Class.

78.    As a proximate result of Defendant IndyMac's violation of 42 U.S.C. § 3605, Plaintiffs and the Class have been injured and are entitled to injunctive and declaratory relief and damages, or make whole equitable relief.

79.    In addition, Defendant IndyMac's conduct as alleged herein was intentional, willful, wanton, reckless, malicious, outrageous, or otherwise aggravated beyond mere negligence.  Defendant IndyMac acted with malice and reckless indifference to the federally protected rights of Plaintiffs and the Class.  As a result, Plaintiffs and the Class are entitled to punitive damages.

80.    Moreover, Defendant IndyMac continues to discriminate in violation of the FHA against members of the Class every time Defendant IndyMac provides a home mortgage loan as described herein.  If not enjoined from such violation by the Court, Defendant IndyMac will continue to engage in conduct that disregards the rights of Plaintiffs and the Class, and cause Plaintiffs and the Class irreparable injury for which there is no adequate remedy at law.  42 U.S.C. § 3613(c).

81.    Plaintiffs and the Class ask this Court to declare the rights of the parties herein regarding Defendant IndyMac's obligation to participate in credit transactions without discriminating against applicants for credit on the basis of the applicants' race.

1

**REQUESTS FOR RELIEF**

2        WHEREFORE, Plaintiffs request the following relief:

3        A.    An order determining that the action is a proper class action pursuant to

4    Rule 23 of the Federal Rules of Civil Procedure;

5        B.    A Judgment awarding Plaintiffs and the Class costs and disbursements

6    incurred in connection with this action, including reasonable attorneys' fees, expert

7    witness fees and other costs;

8        C.    A Judgment granting extraordinary equitable and/or injunctive relief as

9    permitted by law or equity, including rescission, restitution, reformation, attaching,

10    impounding, or imposing a constructive trust upon, or otherwise restricting, the

11    proceeds of Defendant IndyMac's ill-gotten funds to ensure that Plaintiffs and the

12    Class have an effective remedy;

13        D.    A Judgment awarding Plaintiffs and the Class compensatory damages

14    according to proof;

15        E.    A Judgment awarding punitive damages to Plaintiffs and the Class;

16        F.    A Judgment granting declaratory and injunctive relief and all relief that

17    flows from such injunctive and declaratory relief; and

18        G.    A Judgment or other Order granting such other and further relief as the

19    Court deems just and proper.

**JURY DEMAND**

20

21        Plaintiffs demand a trial by jury on all issues so triable.

22

23                                Respectfully submitted
                                on behalf of Plaintiffs,

24

25                                s/*Al Hofeld, Jr.*

26                                Al Hofeld, Jr.,
                                LAW OFFICES OF AL HOFELD, JR. LLC
27                                And The Social Justice Project, Inc.,
                                208 South LaSalle Street, Suite 1650
28                                Chicago. Illinois 60604

Telephone:  (312) 345-1004
Facsimile: (312) 346-3242
al@alhofeldlaw.com

Marvin A. Miller
Lori A. Fanning
MILLER LAW LLC
115 South LaSalle Street, Ste. 2910
Chicago, IL 60603
Telephone:  (312) 676-2665
Facsimile:  (312) 676-2676

Andrew S. Friedman
Wendy J. Harrison
T. Brent Jordan
BONNETT FAIRBOURN
FRIEDMAN & BALINT, P.C.
2901 North Central Avenue, Suite 1000
Phoenix, AZ 85012
Telephone:  (602) 274-1100
Facsimile:   (602) 274-1199

Gary Klein (BBO 560769)
Shennan Kavanagh (BBO 655174)
Kevin Costello (BBO 669100)
RODDY KLEIN & RYAN
727 Atlantic Avenue
Boston, MA  02111-2810
Tel:  (617) 357-5500
Fax:  (617) 357-5030

Mark A. Chavez
Jonathan Gertler
Nance F. Becker
CHAVEZ & GERTLER, L.L.P.
42 Miller Avenue
Mill Valley, CA 94941
Telephone:  (415) 381-5599
Facsimile:  (415) 381-5572

John J. Stoia, Jr.
Theodore J. Pintar
Leslie E. Hurst
COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone:  (619) 231-1058
Facsimile:   (619) 231-7423

Dated: April 16, 2008

- 21 -