**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LEMONT MABLES, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 08 CV 2216 |
| v. | ) | |
| | ) | Judge Lindberg |
| INDYMAC BANK, F.S.B., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT
INDYMAC BANK, F.S.B.'S MOTION TO TRANSFER**

This case should be transferred to the Central District of California in the interest of justice to avoid blatant forum shopping by Plaintiffs' counsel, and for the convenience of the parties and witnesses.

*Mables* is the second of two virtually identical putative nationwide class actions filed by the same Plaintiffs' attorneys against defendant Indymac Bank, F.S.B. ("Indymac"), and the third action filed against Indymac arising out of alleged violations of the Equal Credit Opportunity Act and the Fair Housing Act. A virtually identical action -- *Ulloa v. Indymac Bank, F.S.B.*, No. 08-1312 (C.D. Cal.) ("*Ulloa*") -- was filed in the Central District of California, employing a resident of that district as the named plaintiff, and then dismissed immediately upon filing of this case. The third such suit, *Ware v. Indymac Bank, F.S.B.*, No. 07 C 1982 (N.D. Ill.) ("*Ware*"), an Illinois-only putative class action, is pending in this District, and is nearing the close of discovery. Apparently displeased with their assignment to the Honorable Steven V. Wilson in *Ulloa*, and with the transparent motive of next moving for Judge Bucklo to deem this action related to *Ware,* Plaintiffs' attorneys filed the instant action in this Court, and voluntarily dismissed *Ulloa* the next day.

**This case presents forum shopping at its most egregious**.  Brought by virtually the same set of Plaintiffs' attorneys that filed *Ulloa*, this case alleges the exact same theory of discrimination against the same defendant, and the wording of the core portions of the complaints is nearly identical. (For the Court's convenience, the *Ulloa* complaint is attached as Exhibit A, and the complaint in this action is attached as Exhibit B.)  Moreover, one of the two named plaintiffs in this recycled *Mables* action, as in *Ulloa*, is a resident of the Central District of California.  The complaints in *Ulloa* and *Mables* share an identical class definition.  The only real difference between *Ulloa* and this case is the addition of a second set of named class representatives, who happen to be residents of the Northern District of Illinois.  Under these facts, it is apparent that Plaintiffs' counsel did not like the judge assigned to the *Ulloa* case, preferred to have the case litigated before Judge Bucklo in this District, and re-filed their lawsuit here to accomplish that goal.

In the interests of justice, this Court should not countenance this gamesmanship, and should instead transfer this suit to the Central District of California pursuant to 28 U.S.C. § 1404(a), if for no other reason than to send a clear message that such brazen forum shopping does not serve the interests of justice and will not be tolerated.  Further, the case should be transferred because venue is proper in the Central District of California, and transfer to the Central District of California will serve the convenience of the parties and witnesses.

## <u>RELEVANT FACTS</u>

1.      **The parties to this action.**  Both Indymac and one of the named plaintiffs in this action reside in the Central District of California.  Co-plaintiff Earlene Calvin alleges she is an Indymac borrower who resides in Apple Valley, California, within the Central District.  Complaint, ¶ 9.  Indymac Bank is a federal savings bank with its principal place of business in Pasadena, California, also in the Central District.  *See id.*, ¶ 10; Declaration of Michael L. Stanford ("Stanford Declaration"), attached hereto, ¶ 3.  Indymac has no branches in Illinois.  *Id.* ¶ 5.  The vast majority

of Indymac's senior employees, and most senior underwriting and senior compliance employees, are located in southern California or Austin, Texas, and none are in Illinois. *Id.* ¶¶ 6-7.

There is also likely to be no documents located in this District. Except for newly-funded loans, loan files are not maintained within Illinois, and there are no storage facilities for loan files anywhere in the state. *Id.* ¶ 8. Instead, the vast majority of Indymac's loan records, including file images, are located within the Central District. *Id.*

**The ECOA/FHA litigation against Indymac.** On April 10, 2007, the Edelman Combs firm, which then included Al Hofeld Jr., filed a putative class action on behalf of plaintiffs Carter and Thelma Ware against Indymac and three other defendants, alleging violations of the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691, *et seq.* ("ECOA"), the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* ("FHA"), and other statutes. *Ware v. Indymac Bank, et al.,* No. 07 C 1982 (N.D. Ill.) (Bucklo, J.). A copy of the original *Ware* complaint is attached as Exhibit C. The suit alleged that Indymac's policy of paying "higher yield spread premiums with respect to loans made to minority borrowers . . . necessarily impacts the rates charged to such borrowers." Complaint, ¶ 34. On February 14, 2008, Judge Bucklo denied Indymac's motion to dismiss as it relates to the ECOA and FHA claims. Thereafter, Al Hofeld Jr. left the Edelman Combs firm and retained the *Ware* action in his solo practice. *See Ware* Motion to Withdraw Representation of Plaintiffs (attached as Ex. D). The parties have since engaged in discovery, and the discovery period closes on July 30, 2008.

On February 26, 2008, three plaintiffs' class-action law firms (Bonnett, Fairbourn, Friedman & Balint; Chavez & Gertler; and Coughlin Stoia Geller Rudman & Robbins) filed a putative nationwide class action against Indymac, naming David Ulloa as class representative, alleging violations of ECOA and FHA. *Ulloa* Complaint, ¶ 52. The crux of the *Ulloa* Complaint is that Indymac established a racially discriminatory "Discretionary Pricing Policy," which allegedly

resulted in minority borrowers paying higher mortgage-related fees and charges than white borrowers. *See id.* ¶¶ 1-2.

On April 17, 2008, the same plaintiffs' counsel from *Ulloa,* along with Al Hofeld Jr. and Chicago lawyer Marvin Miller, filed the present action against Indymac, alleging the identical violations of ECOA and FHA, on behalf of the same nationwide class. *Mables* Compl. ¶ 58. The core legal and factual allegations of *Mables* and *Ulloa* are virtually identical, word-for-word and paragraph-for-paragraph. Indeed, the *Mables* complaint was even prepared on California-style numbered pleading paper. Like *Ulloa*, the crux of the *Mables* Complaint is that Indymac established a racially discriminatory "Discretionary Pricing Policy," which allegedly resulted in minority borrowers paying higher mortgage-related fees and charges than white borrowers. *Id.* ¶¶ 1-2. Without question, this *Mables* action is a mere regurgitation of *Ulloa*.

On April 18, 2008 – just one day after the filing of this action and the day prior to the responsive pleading deadline in *Ulloa* – the plaintiff in *Ulloa* voluntarily dismissed his complaint without prejudice. *Ulloa v. Indymac Bank, F.S.B.*, No. 08-1312 (C.D. Cal. Apr. 18, 2008) (attached as Ex. E). Plaintiffs' counsel in *Ulloa* had already been informed by Indymac's counsel that it intended to file a motion to dismiss, and that document was being prepared for filing on the date the suit was voluntarily dismissed.

On Sunday, April 20, 2008, Al Hofeld Jr. filed a motion to amend the *Ware* complaint to allege a legal theory patterned after the theory pled first in *Ulloa* and then in *Mables.* For example, rather than keeping the limitation in the *Ware* suit to yield spread premiums, the proposed amended complaint asserts that Indymac "permitted and encouraged brokers to charge additional points and fees in direct broker compensation" (*Ware* proposed amended complaint (attached as Ex. F), ¶ 39)

and now refers generically to Indymac's "loan pricing policies" (*id.* ¶ 43), both transparent veiled references to the "discretionary pricing policy" alleged in *Ulloa* and in *Mables*.

## LEGAL STANDARD

"For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."  28 U.S.C. § 1404(a).  "Whether to transfer a case is within the sound discretion of the transferor court. The party requesting transfer bears the burden of demonstrating that the transferee forum is clearly more convenient than the transferor forum . . . .  [A] transfer is appropriate if: (1) venue is proper in both the transferor and transferee courts; (2) transfer will serve the convenience of the parties and witnesses; and (3) transfer is in the interest of justice."  *Timebase Pty Ltd. v. Thomson Corp.*, No. 07 C 460, 2007 WL 772946, at *2 (N.D. Ill. Mar. 9, 2007) (Lindberg, J.) (Ex. G) (citing *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219-20 (7th Cir. 1986) (citation omitted)).

In order to determine whether a transfer will "serve the convenience of the parties and witnesses," the Court considers five factors:  (1) the plaintiff's chosen forum; (2) the situs of the material events; (3) the convenience of the witnesses; (4) the relative ease of access to sources of proof in both forums; and (5) the convenience of the parties in litigating in each respective forum.  *Id.*

Whether a transfer is "in the interest of justice" depends on three factors:  (1) each proposed forum court's familiarity with the applicable law; (2) the speed at which the case will proceed to trial; and (3) the desirability of litigating the case in each locale.  *Id.* at *3.  When there is forum shopping by one party, a transfer will likewise be deemed, in appropriate circumstances, to be in the interest of justice.  *Agha v. Secretary of Army*, No. 89-15213, 1990 WL 208723, at *1 n.1 (9th Cir. Dec. 5, 1990) (Ex. H).  Here, the forum shopping by plaintiffs' counsel leaves no doubt that justice is best served by transferring this matter back to where its allegations first were pled:  the Central District of California.

5

## ARGUMENT

Based on the factors listed above, both the interests of justice and the convenience of the parties and witnesses plainly favor the Central District of California as a more appropriate venue for this action than the Northern District of Illinois.

## I.    VENUE IS PROPER IN BOTH THE CENTRAL DISTRICT OF CALIFORNIA AND THE NORTHERN DISTRICT OF ILLINOIS.

Given that Plaintiffs' counsel filed *Ulloa* in the Central District of California, they can hardly contest that venue is proper in both the Central District of California and the Northern District of Illinois. *See Timebase Pty Ltd.*, 2007 WL 772946, at *2 ("[A] transfer is appropriate if: (1) venue is proper in both the transferor and transferee courts . . . .) (citation omitted). Under 28 U.S.C. § 1391(b), "[a] civil action wherein jurisdiction is not founded solely on diversity of citizenship may, except as otherwise provided by law, be brought only in (1) a judicial district where any defendant resides, if all defendants reside in the same State, [or] (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . ."

Here, Indymac's corporate offices and key personnel are located in Pasadena, California, which is within the Central District of California. Furthermore, the basis of Plaintiffs' Complaint is that Indymac's allegedly discretionary pricing policy is intentionally designed to, and does, have a disparate impact on minorities. This alleged policy, if true (which Indymac denies), would have been formulated at Indymac's corporate offices in the Central District of California, and was allegedly implemented in both the Central District of California and the Northern District of Illinois with respect to the named Plaintiffs. *See* Compl. ¶¶ 51-56. Therefore, a substantial portion of the events giving rise to Plaintiffs' claims occurred in the Central District of California, and venue is proper in that District.

II.    **TRANSFER TO THE CENTRAL DISTRICT OF CALIFORNIA WILL SERVE THE CONVENIENCE OF THE PARTIES AND WITNESSES.**

As discussed above, in order to determine whether a transfer will "serve the convenience of the parties and witnesses," the Court considers five factors:  (1) the plaintiff's chosen forum; (2) the situs of the material events; (3) the convenience of the witnesses; (4) the relative ease of access to sources of proof in both forums; and (5) the convenience of the parties in litigating in each respective forum.  *Timebase Pty Ltd.*, 2007 WL 772946, at \*2.  As shown below, these factors weigh in favor of transferring the case to the Central District of California.

A.    **This Court Should Give Minimal or No Deference to Plaintiffs' Chosen Forum.**

Due to Plaintiff's forum shopping, the Court should give little or no deference to the fact that Plaintiffs chose the Northern District of Illinois in which to file their Complaint.  *Campbell Software v. Kronos Inc.*, No. 95 C 7348, 1996 WL 124457, at \*7 n.1 (N.D. Ill. Mar. 15, 1996) (Ex. I).  Further, no deference should be afforded because this is a putative class action and because one of the named Plaintiffs does not reside in the Northern District of Illinois.

1.    **Because Plaintiffs have engaged in forum shopping, this Court should accord no deference to their choice of forum.**

Plaintiffs have openly engaged in forum shopping.  The *Ulloa* Complaint, filed in the Central District of California, is nearly word-for-word identical to Plaintiffs' Complaint.  *Compare Mables* Compl (Ex. B) *with Ulloa* Complaint (Ex. A).  The class definition in this case and the *Ulloa* case are exactly the same.  *Compare Mables* Compl. ¶ 58 *with Ulloa* Complaint ¶ 52.  Many of Plaintiffs' counsel here are also the plaintiff's counsel in the *Ulloa* case.  *Compare* Compl. at 20-21 *with Ulloa* Complaint at 20-21.

Furthermore, the day after the Complaint in this case was filed, the plaintiff in *Ulloa* voluntarily dismissed his complaint without prejudice, conveniently on the eve of Indymac's responsive pleading deadline.  *See* Ex. E.  By waiting to dismiss the *Ulloa* case until *after* the

7

Complaint in this case was filed, Plaintiffs were able to represent on their Civil Cover Sheet that this case "is not a refiling of a previously dismissed action." *See* DE 2, at § IX.

The Court should not allow Plaintiffs to benefit from such obvious forum shopping, which conduct negates any reasonable deference the Court might otherwise provide to Plaintiffs' choice of forum. *See, e.g.*, *Campbell Software,* 1996 WL 124457, at *7 n.1 (refusing to "accord any deference to the chosen forum because of plaintiffs' transparent attempt at forum-shopping"); *Williams v. Bowman*, 157 F. Supp. 2d 1103, 1106 (N.D. Cal. 2001) ("If there is any indication that plaintiff's choice of forum is the result of forum shopping, plaintiff's choice will be accorded little deference.").

Because Plaintiffs have engaged in forum shopping, the Court should accord no deference to Plaintiffs' choice of forum, and the first "convenience" factor weighs in favor of transferring the suit to the Central District of California.

### 2. Because this is a putative class action, the Court should not accord deference to Plaintiffs' choice of forum.

It is likewise well-established that, while a plaintiff's chosen forum is normally accorded deference, the rule is different in class actions (and especially nationwide class actions). In those cases, a court should give little deference to the plaintiff's choice of forum. *See, e.g.*, *Boyd v. Snyder*, 44 F. Supp. 2d 966, 969 (N.D. Ill. 1999) ("A plaintiff's choice of forum is not conclusive, however. The plaintiff's choice is given less weight . . . when the plaintiff sues derivatively or as a class representative . . . . When plaintiff alleges a class action, plaintiff's home forum is irrelevant.") (citation and quotation marks omitted); *Roots P'ship v. Lands End, Inc.*, No. 90 C 1310, 1990 WL 186776, at *3 (N.D. Ill. Nov. 13, 1990) ("[T]his Court, as well as other courts in this district, have held that a plaintiff's choice of forum in a class action or derivative suit should actually be accorded less weight.") (collecting cases) (Ex. J); *Lou v. Belzberg*, 834 F.2d 730, 739 (9th Cir. 1987) ("Although great weight is generally accorded plaintiff's choice of forum, when an individual brings

8

a derivative suit or represents a class, the named plaintiff's choice of forum is given less weight.")
(citations omitted). Therefore, because Plaintiffs' suit is a putative nationwide class action (*see*
Compl. ¶ 58), the Court should accord little deference to Plaintiffs' choice of forum, and the first
"convenience" factor weighs in favor of transferring the suit to the Central District of California.

> **3.      Because one of the named Plaintiffs resides in the Central District of California, the Court should accord minimal deference to the Plaintiffs' choice of forum.**

Finally, the first "convenience" factor weighs in favor or transferring the case to the Central
District of California because one of the three named plaintiffs, Earlene Calvin, resides in Apple
Valley, California (Compl. ¶ 9), which is located within the Central District of California.[1]
Deference to a plaintiff's choice of forum is minimal where he or she does not reside in that forum.
*Timebase Pty Ltd.*, 2007 WL 772946, at *2 ("In this case, the deference is minimal because plaintiff
does not reside in the Northern District of Illinois.") (citation omitted).  The fact that co-plaintiffs
reside in this District does not diminish the fact that one of the Plaintiffs resides in the same district
where *Ulloa* was filed in the first instance.

> **B.      The Situs of Material Events Is Located in the Central District of California.**

Transfer to the Central District of California is likewise appropriate because that District is
the situs of material events.  The gravamen of the Complaint is that Indymac's alleged "Discretionary
Pricing Policy" has a disparate impact on minorities and is intentionally designed to have a disparate
impact on minorities.   This alleged policy, if true (which Indymac denies), would have been
formulated at Indymac's corporate offices in Pasadena, California (*i.e.*, in the Central District of
California).  *See Mables* Complaint, ¶ 10 (noting California location of Indymac's executive offices).
Furthermore, along with one of the named Plaintiffs residing within the Central District of California,

---

[1] The plaintiff in *Ulloa* also resides in the Central District of California.  *See Ulloa* Complaint ¶ 8.

Plaintiffs also allege that the "Discretionary Pricing Policy" was implemented in the Central District of California. *Id.* ¶¶ 10, 32-33. Therefore, the second "convenience" factor, the situs of material events, weighs in favor of transferring the suit to the Central District of California.

### C.     The Majority of Witnesses Reside in the Central District of California.

Based on the concentration of Indymac's witnesses in California, it is likely that virtually all of Indymac's witnesses will be located in California, and one of the Plaintiffs – another likely witness – lives in California. Meanwhile, only two witnesses (the Mables) reside in the Northern District of Illinois. Moreover, key Indymac employees would primarily reside in California, where relevant data and loan documents are retained. *See* Stanford Declaration, ¶¶ 3-8.

If this case were to proceed to trial, Indymac's witnesses would be forced to travel across the country (mainly from southern California) to Chicago. Meanwhile, at least one of the Plaintiffs will be forced to travel across the country regardless of the location of the trial. Therefore, the Central District of California is not any less convenient to Plaintiffs than the Northern District of Illinois, while the Central District of California is far more convenient for Indymac. Therefore, the third "convenience" factor weighs in favor of transferring the suit to the Central District of California. *See Timebase Pty Ltd.*, 2007 WL 772946, at *2.

### D.     Access to Proof Is Easier in the Central District of California.

Any documentary evidence and key witnesses are likely to be found at Indymac's corporate offices. Stanford Declaration, ¶¶ 3-8. Nearly all of the evidence and data Plaintiffs will seek from Indymac are located in California. With the nationwide scope of Plaintiffs' putative class, there could be thousands, if not tens of thousands, of loan files (each several hundred pages) to review, and those loan files are located in California. *Id.* ¶ 8.- Furthermore, Indymac's senior-level employees and officers are located in the Central District of California. *Id.*, ¶¶ 6-7. If the case were to remain in the Northern District of Illinois, Indymac would be forced to transport all of its sources of proof

outside California.  Therefore, the fourth "convenience" factor weighs heavily in favor of transferring the suit to the Central District of California.  *See Timebase Pty Ltd.*, 2007 WL 772946, at *2.

      **E.**      **It Is More Convenient for the Parties to Litigate in the Central District of California.**

As noted above, Indymac's witnesses, one Plaintiff, and all of the likely evidence are located in California.  Furthermore, while "the court does not consider the convenience of a party's counsel in a § 1404(a) transfer analysis," *Timebase Pty Ltd.*, 2007 WL 772946, at *3, it should be noted that many of Plaintiffs' counsel are located in California.  *See* Compl. at 20-21.  Therefore, it is far more convenient for the parties to litigate this case in the Central District of California, rather than the Northern District of Illinois.  Thus, the fifth and final "convenience" factor weighs in favor of transferring the suit to the Central District of California.

**III.**      **THE INTERESTS OF JUSTICE WEIGH IN FAVOR OF TRANSFERRING THIS CASE TO THE CENTRAL DISTRICT OF CALIFORNIA.**

As discussed above, whether a transfer is "in the interest of justice" depends on three factors: (1) each proposed forum court's familiarity with the applicable law; (2) the speed at which the case will proceed to trial; and (3) the desirability of litigating the case in each locale.  *Timebase Pty Ltd.*, 2007 WL 772946, at *3.  "The interest of justice component of a § 1404(a) analysis concerns the efficient administration of the court system." *Id.* (citation and quotation marks omitted).  Finally, the courts can and should act to prevent "forum shopping" in the "interest of justice." *See  Agha*, 1990 WL 208723, at *1 n.1.  Therefore, evidence of a plaintiff's attempt to avoid or seek a particular precedent from a particular judge is relevant to this prong of this analysis.  As shown below, the interest of justice weighs in favor of transferring the case to the Central District of California.

      **A.**      **Plaintiffs' Blatant Forum Shopping Is Contrary to the Interests of Justice.**

In light of Plaintiff counsel's forum shopping, it is manifestly in the interests of  justice to transfer this action to the Central District.  "Discouraging forum-shopping provides a strong reason to

transfer this case" on interests of justice grounds. *Madani v. Shell Oil Co.,* 2008-1 Trade Cas. (CCH) P76,054, 2008 WL 268986, at *3 (C.D. Cal. 2008) (Ex. K) (citing *Wireless Consumers Alliance v. T-Mobile USA, Inc.*, No. C 03-3711, 2003 WL 22387598, at *6 (N.D. Cal. Oct. 14, 2003) ("evidence of plaintiff's attempt to avoid a particular precedent from a particular judge weighs heavily in the context of [the interests of justice] prong and would often make the transfer of venue proper")). In *Madani*, the district court refused to accord any deference to a plaintiff's choice of forum where, as here, plaintiffs initially filed the action in one district and re-filed it in another district for the transparent purpose of forum shopping:

> The Court is persuaded, on this record, that there is a high likelihood that Plaintiffs' counsel are attempting to forum shop. The same counsel, seeking to represent a nearly identical class, filed a[n] earlier lawsuit premised on the same allegedly unlawful activity in the Central District. After expressly disavowing the Rule of Reason claim, and then receiving unfavorable rulings from that Court, the same counsel now seek to assert a Rule of Reason claim in an action filed in this district. Plaintiffs filed the action in this district even though their tolling theory to overcome the statute of limitations bar depends on the pendency of the *Dagher* litigation. The Court can reasonably draw an inference from such conduct that Plaintiffs' counsel are engaged in forum-shopping. *See Alexander v. Franklin Res., Inc.,* 2007 WL 518859 at *4 (N.D. Cal. Feb. 14, 2007). Although Plaintiffs have identified some connections that the Northern District has to the dispute, including the locations of defendant Chevron, of Plaintiffs' lead counsel, and of some of the alleged injuries, none of these connections were absent in the earlier *Dagher* litigation. Plaintiffs have not offered any satisfactory explanation for their decision to change their choice of forum when these factors have not changed.

Id. at *3. The same analysis applies here. Plaintiffs' counsel chose to file virtually the identical suit in the Central District of California, filed this action after the *Ware* plaintiff achieved a plaintiff-friendly result in that action, and then immediately dismissed the Central District case to pursue the same relief here. The interests of justice clearly and strongly discourage such gamesmanship.

## B.    The Remaining Interest of Justice Factors Favor Transfer.

Even if the Court were to choose to ignore Plaintiffs' forum shopping, the interests of justice still favor transfer, applying traditional "interests of justice" analysis.

1.      **Both Courts Are Familiar with the Applicable Law.**  The only two claims in Plaintiffs' Complaint are questions of federal law.  Because both this Court and the Central District of California are "equally familiar and capable of deciding questions of federal law, . . . this factor is neutral to the § 1404(a) analysis."  *Timebase Pty Ltd.*, 2007 WL 772946, at *3.

2.      **The Case Will Proceed to Trial More Quickly in the Central District of California.**  This case will proceed to trial more quickly in the Central District of California than it will in the Northern District of Illinois.  When evaluating the speed at which a case will proceed to trial, courts may look to the Federal Court Management Statistics for both the transferor and the transferee districts. *Amoco Oil Co. v. Mobil Oil Corp.*, 90 F. Supp. 2d 958, 961-62 (N.D. Ill. 2000).  The two most relevant statistics are "(1) the median months from filing to disposition and (2) the median months from filing to trial." *Id.* at 962.

The statistics regarding the median months from filing to disposition are negligibly different, with a little more than two weeks' difference.  In 2007, the median months from filing to disposition in the Central District of California was 6.8, while in the Northern District of Illinois, it was 6.2.  Judicial Caseload Profile Report, *available at* http://www.uscourts.gov/cgi-bin/cmsd2007.pl (accessed Apr. 21, 2008).  In 2006, those numbers were 7.2 and 6.5, respectively. *Id.*

However, the statistics regarding the median months from filing to trial fall markedly in favor of the Central District of California.  In 2007, the median months from filing to trial in the Central District of California was 21.3, while in the Northern District of Illinois, it was 29.7. *Id.*  In 2006, those numbers were 21.3 and 26.4, respectively. *Id.*

Therefore, this factor falls in favor of transferring the case to the Central District of California.

3. **The Central District of California Is a More Desirable Locale for Litigating This Case.** The final "interest of justice" factor – the desirability of litigating the case in each proposed forum – weighs in favor of transfer. Aside from the residence of two Plaintiffs, this case had no connection to this District. Other than those two Plaintiffs, no other witnesses or parties are located in the Northern District of Illinois. The fact that the Mables may have obtained their loan in Illinois does not weigh against transfer because they are in no different position than any of the members of their proposed class, who are allegedly located throughout the country. Whether the Mables are residents of the Northern District of Illinois (or the District of Vermont or the District of Idaho, for that matter) has no bearing on their theory of discrimination, the witnesses at Indymac that possess potentially relevant information, nor the location of the evidence that will allegedly support Plaintiffs' claims. This case bears no relevant connection to this District, and it is clear that its choice as Plaintiffs' forum was the result of nothing more than forum shopping.

On the other hand, this case has considerable relevance to the Central District of California. Indymac is located there, and any of the allegedly discriminatory actions that form the basis for Plaintiffs' complaint occurred there. Indymac's employees, relevant witnesses, and sources of proof are located in California. It is far more desirable to litigate this case in a forum that actually has some nexus to the action than in a forum that was handpicked by Plaintiffs' counsel. Therefore, this "interest of justice" factor weighs in favor of transferring this case to the Central District of California.

## <u>CONCLUSION</u>

For all of the forgoing reasons, this Court should grant Indymac's Motion to Transfer and transfer this case to the Central District of California.

Dated:  April 21, 2008                          Respectfully submitted,

                                                **INDYMAC BANK, F.S.B.**

                                        By:     s/ Richard E. Gottlieb
                                                Richard E. Gottlieb (rgottlieb@dykema.com)
                                                Todd Gale (tgale@dykema.com)
                                                Renee L. Zipprich (rzipprich@dykema.com)
                                                DYKEMA GOSSETT PLLC
                                                10 South Wacker Drive, Suite 2300
                                                Chicago, IL 60606
                                                Phone:  312-876-1700
                                                Fax:     312-627-2302

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 21, 2008, I electronically filed the foregoing Memorandum in Support of Indymac Bank, F.S.B.'s Motion to Transfer with the Clerk of the Court using the ECF system, which sent electronic notification of the filing on the same day to:

Albert F. Hofeld, Jr. (al@alhofeldlaw.com)
Marvin A. Miller (mmiller@millerlawllc.com)

s/ Irina V. Frye

CHICAGO\2441540.4
ID\ADL

16

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LEMONT MABLES, *et al.*,                    )
                                            )
                    Plaintiffs,             )
                                            )        No. 08 CV 2216
v.                                          )
                                            )        Judge Lindberg
INDYMAC BANK, F.S.B.,                       )
                                            )
                    Defendant.              )
                                            )

## DECLARATION OF MICHAEL L. STANFORD

I, Michael L. Stanford, under penalty of perjury, state as follows:

1.      I am First Vice President - Operations for Indymac Bank, F.S.B ("Indymac"). I am over the age of eighteen and under no legal disability that would prevent me from testifying regarding the matters contained within this Declaration. I have personal knowledge of the facts set forth in this Declaration, and, if called to testify, I could and would testify competently and consistently with the facts set forth below.

2.      In my capacity as First Vice President - Operations for Indymac, I am familiar with the types of business records created and maintained as well as how the information for the records is received and/or created. During the course of operations at Indymac, records are created and maintained to reflect Indymac's business activities, such as customer accounts and loan files. I am familiar with Indymac's corporate structure and the locations of Indymac's offices and employees.

3.      Indymac is a federal savings bank with its principal place of business in Pasadena, California.

4.    In 2007, approximately 43 percent of Indymac's residential mortgage loans were originated to residents of California.   In comparison, less than 3% percent of Indymac's residential mortgage loans were originated to residents of Illinois.   In years before 2007, the concentration of Indymac's loans made to California borrowers was even *higher* than in 2007.

5.    Indymac has no depository branches in Illinois.

6.    The vast majority of Indymac's executive-level employees and officers are located in the Los Angeles and Orange County metropolitan areas of California (collectively, "southern California").   No executive-level employees of Indymac maintain their office or reside in Illinois.

7.    The vast majority of Indymac's senior underwriting and senior compliance employees are located in southern California and Austin, Texas.   No senior underwriting or senior compliance employees of Indymac maintain their office or reside in Illinois.

8.    Aside from the files for newly-funded loans, the files related to loans to any Indymac borrowers are not maintained in Illinois.   The vast majority of documents concerning loans made to Indymac's borrowers, including images of loan files and data concerning Indymac's residential mortgage loans, are located within the Central District of California. There are currently no storage facilities for loan files in Illinois, and there have been no such facilities in the past.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: April 21, 2008

_____

Michael L. Stanford

First Vice President, Indymac Bank

2

# EXHIBIT A

FILED

2008 FEB 26 ᴾᴹ 4: 00

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CAL.
LOS ANGELES

BY: _____

ORIGINAL

1/5
20

BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
Andrew S. Friedman (to seek *pro hac vice*)
afriedman@bffb.com
Wendy J. Harrison (CA 151090)
wharrison@bffb.com
2901 North Central Avenue, Suite 1000
Phoenix, Arizona 85012
(602) 274-1100

Additional counsel listed on signature page

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

DAVID ULLOA,

                    Plaintiff,

v.

INDYMAC BANK, F.S.B.,

                    Defendant.

No. **CV08-1312** SVW (CWx)

CLASS ACTION

CLASS ACTION COMPLAINT FOR:

1. Violations of the Equal Credit
   Opportunity Act; and

2. Violations of the Fair Housing Act.

DEMAND FOR JURY TRIAL

        Plaintiff David Ulloa ("Ulloa" or "Plaintiff"), by and through his attorneys, brings this action on behalf of all others similarly situated, against Defendant IndyMac Bank, F.S.B.  ("Defendant IndyMac" or "IndyMac") seeking redress for racially discriminatory lending practices under the Equal Credit Opportunity Act, 15 U.S.C. § 1691, et seq. ("ECOA") and the Fair Housing Act, 42 U.S.C. § 3601 et seq. ("FHA").

## INTRODUCTION

1.      This class action challenges Defendant IndyMac's racially discriminatory mortgage lending practices.  As described below, Defendant IndyMac established a

- 1 -

1  specific, identifiable and uniform credit pricing system, a component of which,
2  referred to herein as the "Discretionary Pricing Policy," authorized an unchecked,
3  subjective surcharge of additional points and fees to an otherwise objective risk-based
4  financing rate.

5     2.   These subjective, additional finance charges directly lead to minorities
6  receiving home loans with higher interest rates and higher fees and costs than
7  similarly situated non-minority borrowers.

8     3.   As used in this Complaint, "minority" or "minorities" shall refer to all
9  non-Caucasians and other minority racial groups protected under 42 U.S.C. § 3604
10  and 15 U.S.C. § 1691.

11    4.   Plaintiff brings this action on behalf of all minorities who have entered
12  into residential mortgage loan contracts that were originated, financed or purchased by
13  Defendant IndyMac, and who have been subjected to racial discrimination (the
14  "Class").

15    5.   Plaintiff seeks injunctive, declaratory, and equitable relief, punitive
16  damages, and other monetary and non-monetary remedies for Defendant IndyMac's
17  racially discriminatory conduct.

18              **JURISDICTION AND VENUE**

19    6.   This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which gives
20  this Court original jurisdiction over civil actions arising under federal law.

21    7.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a
22  substantial part of the events giving rise to Plaintiff's and the Class's claims occurred
23  in this District. In particular, Plaintiff resides in this District and Defendant IndyMac
24  originated and financed Plaintiff's purchase of property located in this District.
25  Defendant IndyMac also maintains its principal executive offices in this District.

26              **PARTIES**

27    8.   Plaintiff David Ulloa is a Latino homeowner who resides in Paramount,
28  California 90723.

Feb. 26. 2008 2:25PM   Class Action Research   No. 9880   P. 7

1    9.    Defendant IndyMac Bank, F.S.B., is a thrift mortgage banker insured by
2  the FDIC, with principal executive offices located at 888 East Walnut Street,
3  Pasadena, California 91101. Defendant IndyMac originates mortgages in all 50 states
4  of the United States and is the largest savings and loan headquartered in Los Angeles
5  County, California. According to representations in its parent corporation's recent
6  SEC filings, Defendant IndyMac is the seventh largest savings and loan nationwide
7  based on its assets, and the ninth largest residential mortgage originator in the United
8  States. Defendant IndyMac is a wholly owned subsidiary of parent holding company
9  IndyMac Bancorp, Inc., a Maryland corporation reincorporated in Delaware in 1987,
10  which trades publicly on the New York Stock Exchange under the symbol IMB.

11  **FACTS**

12  **I.    HISTORICAL DISCRIMINATION IN AMERICAN MORTGAGE**
13  **LENDING: A LONG LEGACY**

14    10.    Racial discrimination in America's mortgage lending industry has a long
15  legacy. As this Complaint attests, that unfortunate history continues to this day due to
16  discriminatory treatment of minority borrowers by mortgage banks such as Defendant
17  IndyMac.

18    11.    According to the Joint Center for Housing Studies at Harvard
19  University's 2005 study called "The Dual Mortgage Market: The Persistence of
20  Discrimination in Mortgage Lending," "[i]n the immediate post-World War II period,
21  racial discrimination in mortgage lending was easy to spot. From government-
22  sponsored racial covenants in the Federal Housing Administration (FHA) guidelines
23  to the redlining practices of private mortgage lenders and financial institutions,
24  minorities were denied access to home mortgages in ways that severely limited their
25  ability to purchase a home. Today, mortgage lending discrimination is more subtle. . .
26  . [M]ore than three decades after the enactment of national fair lending legislation,
27  minority consumers continue to have less-than-equal access to loans at the best prices
28

- 3 -

1  and on the best terms that their credit history, income, and other individual financial
2  considerations merit."

3      12.    The passage of civil rights legislation and fair lending laws in the 1960s
4  and 1970s brought an end to the most virulent forms of overt racial discrimination in
5  the housing markets, but throughout the 1980s and 1990s, mortgage lenders found
6  more subtle ways to discriminate, including maintaining offices only in Caucasian
7  neighborhoods and engaging in practices such as redlining (refusing to lend on
8  properties in predominantly minority neighborhoods).

9      13.    After redlining practices were challenged in the 1990s, mortgage lenders
10 changed tactics once again. Lenders began making loans to minorities, but charged
11 them higher interest rates and loan-related fees than they charged to similarly-situated
12 Caucasian borrowers. Loan data that mortgage lenders must now compile under the
13 federal Home Mortgage Disclosure Act ("HMDA") reveals profound loan pricing
14 disparities between minority borrowers and similarly-situated Caucasian borrowers.

15     14.    The HMDA requires mortgage lenders to report information about the
16 home loans they process each year. In 2005, lenders reported information on more
17 than 30 million home loan applications pursuant to HMDA. In 1989, Congress
18 required lenders to begin disclosing information about mortgage borrowers' race and
19 ethnicity. In 2004, concerned with potential racial discrimination in loan pricing, and
20 recognizing that racial or other types of discrimination can occur when loan officers
21 and mortgage brokers have latitude in setting interest rates, the Federal Reserve Board
22 began requiring lenders to also report information concerning rates, points, and fees
23 charged to borrowers on high-cost loans.

24     15.    According to the Federal Reserve, both 2004 and 2005 HMDA data
25 revealed that "Blacks and Hispanics were more likely . . . to have received higher-
26 priced loans than non-Hispanic whites. . . . [which has] increased concern about the
27 fairness of the lending process." Robert B. Avery, Kenneth P. Brevoort and Glenn
28 B. Canner, "Higher-Priced Home Lending and the 2005 HMDA Data," Federal

1  Reserve Bulletin, A124, A159 (revised Sept. 18, 2006)

2  (http://www.federalreserve.gov/pubs/bulletin/2006/hmda/bull06hmda.pdf (last

3  viewed February 19, 2008).)

4      16.   HMDA data for 2004 reveals profound loan pricing disparities between

5  Hispanic borrowers and non-Hispanic whites even after controlling for borrowers'

6  gender, income, property location, and loan amount.  After accounting for those

7  differences in the 2004 HMDA data, Hispanic borrowers were still almost twice as

8  likely to receive a higher-rate home loan as non-Hispanic whites.

9  (http://www.responsiblelending.org/pdfs/Testimony-Ernst061306.pdf (last viewed

10  February 19, 2008).)  In a speech last year, the Vice-Chairman of the Federal Deposit

11  Insurance Corporation, Martin Gruenberg, discussed the 2004 HMDA data and

12  observed that that data "clearly indicated" that Hispanics are more likely to receive

13  high-cost home loans than are non-Hispanic whites.

14  (http://www.fdic.gov/news/news/speeches/archives/2006/chairman/spoct1806.html

15  (last viewed February 19, 2008).)

16      17.   Likewise, HMDA data for 2005 shows that "for conventional home-

17  purchase loans, the gross mean incidence of higher-priced lending was 54.7 percent

18  for blacks and 17.2 percent for non-Hispanic whites, a difference of 37.5 percentage

19  points."  Avery, Brevoort, and Canner, Federal Reserve Bulletin, at A159.  The

20  situation is similar for refinancings, where there is a difference of 28.3 percentage

21  points between blacks and non-Hispanic whites. Id. at A124, A159.

22      18.   A growing number of research studies and investigations show that

23  significant racial disparities still exist. Association of Community Organizations for

24  Reform Now (ACORN), "The High Cost of Credit: Disparities in High-priced

25  Refinanced Loans to Minority Homeowners in 125 American Cities" (September 27,

26  2005) ("[i]n every metropolitan area where at least 50 refinances were made to

27  African-American homeowners, African-Americans were more likely to receive a

28  high-cost loan than White homeowners")

1  (http://acorn.org/uploads/media/High_Cost_of_Credit_Report_02.doc (last viewed on
2  February 19, 2008); Ross, "The Continuing Practice and Impact of Discrimination"
3  (Revised  July  2006)  (Univ.  of  Connecticut,  Working  Paper  2005-19R)
4  (http://www.econ.uconn.edu/working/2005-19r.pdf) (last viewed February 19, 2008);
5  California Reinvestment Coalition, et al., "Paying More for the American Dream: A
6  Multi-State Analysis of Higher Cost Home Purchase Lending" (March 2007)
7  (http://www.nedap.org/pressroom/documents/2007_Report-2005_HMDA.pdf (last
8  viewed February 19, 2008).

9       19.    The  aggregate  HMDA  data  discussed  above  is  representative  of
10 IndyMac.   According  to  the  Form  10-K  for  year  end  2006  filed  by  Defendant
11 IndyMac's parent holding company, IndyMac Bancorp, Inc., Defendant IndyMac is
12 the ninth largest residential mortgage originator in the United States.

13       20.    Based on HMDA data, minorities who borrowed from IndyMac between
14 2004 and 2006 are over 50% more likely than Caucasian borrowers to have received a
15 high-APR loan to purchase or refinance their home.

16       21.    Importantly, consistent with the consensus that the HMDA data
17 reveals profound loan pricing disparities between minorities and Caucasians even
18 after controlling for income and other objective factors, research studies have also
19 generally suggested that borrowers' credit profiles cannot fully explain why some
20 borrowers, and not others, are saddled with higher cost loans.

21       22.    As an example, research by Howell Jackson of Harvard Law School,
22 detailed in the article *Kickbacks or Compensation: The Case of Yield Spread*
23 *Premiums* (Harvard Univ.), H. Jackson and J. Berry, available at
24 (http://www.law.harvard.edu/faculty/hjackson/pdfs/january_draft.pdf) (last viewed
25 February 19, 2008), concluded that the substantially higher mortgage broker
26 compensation received as the result of yield spread premiums could not fully be
27 explained when controlling for variables associated with creditworthiness.
28

1    23.    In short, a number of researchers have raised "doubts that risk can

2  adequately explain racial differences" in high-cost loans.  Bradford, Center for

3  Community Change, "Risk or Race? Racial Disparities and the Subprime

4  Refinance Market" (May 2002)

5  (http://www.knowledgeplex.org/kp/report/report/relfiles/ccc_0729_risk.pdf) (last

6  viewed February 19, 2008).  In other words, evidence "suggests that weak

7  borrower credit profiles do not fully explain why some borrowers get stuck with

8  higher-cost home loans."  California Reinvestment Coalition, et al., "Paying More

9  for the American Dream: A Multi-State Analysis of Higher Cost Home Purchase

10 Lending" (March 2007).

11 **II.    PAST AS PROLOGUE: DEFENDANT INDYMAC'S**
12 **DISCRIMINATORY LENDING POLICY**

13       **A.    DEFENDANT INDYMAC'S RELATIONSHIPS WITH ITS**
14            **MORTGAGE BROKERS AND CORRESPONDENT LENDERS**

15    24.    Defendant IndyMac is among America's leading mortgage lenders,

16 originating and funding mortgage loans through loan officers, through authorized

17 mortgage brokers and through a network of correspondent lenders.

18    25.    On information and belief, Defendant IndyMac's loan officers, mortgage

19 brokers and correspondent lenders broker and fund loans in collaboration with

20 Defendant IndyMac, and in conformance with Defendant IndyMac's Discretionary

21 Pricing Policy.

22    26.    In addition to instruction in its credit-pricing policies and procedures,

23 Defendant IndyMac provides its loan officers, brokers and correspondents with

24 marketing support and materials, including an online library of "private label"

25 materials such as flyers, brochures, print advertisements, and "program highlights."

26 (https://new-e-

27 mits.IndyMacb2b.com/login/login.asp?goto=marketingMaterials&popup (last viewed

28 on February 19, 2008).)

27.    Defendant IndyMac also maintains a "Corporate Blog" on the Internet, which it uses to communicate to its broker force, correspondents and loan officers as well as the investing community. (http://www.theimbreport.com (last viewed on February 19, 2008).)  Among other things, the "Corporate Blog" updates Defendant IndyMac's partners on delinquencies in its loan portfolios, formulates attacks upon whatever investment analyst reports may be critical of Defendant IndyMac's lending operations, and links visitors to articles with titles like "Booms and Busts: The Case of Subprime Mortgages." (Id.)

28.    Defendant IndyMac has established, implemented and continues to implement its Discretionary Pricing Policy, causing minority borrowers to pay subjective fees such as yield spread premiums and other mortgage-related finance charges at higher rates than similarly situated non-minority borrowers.  By its Discretionary Pricing Policy, Defendant IndyMac has intentionally discriminated against Plaintiff and Class Members, systematically channeling Plaintiff and other Class members into mortgage loans with less favorable conditions than those given to similarly situated non-minority borrowers.  This pattern of discrimination is not the result of random or non-discriminatory factors.  Rather, it is the direct and intended result of Defendant IndyMac's business model and loan-funding practices.

29.    Defendant IndyMac's loan officers, authorized mortgage brokers and correspondent lenders receive part or all of their compensation from Defendant IndyMac based on the interest rate charged to the borrower.  Defendant IndyMac's loan officers, authorized brokers and correspondent lenders receive more compensation from Defendant IndyMac when they steer their clients into IndyMac loans with higher interest rates, and less compensation when they place their clients into IndyMac loans with lower interest rates.  These same incentives apply when Indymac's loan officers, authorized mortgage brokers and correspondent lenders place borrowers into loans which include prepayment penalties and other onerous conditions.

1       30.   Defendant IndyMac intentionally and actively implements its
2   Discretionary Pricing Policy in a variety of ways, including actively educating loan
3   officers and brokers about IndyMac's credit policies and procedures and directing its
4   loan officers and brokers regarding the marketing of IndyMac loan products.

5       31.   Defendant IndyMac evaluates its loan officers, authorized brokers and
6   correspondents to ensure that they comply with Defendant IndyMac's Discretionary
7   Pricing Policy. Because the Discretionary Pricing Policy is designed to discriminate,
8   Defendant IndyMac has not taken precautions to ensure that application of the Policy
9   will avoid discrimination against minorities.

10      32.   Defendant IndyMac's Discretionary Pricing Policy permits its loan
11  officers, authorized mortgage brokers and correspondent lenders subjectively to
12  charge minority loan applicants yield spread premiums and other discretionary
13  charges, and indeed provides financial incentives for them to do so.

14      33.   This pattern and design of discrimination cannot be justified by business
15  necessity, and could be avoided through the use of alternative policies and procedures
16  that have less discriminatory impact and no less business efficacy.

17
18  **B.   DEFENDANT INDYMAC'S DISCRETIONARY CREDIT
    PRICING SYSTEM: DESIGNED TO DISCRIMINATE**
19
20      34.   Defendant IndyMac discriminates through its authorized mortgage
21  brokers.  Authorized mortgage brokers act as Defendant IndyMac's agents in
22  originating mortgage loans. Authorized mortgage brokers enter into agreements with
23  Defendant IndyMac to accept loan applications on behalf of Defendant IndyMac;
24  communicate to loan applicants financing terms and rates set by Defendant IndyMac;
25  tell loan applicants about Defendant IndyMac's various financing options; and
26  ultimately originate mortgage loans funded by Defendant IndyMac using Defendant
27  IndyMac's forms and in accordance with Defendant IndyMac's policies and
28  procedures.

35.    Likewise, Defendant IndyMac's authorized correspondent lenders and loan officers, acting as Defendant IndyMac's agents, work with Defendant IndyMac to make loans in accordance with Defendant IndyMac's credit policies and procedures.  Defendant IndyMac funds correspondent-generated loans before or shortly after they go to closing.

36.    Defendant IndyMac then funds loans originated by its loan officers, authorized mortgage brokers and correspondent lenders, sets the terms and conditions of credit on those loans, and shoulders part or all of the risk on such loans.  Defendant IndyMac actively and intentionally enforces its credit policies through its loan officers, authorized mortgage brokers and correspondent lenders in a variety of ways. Among other things, Defendant IndyMac supplies its loan officers, mortgage brokers and correspondent lenders with an array of loan-related forms and agreements, including loan contracts, loan applications, and instructions on completing loan applications and contracts.  And, as noted above, Defendant IndyMac actively trains its authorized brokers to follow its policies and procedures, and reinforces that training with marketing support.

37.    Once a loan applicant has provided credit information through a loan officer, mortgage broker or correspondent lender, Defendant IndyMac performs an initial objective credit analysis. Defendant IndyMac, at this point, evaluates numerous risk-related credit variables, including debt-to-income ratios, loan-to-value ratios, credit bureau histories, debt ratios, bankruptcies, automobile repossessions, prior foreclosures, payment histories, credit scores and the like.

38.    Defendant IndyMac derives a risk-based financing rate from these objective factors, which Defendant IndyMac and others in the mortgage industry simply call the "par rate." (Defendant IndyMac's brokers and correspondent lenders can also estimate the par rates by referring to an applicant's credit bureau-determined credit score.)

1    39.    Although Defendant IndyMac's initial analysis applies objective criteria
2  to calculate this risk-related interest rate, Defendant IndyMac's Discretionary Pricing
3  Policy authorizes and provides incentives to its loan officers, mortgage brokers and
4  correspondent lenders to mark up that rate later and also impose additional non-risk-
5  based charges, including yield spread premiums and other discretionary fees.
6  Defendant IndyMac regularly communicates applicable par rates, authorized yield
7  spread premiums, and other discretionary fees to its loan officers, mortgage brokers
8  and correspondent lenders via "rate sheets" and other communications.

9    40.    Defendant IndyMac gives its loan officers, authorized mortgage brokers
10  and correspondent lenders discretion to impose yield spread premiums and other
11  subjective fees on borrowers. When borrowers pay yield spread premiums, Defendant
12  IndyMac shares in additional income generated by the premium because the yield
13  spread premium-affected borrower is locked into a higher interest rate going forward
14  on their IndyMac loan than they would be if they had been placed in a par rate loan
15  without a yield spread premium.

16    41.    Defendant IndyMac's borrowers pay yield spread premiums and other
17  discretionary fees that inflate their finance charges not knowing that a portion of their
18  finance charges are non-risk-related. Moreover, Defendant IndyMac's policies make
19  it more difficult for a borrower to get out of such an unfavorable loan, by including
20  substantial prepayment penalties.

21    42.    Defendant IndyMac's Discretionary Pricing Policy causes persons with
22  identical or similar credit scores to pay differing amounts for obtaining credit. Such
23  subjective loan pricing - which by design imposes differing finance charges on
24  persons with the same or similar credit profiles - disparately impacts Defendant
25  IndyMac's minority borrowers.

26    43.    While Defendant IndyMac's use of its Discretionary Pricing Policy for
27  all loan applicants might appear to be racially neutral, Defendant IndyMac's use of
28  yield spread premiums and other discretionary fees disproportionately and adversely

- 11 -

1   affects minorities (relative to similarly situated non-minorities). Defendant IndyMac's

2   Discretionary Pricing Policy causes minorities to pay disparately more finance charges

3   than similarly situated non-minorities, and Defendant takes no precautions to avoid

4   this result. As the HMDA data cited herein indicates, minorities, after controlling for

5   credit risk, are substantially more likely than similarly situated non-minorities to pay

6   such charges.

7        44.   Defendant IndyMac's Discretionary Pricing Policy is in fact intentionally

8   discriminatory. In an attempt to insulate itself from the discriminatory decision-

9   making, Defendant IndyMac intentionally designed its subjective Discretionary

10  Pricing Policy to allow and encourage its lending agents to obtain greater profits from

11  minority borrowers. As described above, Defendant IndyMac's Discretionary Pricing

12  Policy by design discriminates against minority borrowers and directly causes this

13  disparate impact.

14  **III.   DEFENDANT INDYMAC IMPOSED DISCRIMINATORY FEES ON
15  PLAINTIFF**

16       45.   Defendant IndyMac's discriminatory Discretionary Pricing Policy

17  directly damaged Plaintiff and the Class.

18       46.   On or about July 3, 2007, Plaintiff entered into a mortgage transaction

19  with Defendant IndyMac to refinance his home loan for his residence in Paramount,

20  California. The principal balance of the loan was $394,200. The financing was

21  arranged through Latin Mortgage Corporation ("Latin Mortgage"), a mortgage

22  company located in Downey, California, which on information and belief is one of

23  Defendant IndyMac's authorized mortgage brokers and/or correspondent lenders.

24       47.   The "LENDER'S CLOSING INSTRUCTIONS" issued by Defendant

25  IndyMac evidence that Plaintiff paid the following charges, among others, in

26  connection with the transaction: a $7,884 loan origination fee, a $500 "broker

27  processing fee," a $1,680 "broker fee" and a $725 "funding fee." On information and

28  belief, all of these fees were assessed pursuant to Defendant IndyMac's Discretionary

1 Pricing Policy. These fees were higher than fees charged by IndyMac to non-minority
2 borrowers with objective credit risk factors similar to Plaintiff's.

3     48.    Moreover, Plaintiff's loan with Defendant IndyMac included rates and
4 terms, including significant prepayment penalties, which were significantly less
5 favorable than rates and terms imposed on non-minority borrowers with objective
6 credit risk factors similar to Plaintiff's.

7     49.    Latin Mortgage and Defendant IndyMac knew that Plaintiff was a
8 minority borrower because, among other things, Spanish is Plaintiff's primary
9 language, and Defendant IndyMac's authorized mortgage broker and/or
10 correspondent, Latin Mortgage, specializes (as its name implies) in lending to the
11 Latino community.

12     50.    As a result of Defendant IndyMac's discriminatory conduct, Plaintiff
13 received a loan on worse terms, with higher costs, than similarly situated non-minority
14 borrowers.

15 ## CLASS ACTION ALLEGATIONS

16     51.    Plaintiff repeats and re-alleges each allegation above as if set forth herein
17 in full.

18     52.    This class action is brought pursuant to the ECOA and the FHA by
19 Plaintiff on behalf of himself and all minority borrowers who entered into residential
20 mortgage loan contracts that were originated, financed or purchased by Defendant
21 IndyMac, and who were harmed by Defendant's discriminatory conduct (the "Class").

22     53.    Plaintiff sues on his own behalf, and on behalf of a class of persons under
23 Rule 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure.

24     54.    Plaintiff does not know the exact size of the Class or the identities of the
25 members of the Class, since that information is in the exclusive control of Defendant
26 IndyMac. Plaintiff believes that the Class includes many thousands, or tens of
27 thousands of individuals, who are geographically dispersed throughout the United
28

- 13 -

1  States. Therefore, the Class is so numerous that joinder of all members is
2  impracticable.

3      55.    All members of the Class have been subject to and affected by Defendant
4  IndyMac's practice of assessing yield spread premiums and other discretionary fees
5  on mortgage loans. There are questions of law and fact that are common to the Class,
6  and that predominate over any questions affecting only individual members of the
7  Class. These questions include, but are not limited to the following:

8          a.    the nature and scope of Defendant IndyMac's policies and
9                procedures concerning the assessment of yield spread
10               premiums and other discretionary fees on mortgage loans it
11               funds;

12         b.    whether Defendant IndyMac is a creditor under the ECOA
13               because, in the ordinary course of business, it participates in
14               the decision of whether or not to extend credit to consumers;

15         c.    whether Defendant IndyMac's policies and procedures
16               regarding yield spread premiums and other discretionary fees
17               are a facially neutral credit pricing system that has effected
18               racial discrimination in violation of the ECOA;

19         d.    whether there are statistically significant disparities between
20               the amount of the discretionary charges imposed on minorities
21               and the amount of the discretionary charges imposed on
22               Caucasians that are unrelated to creditworthiness;

23         e.    whether Defendant IndyMac has any legitimate business
24               justification for its policies and procedures;

25         f.    whether there is a less discriminatory alternative to these
26               policies and procedures;

27         g.    whether the Court can enter declaratory and injunctive relief;
28               and

1        h.    the proper measure of disgorgement or monetary relief.

2    56.    Plaintiff's claims are typical of the claims of the Class, and do not

3 conflict with the interests of any other members of the Class, in that Plaintiff and the

4 other members of the Class were subjected to the same yield spread premiums and

5 other discretionary fees that have disproportionately affected minority borrowers.

6    57.    Plaintiff will fairly and adequately represent the interests of the Class.

7 Plaintiff is committed to vigorous prosecution of the Class's claims, and has retained

8 attorneys who have extensive experience in consumer protection and credit

9 discrimination actions and in class actions.

10    58.    A class action is superior to other methods for the speedy and efficient

11 adjudication of this controversy. A class action regarding the issues in this case does

12 not create any problems of manageability.

13    59.    In the alternative, Defendant IndyMac has acted or refused to act on

14 grounds generally applicable to the Class, thereby making appropriate final injunctive

15 relief or corresponding declaratory relief with respect to the Class as a whole.

16             **TOLLING OF THE STATUTE OF LIMITATIONS**

17    60.    The causes of action alleged herein accrued upon discovery of the

18 discriminatory impact of Defendant IndyMac's Discretionary Pricing Policy.

19 Plaintiff and members of the Class did not discover and could not have discovered

20 through the exercise of reasonable diligence the factual bases of those claims.

21 Indeed, the data forming the basis of Plaintiff's claims was only recently released

22 and analyzed in a comprehensive manner.  Moreover, because Defendant IndyMac

23 knowingly and actively concealed the facts alleged herein, Plaintiff and the Class

24 have been kept ignorant of vital information essential to the pursuit of these claims,

25 without any fault or lack of diligence on their part.

26    61.    Despite the fact that Defendant IndyMac knew or should have known

27 of the discriminatory effect of its Discretionary Pricing Policy, none of the loan

28

1   documents inform the customer that its finance rates are subjective and not based
2   solely on risk-related characteristics.

3       62.    Defendant IndyMac was and is under a continuous duty to disclose to
4   Plaintiff and the Class material information regarding their loans. The fact that
5   certain loan terms are subjective and discretionary is information a reasonable
6   borrower would consider important when deciding whether to purchase the loan
7   and on what terms. The fact that the subjective and discretionary components
8   result in a disparate impact on minority borrowers is also information reasonable
9   minority borrowers would consider important.

10      63.    Defendant IndyMac failed to disclose this information, however, and
11  Plaintiff and Class Members reasonably relied upon Defendant IndyMac's
12  representation that terms of their loans would be based on their creditworthiness.
13  Defendant IndyMac's financing documents falsely foster the image that Defendant
14  IndyMac offers competitive rates that are objectively set. However, Defendant
15  IndyMac never discloses to its credit applicants the fact that: (a) its credit rates are
16  subjective and can vary significantly among persons with identical credit profiles;
17  and (b) it has authorized and provided a financial incentive to mortgage brokers to
18  subjectively increase the credit rate above the rate otherwise available to
19  homeowners.

20      64.    Due to the inherent nature of Defendant IndyMac's undisclosed
21  Discretionary Pricing Policy and due to Defendant IndyMac's deception and
22  concealment, Defendant IndyMac's minority customers have no way of knowing
23  or suspecting: (a) the existence of Defendant IndyMac's subjective credit pricing
24  policy; (b) that they were charged additional subjective credit charges; or (c) that
25  they were charged a disproportionately greater amount for their cost of credit than
26  similarly situated Caucasian persons. Thus Defendant IndyMac is estopped from
27  relying on any statutes of limitation in its defense of this action.

28

# COUNT I

## VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT

### (15 U.S.C. §§ 1691 - 1691f)

65.   Plaintiff repeats and re-alleges the allegations contained in paragraphs 1 through 65 above as if fully set forth herein.

66.   Defendant IndyMac engages in credit transactions through its offering, granting, and purchasing of residential mortgage loans.

67.   By imposing higher interest rates and other discretionary fees and terms on residential mortgage loans to Plaintiff and the Class than it imposes on non-minority mortgage borrowers, Defendant IndyMac has discriminated and continues to discriminate against Plaintiff and members of the Class with respect to a credit transaction on the basis of race in violation of the ECOA. 15 U.S.C. § 1691(a).

68.   In addition, Defendant IndyMac's pricing policies and procedures (including yield spread premiums), which provide financial incentives to its loan officers, mortgage brokers and correspondent lenders to make subjective decisions to increase interest rates and charge additional fees and costs, have a disparate impact on Plaintiff and the Class.

69.   As a proximate result of Defendant IndyMac's violation of 15 U.S.C. § 1691, Plaintiff and members of the Class have been injured and are entitled to injunctive and declaratory relief and damages, or make whole equitable relief.

70.   In addition, Defendant IndyMac's conduct as alleged herein was intentional, willful, wanton, reckless, malicious, outrageous, or otherwise aggravated beyond mere negligence.  Defendant IndyMac acted with malice and reckless indifference to the federally protected rights of Plaintiff and the Class.  As a result, Plaintiff and the Class are entitled to punitive damages.

71.   Moreover, Defendant IndyMac continues to discriminate in violation of the ECOA against Class Members every time Defendant IndyMac provides a home

- 17 -

1  mortgage loan as described herein. If not enjoined from such violation by the Court,

2  Defendant IndyMac will continue to engage in conduct that disregards the rights of

3  Plaintiff and members of the Class, and cause Plaintiff and the Class irreparable injury

4  for which there is no adequate remedy at law. 15 U.S.C. § 1691(e).

5       72.    Plaintiff and the Class ask this Court to declare the rights of the parties

6  herein regarding Defendant IndyMac's obligation to enter into credit transactions

7  without discriminating against applicants for credit on the basis of the applicants'

8  race.

9                                    **COUNT II**

10  **VIOLATION OF THE FAIR HOUSING ACT (42 U.S.C. §§ 3601 – 3619)**

11      73.    Plaintiff repeats, re-alleges and incorporates the allegations in paragraphs

12  1 through 73 above as if fully set forth herein.

13      74.    Mortgage lending and the providing of residential mortgage loans is a

14  "residential real estate-related transaction" within the meaning of the FHA. 42 U.S.C.

15  § 3605(b).

16      75.    By imposing higher interest rates and other discretionary fees and terms

17  on residential mortgage loans to Plaintiff and the Class than it imposed on non-

18  minority mortgage borrowers, Defendant IndyMac has discriminated against Plaintiff

19  and the Class concerning their ability to participate in real estate-related transactions,

20  and in the terms and conditions of such transactions, in violation of the FHA. 42

21  U.S.C. § 3605(a).

22      76.    In addition, Defendant IndyMac's pricing policies and procedures

23  (including yield spread premiums), which provide financial incentives to its loan

24  officers, mortgage brokers and correspondent lenders to make subjective decisions to

25  increase interest rates and charge additional fees and costs, had a disparate impact

26  upon Plaintiff and the Class.

27

28

1   77.   As a proximate result of Defendant IndyMac's violation of 42 U.S.C. §
2   3605, Plaintiff and the Class have been injured and are entitled to injunctive and
3   declaratory relief and damages, or make whole equitable relief.

4   78.   In addition, Defendant IndyMac's conduct as alleged herein was
5   intentional, willful, wanton, reckless, malicious, outrageous, or otherwise aggravated
6   beyond mere negligence.   Defendant IndyMac acted with malice and reckless
7   indifference to the federally protected rights of Plaintiff and the Class.  As a result,
8   Plaintiff and the Class are entitled to punitive damages.

9   79.   Moreover, Defendant IndyMac continues to discriminate in violation of
10  the FHA against members of the Class every time Defendant IndyMac provides a
11  home mortgage loan as described herein.  If not enjoined from such violation by the
12  Court, Defendant IndyMac will continue to engage in conduct that disregards the
13  rights of Plaintiff and the Class, and cause Plaintiff and the Class irreparable injury for
14  which there is no adequate remedy at law.  42 U.S.C. § 3613(c).

15  80.   Plaintiff and the Class ask this Court to declare the rights of the parties
16  herein regarding Defendant IndyMac's obligation to participate in credit transactions
17  without discriminating against applicants for credit on the basis of the applicants'
18  race.

19                              **REQUESTS FOR RELIEF**

20  WHEREFORE, Plaintiff requests the following relief:

21  A.    An order determining that the action is a proper class action pursuant to
22  Rule 23 of the Federal Rules of Civil Procedure;

23  B.    A Judgment awarding Plaintiff and the Class costs and disbursements
24  incurred in connection with this action, including reasonable attorneys' fees, expert
25  witness fees and other costs;

26  C.    A Judgment granting extraordinary equitable and/or injunctive relief as
27  permitted by law or equity, including rescission, restitution, reformation, attaching,
28  impounding, or imposing a constructive trust upon, or otherwise restricting, the

1    proceeds of Defendant IndyMac's ill-gotten funds to ensure that Plaintiff and the
2    Class have an effective remedy;

3        D.      A Judgment awarding Plaintiff and the Class compensatory damages
4    according to proof;

5        E.      A Judgment awarding punitive damages to Plaintiff and the Class;

6        F.      A Judgment granting declaratory and injunctive relief and all relief that
7    flows from such injunctive and declaratory relief; and

8        G.      A Judgment or other Order granting such other and further relief as the
9    Court deems just and proper.

10       DATED this 26th day of February, 2008.

11

12                              BONNETT, FAIRBOURN,
13                              FRIEDMAN, & BALINT, P.C.

14

15

16                              Andrew S. Friedman (to seek *pro hac*
                                *vice*)
17                              afriedman@bffb.com
18                              Wendy J. Harrison (CA SBN 151090)
                                wharrison@bffb.com
19                              2901 North Central Avenue, Suite 1000
                                Phoenix, Arizona 85012
20                              (602) 274-1100

21

22

23

24

25

26

27

28

- 20 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CHAVEZ & GERTLER, L.L.P.
Mark A. Chavez (CA SBN 90858)
mark@chavezgertler.com
Jonathan Gertler (CA SBN 111531)
jon@chavezgertler.com
Nance F. Becker (CA SBN 99292)
nance@chavezgertler.com
42 Miller Avenue
Mill Valley, California 94941
(415) 381-5599

COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
John J. Stoia, Jr. (CA SBN 141757)
johns@csgrr.com
Theodore J. Pintar (CA SBN 131372)
tedp@csgrr.com
655 West Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058

*Attorneys for Plaintiff*

1

2

### JURY TRIAL DEMANDED

3  Plaintiff demands a trial by jury on all issues so triable.

DATED this 26th day of February, 2008.

4

5                              BONNETT, FAIRBOURN,
                               FRIEDMAN, & BALINT, P.C.
6

7                              _____

8                              Andrew S. Friedman (to seek *pro hac
                               vice*)
9                              afriedman@bffb.com
                               Wendy J. Harrison (CA SBN 151090)
10                             wharrison@bffb.com
                               2901 North Central Avenue, Suite 1000
11                             Phoenix, Arizona 85012
                               (602) 274-1100
12

13                             CHAVEZ & GERTLER, L.L.P.
14                             Mark A. Chavez (CA SBN 90858)
                               mark@chavezgertler.com
15                             Jonathan Gertler (CA SBN 111531)
                               jon@chavezgertler.com
16                             Nance F. Becker (CA SBN 99292)
17                             nance@chavezgertler.com
                               42 Miller Avenue
18                             Mill Valley, California 94941
19                             (415) 381-5599

20

21                             COUGHLIN STOIA GELLER
                               RUDMAN & ROBBINS LLP
22                             John J. Stoia, Jr. (CA SBN 141757)
23                             johns@csgrr.com
                               Theodore J. Pintar (CA SBN 131372)
24                             tedp@csgrr.com
25                             655 West Broadway, Suite 1900
                               San Diego, CA 92101
26                             (619) 231-1058

27
                               *Attorneys for Plaintiff*
28

- 22 -

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

LEMONT MABLES, LARISSA
HENDERSON-MABLES and
EARLENE CALVIN on behalf of
themselves and others similarly situated,

Plaintiffs,

v.

INDYMAC BANK, F.S.B.,

Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. _____

JURY TRIAL DEMANDED

## **CLASS ACTION COMPLAINT**

Plaintiffs Lemont Mables, Larissa Henderson-Mables and Earlene Calvin ("Plaintiffs"), by and through their attorneys, bring this action on behalf of all others similarly situated, against Defendant IndyMac Bank, F.S.B. ("Defendant IndyMac" or "IndyMac") seeking redress for racially discriminatory lending practices under the Equal Credit Opportunity Act, 15 U.S.C. § 1691, et seq. ("ECOA") and the Fair Housing Act, 42 U.S.C. § 3601 et seq. ("FHA").

## **INTRODUCTION**

1. This class action challenges Defendant IndyMac's racially discriminatory mortgage lending practices. As described below, Defendant IndyMac established a specific, identifiable and uniform credit pricing system, a component of which, referred to herein as the "Discretionary Pricing Policy," authorized an unchecked, subjective surcharge of additional points and fees to an otherwise objective risk-based financing rate.

2. These subjective, additional finance charges directly lead to minorities receiving home loans with higher interest rates and higher fees and costs than similarly situated non-minority borrowers.

- 1 -

3. As used in this Complaint, "minority" or "minorities" shall refer to all non-Caucasians and other minority racial groups protected under 42 U.S.C. § 3604 and 15 U.S.C. § 1691.

4. Plaintiffs bring this action on behalf of all minorities who have entered into residential mortgage loan contracts that were originated, financed or purchased by Defendant IndyMac, and who have been subjected to racial discrimination (the "Class").

5. Plaintiffs seek injunctive, declaratory, and equitable relief, punitive damages, and other monetary and non-monetary remedies for Defendant IndyMac's racially discriminatory conduct.

## JURISDICTION AND VENUE

6. This Court has jurisdiction pursuant to 28 U.S.C. § 1331, which gives this Court original jurisdiction over civil actions arising under federal law.

7. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b). Plaintiffs Lemont Mables and Larissa Henderson-Mables reside in this District and Defendant IndyMac originated and financed their purchase of property located in this District. Defendant IndyMac regularly does business in this District and Plaintiff Lemont Mables and Larissa Henderson-Mables' residential mortgage transaction is one of a number of financings which Defendant IndyMac originated in this District, secured by properties located in this District.

## PARTIES

8. Lemont Mables and Larissa Henderson-Mables ("Plaintiffs Mables" or "Mables") are African-American homeowners who reside in Chicago, Illinois 60639.

9. Earlene Calvin ("Plaintiff Calvin" or "Calvin") is an African-American homeowner who resides in Apple Valley, California.

10. Defendant IndyMac Bank, F.S.B., is a hybrid thrift/mortgage bank insured by the FDIC, with principal executive offices located at 888 East Walnut Street, Pasadena, California 91101. Defendant IndyMac originates mortgages in all

50 states of the United States. According to representations in its parent corporation's recent SEC filings, Defendant IndyMac is the seventh largest savings and loan nationwide based on its assets, and the ninth largest residential mortgage originator in the United States. Defendant IndyMac is a wholly owned subsidiary of parent holding company IndyMac Bancorp, Inc., a Maryland corporation reincorporated in Delaware in 1987, which trades publicly on the New York Stock Exchange under the symbol IMB.

## FACTS

## I. HISTORICAL DISCRIMINATION IN AMERICAN MORTGAGE LENDING: A LONG LEGACY

11. Racial discrimination in America's mortgage lending industry has a long legacy. As this Complaint attests, that unfortunate history continues to this day due to discriminatory treatment of minority borrowers by mortgage lenders such as Defendant IndyMac.

12. According to the Joint Center for Housing Studies at Harvard University's 2005 study called "The Dual Mortgage Market: The Persistence of Discrimination in Mortgage Lending," "[i]n the immediate post-World War II period, racial discrimination in mortgage lending was easy to spot. From government-sponsored racial covenants in the Federal Housing Administration (FHA) guidelines to the redlining practices of private mortgage lenders and financial institutions, minorities were denied access to home mortgages in ways that severely limited their ability to purchase a home. Today, mortgage lending discrimination is more subtle. . . . [M]ore than three decades after the enactment of national fair lending legislation, minority consumers continue to have less-than-equal access to loans at the best prices and on the best terms that their credit history, income, and other individual financial considerations merit."

13. The passage of civil rights legislation and fair lending laws in the 1960s and 1970s brought an end to the most virulent forms of overt racial discrimination in

the housing markets, but throughout the 1980s and 1990s, mortgage lenders found more subtle ways to discriminate, including maintaining offices only in Caucasian neighborhoods and engaging in practices such as redlining (refusing to lend on properties in predominantly minority neighborhoods).

14. After redlining practices were challenged in the 1990s, mortgage lenders changed tactics once again. Lenders began making loans to minorities, but charged them higher interest rates and loan-related fees than they charged to similarly-situated Caucasian borrowers. Loan data that mortgage lenders must now compile under the federal Home Mortgage Disclosure Act ("HMDA") reveals profound loan pricing disparities between minority borrowers and similarly-situated Caucasian borrowers.

15. The HMDA requires mortgage lenders to report information about the home loans they process each year. In 2005, lenders reported information on more than 30 million home loan applications pursuant to HMDA. In 1989, Congress required lenders to begin disclosing information about mortgage borrowers' race and ethnicity. In 2004, concerned with potential racial discrimination in loan pricing, and recognizing that racial or other types of discrimination can occur when loan officers and mortgage brokers have latitude in setting interest rates, the Federal Reserve Board began requiring lenders to also report information concerning rates, points, and fees charged to borrowers on high-cost loans.

16. According to the Federal Reserve, both 2004 and 2005 HMDA data revealed that "Blacks and Hispanics were more likely . . . to have received higher-priced loans than non-Hispanic whites. . . . [which has] increased concern about the fairness of the lending process." Robert B. Avery, Kenneth P. Brevoort and Glenn B. Canner, "Higher-Priced Home Lending and the 2005 HMDA Data," Federal Reserve Bulletin, A124, A159 (revised Sept. 18, 2006) (http://www.federalreserve.gov/pubs/bulletin/2006/hmda/bull06hmda.pdf (last viewed April 2, 2008).)

17.     HMDA data for 2004 reveals profound loan pricing disparities between Hispanic borrowers and non-Hispanic whites even after controlling for borrowers' gender, income, property location, and loan amount.  After accounting for those differences in the 2004 HMDA data, Hispanic borrowers were still almost twice as likely to receive a higher-rate home loan as non-Hispanic whites. (http://www.responsiblelending.org/pdfs/Testimony-Ernst061306.pdf (last viewed April 2, 2008).)  In a speech last year, the Vice-Chairman of the Federal Deposit Insurance Corporation, Martin Gruenberg, discussed the 2004 HMDA data and observed that that data "clearly indicated" that Hispanics are more likely to receive high-cost home loans than are non-Hispanic whites. (http://www.fdic.gov/news/news/speeches/archives/2006/chairman/spoct1806.html (last viewed April 2, 2008).)

18.     Likewise, HMDA data for 2005 shows that "for conventional home-purchase loans, the gross mean incidence of higher-priced lending was 54.7 percent for blacks and 17.2 percent for non-Hispanic whites, a difference of 37.5 percentage points."  Avery, Brevoort, and Canner, Federal Reserve Bulletin, at A159.  The situation is similar for refinancings, where there is a difference of 28.3 percentage points between blacks and non-Hispanic whites.  Id. at A124, A159.

19.     A growing number of research studies and investigations show that significant racial disparities still exist.  California Reinvestment Coalition, et al., "Paying More for the American Dream: A Multi-State Analysis of Higher Cost Home Purchase Lending" (March 2007) (http://www.nedap.org/pressroom/documents/2007_Report-2005_HMDA.pdf (last viewed April 2, 2008); Ross, "The Continuing Practice and Impact of Discrimination" (Revised July 2006) (Univ. of Connecticut, Working Paper 2005-19R) (http://www.econ.uconn.edu/working/2005-19r.pdf) (last viewed April 2, 2008).

20.     Just this month, the California Reinvestment Coalition, jointly with several other non-profit and housing advocacy groups, published another report.  The

organizations examined the impact of lending by subprime, high-risk lenders in 7 metropolitan areas – Boston, Charlotte, Chicago, Cleveland, Los Angeles, New York City and Rochester, NY. California Reinvestment Coalition, et al., "Paying More for the American Dream: A Multi-State Analysis of Higher Cost Home Purchase Lending" (March 2008) ("March 2008 CRC Report") (available at http://www.nedap.org/resources/reports.html) (last viewed April 2, 2008). The CRC Report focuses on a subset of 35 lenders (among a larger group of 228 subprime lenders that, since late 2006, have either closed, gone bankrupt, or been sold) who specialized in subprime, high-risk lending.

21. The study showed that subprime high-risk lenders are concentrated in minority neighborhoods. Data supporting this finding demonstrated that subprime high-risk lenders had 20% of the market share in predominantly minority neighborhoods in these metro areas, compared to a 4% market share in predominantly white neighborhoods. March 2008 CRC Report at 5. In addition, over 40% of the loans made by subprime high-risk lenders were in neighborhoods where 80% or more of the residents were minorities. Id. In stark contrast, less than 10% of subprime high-risk lender loans were in areas where less than 10% of the residents were minorities. Id.

22. In the Chicago metro area, where Plaintiffs Mables reside, the same study shows that the subprime, high-risk lender market share in predominantly minority neighborhoods was 3.7 times the high-risk lender market share in predominantly white neighborhoods. March 2008 CRC Report at 6. Further, in metro Los Angeles, home to Plaintiff Calvin, the study shows that the high-risk lenders' market share in predominantly minority neighborhoods was a whopping 9.5 times higher than their market share in largely white neighborhoods. Id. By a substantial margin, the Los Angeles metro area had the greatest high-risk lender market share disparity surveyed in the March 2008 CRC Report.

23.    The Association of Community Organizations for Reform Now (ACORN) released a report entitled "The High Cost of Credit: Disparities in High-priced Refinanced Loans to Minority Homeowners in 125 American Cities," dated September 27, 2005, that found that "[i]n every metropolitan area where at least 50 refinances were made to African-American homeowners, African-Americans were more likely to receive a high-cost loan than White homeowners." (http://acorn.org/uploads/media/High_Cost_of_Credit_Report_02.doc (last viewed on April 2, 2008).

24.    The aggregate HMDA data discussed above is representative of IndyMac.  According to the Form 10-K for year end 2006 filed by Defendant IndyMac's parent holding company, IndyMac Bancorp, Inc., Defendant IndyMac is the ninth largest residential mortgage originator in the United States.

25.    Based on HMDA data, minorities who borrowed from IndyMac between 2004 and 2006 are over 50% more likely than Caucasian borrowers to have received a high-APR loan to purchase or refinance their home.

26.    Importantly, consistent with the consensus that the HMDA data reveals profound loan pricing disparities between minorities and Caucasians even after controlling for income and other objective factors, research studies have also generally suggested that borrowers' credit profiles cannot fully explain why some borrowers, and not others, are saddled with higher cost loans.

27.    As an example, research by Howell Jackson of Harvard Law School, detailed in the article *Kickbacks or Compensation: The Case of Yield Spread Premiums* (Harvard Univ.), H. Jackson and J. Berry, available at (http://www.law.harvard.edu/faculty/hjackson/pdfs/january_draft.pdf) (last viewed April 2, 2008), concluded that the substantially higher mortgage broker compensation received as the result of yield spread premiums could not fully be explained when controlling for variables associated with creditworthiness.

28.    In short, a number of researchers have raised "doubts that risk can adequately explain racial differences" in high-cost loans.  Bradford, Center for Community Change, "Risk or Race? Racial Disparities and the Subprime Refinance Market" (May 2002) (http://www.knowledgeplex.org/kp/report/report/relfiles/ccc_0729_risk.pdf) (last viewed April 2, 2008).  In other words, evidence "suggests that weak borrower credit profiles do not fully explain why some borrowers get stuck with higher-cost home loans."  California Reinvestment Coalition, et al., "Paying More for the American Dream: A Multi-State Analysis of Higher Cost Home Purchase Lending" (March 2007).

## II.    PAST AS PROLOGUE: DEFENDANT INDYMAC'S DISCRIMINATORY LENDING POLICY

### A.    DEFENDANT INDYMAC'S RELATIONSHIPS WITH ITS MORTGAGE BROKERS AND CORRESPONDENT LENDERS

29.    Defendant IndyMac is among America's leading mortgage lenders, originating and funding mortgage loans through loan officers, through authorized mortgage brokers and through a network of correspondent lenders.

30.    On information and belief, Defendant IndyMac's loan officers, mortgage brokers and correspondent lenders broker and fund loans in collaboration with Defendant IndyMac, and in conformance with Defendant IndyMac's Discretionary Pricing Policy.

31.    In addition to instruction in its credit-pricing policies and procedures, Defendant IndyMac provides its loan officers, brokers and correspondents with marketing support and materials, including an online library of "private label" materials such as flyers, brochures, print advertisements, and "program highlights." (https://new-e-mits.IndyMacb2b.com/login/login.asp?goto=marketingMaterials&popup (last viewed on April 2, 2008).)

32.     Defendant IndyMac also maintains a "Corporate Blog" on the Internet, which it uses to communicate to its broker force, correspondents and loan officers as well as the investing community.  (http://www.theimbreport.com (last viewed on April 2, 2008).)  Among other things, the "Corporate Blog" updates Defendant IndyMac's partners on delinquencies in its loan portfolios, formulates attacks upon whatever investment analyst reports may be critical of Defendant IndyMac's lending operations, and links visitors to articles with titles like "Booms and Busts: The Case of Subprime Mortgages."  (Id.)

33.     Defendant IndyMac has established, implemented and continues to implement its Discretionary Pricing Policy, causing minority borrowers to pay subjective fees such as yield spread premiums and other mortgage-related finance charges at higher rates than similarly situated non-minority borrowers.  By its Discretionary Pricing Policy, Defendant IndyMac has intentionally discriminated against Plaintiffs and Class Members, systematically channeling Plaintiffs and other Class members into mortgage loans with less favorable conditions than those given to similarly situated non-minority borrowers.  This pattern of discrimination is not the result of random or non-discriminatory factors.  Rather, it is the direct and intended result of Defendant IndyMac's business model and loan-funding practices.

34.     Defendant IndyMac's loan officers, authorized mortgage brokers and correspondent lenders receive part or all of their compensation from Defendant IndyMac based on the interest rate charged to the borrower.  Defendant IndyMac's loan officers, authorized brokers and correspondent lenders receive more compensation from Defendant IndyMac when they steer their clients into IndyMac loans with higher interest rates, and less compensation when they place their clients into IndyMac loans with lower interest rates.  These same incentives apply when Indymac's loan officers, authorized mortgage brokers and correspondent lenders place borrowers into loans which include prepayment penalties and other onerous conditions.

35. Defendant IndyMac intentionally and actively implements its Discretionary Pricing Policy in a variety of ways, including actively educating loan officers and brokers about IndyMac's credit policies and procedures and directing its loan officers and brokers regarding the marketing of IndyMac loan products.

36. Defendant IndyMac evaluates its loan officers, authorized brokers and correspondents to ensure that they comply with Defendant IndyMac's Discretionary Pricing Policy. Because the Discretionary Pricing Policy is designed to discriminate, Defendant IndyMac has not taken precautions to ensure that application of the Policy will avoid discrimination against minorities.

37. Defendant IndyMac's Discretionary Pricing Policy permits its loan officers, authorized mortgage brokers and correspondent lenders subjectively to charge minority loan applicants yield spread premiums and other discretionary charges, and indeed provides financial incentives for them to do so.

38. This pattern and design of discrimination cannot be justified by business necessity, and could be avoided through the use of alternative policies and procedures that have less discriminatory impact and no less business efficacy.

**B. DEFENDANT INDYMAC'S DISCRETIONARY CREDIT PRICING SYSTEM: DESIGNED TO DISCRIMINATE**

39. Defendant IndyMac discriminates through its authorized mortgage brokers. Authorized mortgage brokers act as Defendant IndyMac's agents in originating mortgage loans. Authorized mortgage brokers enter into agreements with Defendant IndyMac to accept loan applications on behalf of Defendant IndyMac; communicate to loan applicants financing terms and rates set by Defendant IndyMac; tell loan applicants about Defendant IndyMac's various financing options; and ultimately originate mortgage loans funded by Defendant IndyMac using Defendant IndyMac's forms and in accordance with Defendant IndyMac's policies and procedures.

40. Likewise, Defendant IndyMac's authorized correspondent lenders and loan officers, acting as Defendant IndyMac's agents, work with Defendant IndyMac to make loans in accordance with Defendant IndyMac's credit policies and procedures. Defendant IndyMac funds correspondent-generated loans before or shortly after they go to closing.

41. Defendant IndyMac then funds loans originated by its loan officers, authorized mortgage brokers and correspondent lenders, sets the terms and conditions of credit on those loans, and shoulders part or all of the risk on such loans. Defendant IndyMac actively and intentionally enforces its credit policies through its loan officers, authorized mortgage brokers and correspondent lenders in a variety of ways. Among other things, Defendant IndyMac supplies its loan officers, mortgage brokers and correspondent lenders with an array of loan-related forms and agreements, including loan contracts, loan applications, and instructions on completing loan applications and contracts. And, as noted above, Defendant IndyMac actively trains its authorized brokers to follow its policies and procedures, and reinforces that training with marketing support.

42. Once a loan applicant has provided credit information through a loan officer, mortgage broker or correspondent lender, Defendant IndyMac performs an initial objective credit analysis. Defendant IndyMac, at this point, evaluates numerous risk-related credit variables, including debt-to-income ratios, loan-to-value ratios, credit bureau histories, debt ratios, bankruptcies, automobile repossessions, prior foreclosures, payment histories, credit scores and the like.

43. Defendant IndyMac derives a risk-based financing rate from these objective factors, which Defendant IndyMac and others in the mortgage industry simply call the "par rate." (Defendant IndyMac's brokers and correspondent lenders can also estimate the par rates by referring to an applicant's credit bureau-determined credit score.)

44.     Although Defendant IndyMac's initial analysis applies objective criteria to calculate this risk-related interest rate, Defendant IndyMac's Discretionary Pricing Policy authorizes and provides incentives to its loan officers, mortgage brokers and correspondent lenders to mark up that rate later and also impose additional non-risk-based charges, including yield spread premiums and other discretionary fees. Defendant IndyMac regularly communicates applicable par rates, authorized yield spread premiums, and other discretionary fees to its loan officers, mortgage brokers and correspondent lenders via "rate sheets" and other communications.

45.     Defendant IndyMac gives its loan officers, authorized mortgage brokers and correspondent lenders discretion to impose yield spread premiums and other subjective fees on borrowers. When borrowers pay yield spread premiums, Defendant IndyMac shares in additional income generated by the premium because the yield spread premium-affected borrower is locked into a higher interest rate going forward on their IndyMac loan than they would be if they had been placed in a par rate loan without a yield spread premium.

46.     Defendant IndyMac's borrowers pay yield spread premiums and other discretionary fees that inflate their finance charges not knowing that a portion of their finance charges are non-risk-related. Moreover, Defendant IndyMac's policies make it more difficult for a borrower to get out of such an unfavorable loan, by including substantial prepayment penalties.

47.     Defendant IndyMac's Discretionary Pricing Policy causes persons with identical or similar credit scores to pay differing amounts for obtaining credit. Such subjective loan pricing - which by design imposes differing finance charges on persons with the same or similar credit profiles - disparately impacts Defendant IndyMac's minority borrowers.

48.     While Defendant IndyMac's use of its Discretionary Pricing Policy for all loan applicants might appear to be racially neutral, Defendant IndyMac's use of yield spread premiums and other discretionary fees disproportionately and adversely

affects minorities (relative to similarly situated non-minorities). Defendant IndyMac's Discretionary Pricing Policy causes minorities to pay disparately more finance charges than similarly situated non-minorities, and Defendant takes no precautions to avoid this result. As the HMDA data cited herein indicates, minorities, after controlling for credit risk, are substantially more likely than similarly situated non-minorities to pay such charges.

49. Defendant IndyMac's Discretionary Pricing Policy is in fact intentionally discriminatory. In an attempt to insulate itself from the discriminatory decision-making, Defendant IndyMac intentionally designed its subjective Discretionary Pricing Policy to allow and encourage its lending agents to obtain greater profits from minority borrowers. As described above, Defendant IndyMac's Discretionary Pricing Policy by design discriminates against minority borrowers and directly causes this disparate impact.

## III. DEFENDANT INDYMAC IMPOSED DISCRIMINATORY FEES ON PLAINTIFFS

50. Defendant IndyMac's discriminatory Discretionary Pricing Policy directly damaged Plaintiffs and the Class.

51. On or about April 11, 2007, Plaintiff Lemont Mables and Larissa Henderson-Mables entered into a mortgage transaction with Defendant IndyMac, borrowing $370,800.00 to refinance their home loan for their residence in Chicago, Illinois. The financing was arranged through a mortgage broker, Westlake Mortgage Corp. ("Westlake"), which on information and belief is one of Defendant IndyMac's authorized mortgage brokers and/or correspondent lenders.

52. Plaintiff Mables' HUD-1 Settlement Statement indicates that in connection with his loan, that Defendant paid a yield spread premium in the amount of $1,854 to Westlake, paid outside of closing ("POCL") which was based in whole or in part on mark-up of Plaintiffs' loan rate. In addition, Plaintiffs paid the following fees, among others, in connection with the transaction: a "broker origination fee" of $3,708 to Westlake; a "broker processing fee" of $450 to Westlake, an "application fee" of $450 to Westlake, and a $700 "funding fee" to Defendant IndyMac. On information and belief, each of these fees were assessed pursuant to Defendant IndyMac's Discretionary Pricing Policy, and were higher than fees charged by IndyMac to non-minority borrowers with objective credit risk factors similar to Plaintiff Lemont Mables'.

53. On or about April 30, 2007, Plaintiff Calvin entered into a mortgage transaction with Defendant IndyMac to refinance her home loan for her residence in Apple Valley, California. The principal balance of the loan was $416,000. The financing was arranged through Windsor Capital Mortgage Corporation ("Windsor Capital"), a mortgage company which on information and belief is one of Defendant IndyMac's authorized mortgage brokers and/or correspondent lenders.

54. The "LENDER'S CLOSING INSTRUCTIONS" issued by Defendant IndyMac evidence that Defendant paid a yield spread premium to Windsor Capital in the amount of $10,400, paid outside of closing (POC) which was based in whole or in part on a markup of Plaintiff's loan rate. Plaintiff Calvin also paid the following charges, among others, in connection with the transaction: a $8,320 loan origination fee to Windsor Capital, a $630 "broker processing fee" to Windsor Capital, a $495 "administration fee" to Windsor Capital; and a $725 "funding fee" to Defendant IndyMac. On information and belief, all of these fees were assessed pursuant to Defendant IndyMac's Discretionary Pricing Policy. These fees were higher than fees charged by IndyMac to non-minority borrowers with objective credit risk factors similar to Plaintiff Calvin's.

55.     Plaintiffs' loans with Defendant IndyMac also included rates and terms, including significant prepayment penalties, which were significantly less favorable than rates and terms imposed on non-minority borrowers with objective credit risk factors similar to Plaintiffs'.

56.     As described herein, as a result of Defendant IndyMac's discriminatory conduct, Plaintiffs received loans on worse terms, with higher costs, than similarly situated non-minority borrowers.

## **CLASS ACTION ALLEGATIONS**

57.     Plaintiffs repeat and re-allege each allegation above as if set forth herein in full.

58.     This class action is brought pursuant to the ECOA and the FHA by Plaintiffs on behalf of themselves and all minority borrowers who entered into residential mortgage loan contracts that were originated, financed or purchased by Defendant IndyMac, and who were harmed by Defendant's discriminatory conduct (the "Class").

59.     Plaintiffs sue on their own behalf, and on behalf of a class of persons under Rule 23(a) and (b)(2) and/or (b)(3) of the Federal Rules of Civil Procedure.

60.     Plaintiffs do not know the exact size of the Class or the identities of the members of the Class, since that information is in the exclusive control of Defendant IndyMac. Plaintiffs believe that the Class includes many thousands, or tens of thousands of individuals, who are geographically dispersed throughout the United States. Therefore, the Class is so numerous that joinder of all members is impracticable.

61.     All members of the Class have been subject to and affected by Defendant IndyMac's practice of assessing yield spread premiums and other discretionary fees on mortgage loans.  There are questions of law and fact that are common to the Class, and that predominate over any questions affecting only individual members of the Class.  These questions include, but are not limited to the following:

a. the nature and scope of Defendant IndyMac's policies and procedures concerning the assessment of yield spread premiums and other discretionary fees on mortgage loans it funds;

b. whether Defendant IndyMac is a creditor under the ECOA because, in the ordinary course of business, it participates in the decision of whether or not to extend credit to consumers;

c. whether Defendant IndyMac's policies and procedures regarding yield spread premiums and other discretionary fees are a facially neutral credit pricing system that has effected racial discrimination in violation of the ECOA;

d. whether there are statistically significant disparities between the amount of the discretionary charges imposed on minorities and the amount of the discretionary charges imposed on Caucasians that are unrelated to creditworthiness;

e. whether Defendant IndyMac has any legitimate business justification for its policies and procedures;

f. whether there is a less discriminatory alternative to these policies and procedures;

g. whether the Court can enter declaratory and injunctive relief; and

h. the proper measure of disgorgement or monetary relief.

62. Plaintiffs' claims are typical of the claims of the Class, and do not conflict with the interests of any other members of the Class, in that Plaintiffs and the other members of the Class were subjected to the same yield spread premiums and other discretionary fees that have disproportionately affected minority borrowers.

63. Plaintiffs will fairly and adequately represent the interests of the Class. Plaintiffs are committed to vigorous prosecution of the Class's claims, and have

retained attorneys who have extensive experience in consumer protection and credit discrimination actions and in class actions.

64. A class action is superior to other methods for the speedy and efficient adjudication of this controversy. A class action regarding the issues in this case does not create any problems of manageability.

65. In the alternative, Defendant IndyMac has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## COUNT I
## VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT
## (15 U.S.C. §§ 1691 - 1691f)

66. Plaintiffs repeat, re-allege and incorporate the allegations contained in paragraphs 1 through 65 above as if fully set forth herein.

67. Defendant IndyMac engages in credit transactions through its offering, granting, and purchasing of residential mortgage loans.

68. By imposing higher interest rates and other discretionary fees and terms on residential mortgage loans to Plaintiffs and the Class than it imposes on non-minority mortgage borrowers, Defendant IndyMac has discriminated and continues to discriminate against Plaintiffs and members of the Class with respect to a credit transaction on the basis of race in violation of the ECOA. 15 U.S.C. § 1691(a).

69. In addition, Defendant IndyMac's pricing policies and procedures (including yield spread premiums), which provide financial incentives to its loan officers, mortgage brokers and correspondent lenders to make subjective decisions to increase interest rates and charge additional fees and costs, have a disparate impact on Plaintiffs and the Class.

70. As a proximate result of Defendant IndyMac's violation of 15 U.S.C. § 1691, Plaintiffs and members of the Class have been injured and are entitled to injunctive and declaratory relief and damages, or make whole equitable relief.

71. In addition, Defendant IndyMac's conduct as alleged herein was intentional, willful, wanton, reckless, malicious, outrageous, or otherwise aggravated beyond mere negligence. Defendant IndyMac acted with malice and reckless indifference to the federally protected rights of Plaintiffs and the Class. As a result, Plaintiffs and the Class are entitled to punitive damages.

72. Moreover, Defendant IndyMac continues to discriminate in violation of the ECOA against Class Members every time Defendant IndyMac provides a home mortgage loan as described herein. If not enjoined from such violation by the Court, Defendant IndyMac will continue to engage in conduct that disregards the rights of Plaintiffs and members of the Class, and cause Plaintiffs and the Class irreparable injury for which there is no adequate remedy at law. 15 U.S.C. § 1691(e).

73. Plaintiffs and the Class ask this Court to declare the rights of the parties herein regarding Defendant IndyMac's obligation to enter into credit transactions without discriminating against applicants for credit on the basis of the applicants' race.

## COUNT II
## VIOLATION OF THE FAIR HOUSING ACT (42 U.S.C. §§ 3601 – 3619)

74. Plaintiffs repeat, re-allege and incorporate the allegations in paragraphs 1 through 73 above as if fully set forth herein.

75. Mortgage lending and the providing of residential mortgage loans is a "residential real estate-related transaction" within the meaning of the FHA. 42 U.S.C. § 3605(b).

76. By imposing higher interest rates and other discretionary fees and terms on residential mortgage loans to Plaintiffs and the Class than it imposed on non-

minority mortgage borrowers, Defendant IndyMac has discriminated against Plaintiffs and the Class concerning their ability to participate in real estate-related transactions, and in the terms and conditions of such transactions, in violation of the FHA. 42 U.S.C. § 3605(a).

77.    In addition, Defendant IndyMac's pricing policies and procedures (including yield spread premiums), which provide financial incentives to its loan officers, mortgage brokers and correspondent lenders to make subjective decisions to increase interest rates and charge additional fees and costs, had a disparate impact upon Plaintiffs and the Class.

78.    As a proximate result of Defendant IndyMac's violation of 42 U.S.C. § 3605, Plaintiffs and the Class have been injured and are entitled to injunctive and declaratory relief and damages, or make whole equitable relief.

79.    In addition, Defendant IndyMac's conduct as alleged herein was intentional, willful, wanton, reckless, malicious, outrageous, or otherwise aggravated beyond mere negligence.  Defendant IndyMac acted with malice and reckless indifference to the federally protected rights of Plaintiffs and the Class.  As a result, Plaintiffs and the Class are entitled to punitive damages.

80.    Moreover, Defendant IndyMac continues to discriminate in violation of the FHA against members of the Class every time Defendant IndyMac provides a home mortgage loan as described herein.  If not enjoined from such violation by the Court, Defendant IndyMac will continue to engage in conduct that disregards the rights of Plaintiffs and the Class, and cause Plaintiffs and the Class irreparable injury for which there is no adequate remedy at law.  42 U.S.C. § 3613(c).

81.    Plaintiffs and the Class ask this Court to declare the rights of the parties herein regarding Defendant IndyMac's obligation to participate in credit transactions without discriminating against applicants for credit on the basis of the applicants' race.

# REQUESTS FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

A.    An order determining that the action is a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B.    A Judgment awarding Plaintiffs and the Class costs and disbursements incurred in connection with this action, including reasonable attorneys' fees, expert witness fees and other costs;

C.    A Judgment granting extraordinary equitable and/or injunctive relief as permitted by law or equity, including rescission, restitution, reformation, attaching, impounding, or imposing a constructive trust upon, or otherwise restricting, the proceeds of Defendant IndyMac's ill-gotten funds to ensure that Plaintiffs and the Class have an effective remedy;

D.    A Judgment awarding Plaintiffs and the Class compensatory damages according to proof;

E.    A Judgment awarding punitive damages to Plaintiffs and the Class;

F.    A Judgment granting declaratory and injunctive relief and all relief that flows from such injunctive and declaratory relief; and

G.    A Judgment or other Order granting such other and further relief as the Court deems just and proper.

# JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

Respectfully submitted
on behalf of Plaintiffs,

s/*Al Hofeld, Jr.*

Al Hofeld, Jr.,
LAW OFFICES OF AL HOFELD, JR. LLC
And The Social Justice Project, Inc.,
208 South LaSalle Street, Suite 1650
Chicago, Illinois 60604

Telephone: (312) 345-1004
Facsimile: (312) 346-3242
al@alhofeldlaw.com

Marvin A. Miller
Lori A. Fanning
MILLER LAW LLC
115 South LaSalle Street, Ste. 2910
Chicago, IL 60603
Telephone: (312) 676-2665
Facsimile: (312) 676-2676

Andrew S. Friedman
Wendy J. Harrison
T. Brent Jordan
BONNETT FAIRBOURN
FRIEDMAN & BALINT, P.C.
2901 North Central Avenue, Suite 1000
Phoenix, AZ 85012
Telephone: (602) 274-1100
Facsimile: (602) 274-1199

Gary Klein (BBO 560769)
Shennan Kavanagh (BBO 655174)
Kevin Costello (BBO 669100)
RODDY KLEIN & RYAN
727 Atlantic Avenue
Boston, MA 02111-2810
Tel: (617) 357-5500
Fax: (617) 357-5030

Mark A. Chavez
Jonathan Gertler
Nance F. Becker
CHAVEZ & GERTLER, L.L.P.
42 Miller Avenue
Mill Valley, CA 94941
Telephone: (415) 381-5599
Facsimile: (415) 381-5572

John J. Stoia, Jr.
Theodore J. Pintar
Leslie E. Hurst
COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423

Dated: April 16, 2008

# EXHIBIT C

FILED

APR 10 2007    NH

4-10-07

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| CARTER WARE and THELMA WARE, on behalf of themselves and the classes defined herein, | ) ) ) |
| Plaintiffs, | ) **07CV1982** ) **JUDGE BUCKLO** ) **MAGISTRATE JUDGE MASON** |
| v. | ) ) |
| INDYMAC BANK, FSB; HOMESTART MORTGAGE CORPORATION; CITIMORTGAGE, INC.; MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., and DOES 1-5, | ) ) ) ) ) ) |
| Defendants. | ) **JURY DEMANDED** ) |

## COMPLAINT – CLASS ACTION

### INTRODUCTION

1. Plaintiffs Carter Ware and Thelma Ware bring this action against a mortgage lender and broker to secure redress for discriminatory lending practices. Plaintiffs also seek rescission of two loans for violation of the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA").

### JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction under 28 U.S.C. §§1331 (general federal question), 1337 (interstate commerce), and 1367 (supplementary jurisdiction), 15 U.S.C. §1640 (TILA), 42 U.S.C. §3613 (Fair Housing Act), and 15 U.S.C. §1691e (Equal Credit Opportunity Act).

3. Defendants all transact business in the District and are deemed to reside here.

### PARTIES

4. Plaintiffs Carter Ware and Thelma Ware are husband and wife. They own

1

and reside in a home at 2615 N. Oak Park Ave., Chicago, IL 60707.

5. Plaintiffs are African-American.

6. Defendant IndyMac Bank, FSB ("Indymac") is a bank with its principal offices in California. It does business in Illinois and has offices at 20 N. Martingale Rd., Schaumburg, IL 60173-2412. It is engaged in the business of making and servicing residential mortgage loans and makes more than 26 such loans per year.

7. Defendant Homestart Mortgage Corporation ("Homestart") is an Illinois corporation with its principal office at 11 South LaSalle St., Suite 700, Chicago, IL 60603. It is engaged in the business of a mortgage broker and lender.

8. Defendant Citimortgage, Inc. ("Citimortgage") is a New York corporation with its principal place of business in Missouri. It does business in Illinois. Its registered agent and office are CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, Illinois 60604. It is engaged in the business of originating, purchasing, owning and servicing mortgages.

9. Defendant Mortgage Electronic Registration Systems, Inc. ("MERS") is a corporation that holds title to mortgages. It does business in Illinois. Its registered agent and office are CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, Illinois 60604. MERS holds title to the mortgages that resulted from the transaction complained of herein. MERS thus claims rights with respect to the transaction at issue herein and is a party necessary to be joined if feasible.

10. Plaintiffs are currently making payments to Indymac and Citimortgage on the loans at issue. MERS holds title to the mortgages. On information and belief, Indymac and Citimortgage are the beneficial owners of the loans. If they are not, the beneficial owners are named as Does 1-5.

## FACTS RELATING TO PLAINTIFFS

11. On or about March 25, 2005, plaintiffs had obtained a $313,500 loan from

2

Homestart secured by a mortgage on their residence, for the purpose of refinancing prior debts. Homestart had obtained broker fees totaling $4,438.75 from plaintiffs in connection with this transaction. In addition, Homestart had obtained a "yield spread premium," described below, of $3,448.50 from Ohio Savings Bank, to which the loan was immediately transferred.

12.     On or about November 1 and 2, 2005, plaintiffs were again refinanced through Homestart. This time, Homestart brokered two no-documentation loans through Indymac.

13.     Plaintiffs needed and used all of these loans for personal, family or household purposes, namely, refinancing of prior debt incurred for such purposes.

14.     The larger November 1, 2005 loan, # 100055401222131015, was in the amount of $280,000, with a note rate of 6.5%, adjustable from December 2010, and an APR of 6.990%, secured by a first mortgage on the Wares' residence. Thelma Ware signed the note and both Thelma and Carter Ware signed the mortgage.

15.     The smaller November 1, 2005 loan, #100055401222134332, was in the amount of $49,000, with a fixed note rate of 7.75% and an APR of 8.017% and a balloon payment of $37,646, payable after 15 years, secured by a second mortgage on the Wares' residence. Thelma Ware signed the note and both Thelma and Carter Ware signed the mortgage.

16.     The combined total of the two loans was thus $329,000.

17.     Plaintiffs paid Homestart a broker fee of $4,720 on the larger loan (HUD-1, lines 801, 812) and $795 on the smaller loan (HUD-1, lines 801, 810), or a total of $5,515.

18.     The $5,515 represented reasonable compensation for originating $329,000 in financing.

19.     In addition, Indymac paid Homestart a "yield spread premium" of $7,000 on the larger loan and $245 on the smaller loan.

20.     A "yield spread premium" is a payment by a lender to a broker based on the extent to which the interest rate on the loan exceeds a "par" rate. For example, if the interest

3

rate on the loan is .50% above "par," the lender will pay a "yield spread premium" of, e.g., 0.5% of the principal amount of the loan to the broker.

        21.     The total broker compensation received by Homestart on the November 1, 2005 loans was thus $12,760.

        22.     The total compensation of $12,760 received by Homestart was exorbitant and unreasonable.

        23.     Yield spread premiums disproportionately impact minority borrowers such as plaintiffs.  This result is known and intended by defendants.

        24.     As a result of defendants' conduct, plaintiffs were induced to sign loan documents providing for a loan that was unnecessarily expensive and which was made on less favorable terms than loans made to Caucasian individuals.

        25.     The following are documents relating to the larger loan:

            a.     A note, Exhibit A;

            b.     A mortgage, Exhibit B;

            c.     A settlement statement, Exhibit C;

            d.     A Truth in Lending statement, Exhibit D;

            e.     The three-day notice of right to cancel required by the Federal

Reserve Board, Exhibit E.

            f.     An itemization of amount financed, Exhibit F.

        26.     The following are documents relating to the smaller loan:

            a.     A note, Exhibit G;

            b.     A mortgage, Exhibit H;

             c.     A settlement statement, Exhibit I;

             d.     A Truth in Lending statement, Exhibit J;

             e.     The three-day notice of right to cancel required by the Federal

Reserve Board, Exhibit K.

f.    An itemization of amount financed, Exhibit L.

27.    Although the loan documents purport to have been signed at a title
company on November 1, 2005, they were in fact signed at plaintiffs' home over a period of two
days, believed to be November 1 and 2, 2005.

28.    No copies of the Truth in Lending financial disclosures or notices of right
to cancel were furnished to plaintiffs on either day of the closing. The person conducting the
closing did not bring extra sets of loan documents and plaintiffs did not have a copier at their
home. The person conducting the closing therefore sent a copy of the loan documents by mail,
with plaintiffs receiving them after the three-day rescission period expired.

29.    Plaintiffs are continuing to make payments on the larger loan to Indymac.
Plaintiffs were directed to make payments on the smaller loan to Citimortgage.

30.    On information and belief, Indymac and Citimortgage own plaintiffs'
loans.

31.    In the event Indymac and Citimortgage do not own plaintiff's loan, the
actual owners or holders are named as Does 1-5.

## COUNT I – FAIR HOUSING ACT

32.    Plaintiffs incorporate paragraphs 1-31. This claim is against Indymac and
Homestart.

33.    The Fair Housing Act, 42 U.S.C. §3605, provides:

**Discrimination in residential real estate-related transactions**

**(a) In general. It shall be unlawful for any person or other entity whose
business includes engaging in residential estate-related transactions to
discriminate against any person in making available such a transaction, or in
the terms or conditions of such a transaction, because of race, color, religion,
sex, handicap, familial status, or national origin.**

**(b) "Residential real estate-related transaction" defined. As used in this
section, the term "residential real estate-related transaction" means any of
the following:**

**(1) The making or purchasing of loans or providing other financial
assistance--**

5

(A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or

(B) secured by residential real estate.

(2) The selling, brokering, or appraising of residential real property.

(c) Appraisal exemption. Nothing in this title prohibits a person engaged in the business of furnishing appraisals of real property to take into consideration factors other than race, color, religion, national origin, sex, handicap, or familial status.

34. Defendants Indymac and Homestart violated the Fair Housing Act by paying and receiving, respectively, higher yield spread premiums with respect to loans made to minority borrowers, which necessarily impacts the rates charged to such borrowers.

35. The Fair Housing Act, 42 U.S.C. §3613, provides:

§ 3613. Enforcement by private persons

(a) Civil action.

(1) (A) An aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice, or the breach of a conciliation agreement entered into under this title, whichever occurs last, to obtain appropriate relief with respect to such discriminatory housing practice or breach. . . .

(c) Relief which may be granted.

(1) In a civil action under subsection (a), if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages, and subject to subsection (d), may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).

(2) In a civil action under subsection (a), the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee and costs. The United States shall be liable for such fees and costs to the same extent as a private person. . . .

## CLASS ALLEGATIONS

36. Plaintiffs bring this claim on behalf of two classes, Homestart and

Indymac.

37.     The Homestart class consists of (a) all Hispanic and African-American persons with Illinois addresses, (b) who obtained a loan from any lender through Homestart, (c) and paid Homestart direct compensation of not less than 1% of the loan principal or $2,000, whichever is greater, (d) where Homestart received a yield spread premium of not less than 1% of the loan principal or $2,000, whichever is greater, (e) where the loan was closed on or after a date two years prior to the filing of this action.

38.     The Indymac class consists of (a) all Hispanic and African-American persons with Illinois addresses, (b) who obtained a loan from Indymac through a broker, (c) which broker was paid direct compensation of not less than 1% of the loan principal or $2,000, whichever is greater, (d) where Indymac paid the broker a yield spread premium of not less than 1% of the loan principal or $2,000, whichever is greater, (e) where the loan was closed on or after a date two years prior to the filing of this action.

39.     Each class is so numerous that joinder is impracticable. On information and belief, there are more than 50 members of the class.

40.     There are questions of law and fact common to the members of the class, which common questions predominate over any questions that affect only individual class members. The predominant common question is whether the payment and receipt of yield spread premiums results in loan terms which are intended to discriminate or have the effect of discriminating against Hispanic or African-American borrowers.

41.     Plaintiffs' claim is typical of the claims of the class members. All are based on the same factual and legal theories.

42.     Plaintiffs will fairly and adequately represent the interests of the class members. Plaintiffs have retained counsel experienced in consumer credit cases.

43.     A class action is superior to other alternative methods of adjudicating this dispute. Individual cases are not economically feasible. The nature of the claim is such that

7

proof of the classwide impact of yield spread premiums is necessary. .

WHEREFORE, plaintiffs request that the Court enter judgment in favor of

plaintiffs and the classes and against defendants for:

              a.     Appropriate damages;

              b.     Attorney's fees, litigation expenses and costs.

              c.     Such other or further relief as the Court deems appropriate.

### COUNT II – EQUAL CREDIT OPPORTUNITY ACT

44.     Plaintiffs incorporate paragraphs 1-31. This claim is against Indymac and

Homestart.

45.     The Equal Credit Opportunity Act, 15 U.S.C. §1691, provides:

**(a) Activities constituting discrimination. It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction--**

**(1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract) . . .**
**.**

46.     Defendants Indymac and Homestart violated the ECOA.

47.     The Equal Credit Opportunity Act, 15 U.S.C. §1691e, further provides:

**Civil liability**

**(a) Individual or class action for actual damages. Any creditor who fails to comply with any requirement imposed under this title shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class.**

**(b) Recovery of punitive damages in individual and class action for actual damages; exemptions; maximum amount of punitive damages in individual actions; limitation on total recovery in class actions; factors determining amount of award. Any creditor, other than a government or governmental subdivision or agency, who fails to comply with any requirement imposed under this title shall be liable to the aggrieved applicant for punitive damages in an amount not greater than $ 10,000, in addition to any actual damages provided in subsection (a), except that in the case of a class action the total recovery under this subsection shall not exceed the lesser of $ 500,000 or 1 per centum of the net worth of the creditor. In determining the amount of such damages in any action, the court shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by the creditor, the resources of the**

8

creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional.

(c) Action for equitable and declaratory relief. Upon application by an aggrieved applicant, the appropriate United States district court or any other court of competent jurisdiction may grant such equitable and declaratory relief as is necessary to enforce the requirements imposed under this title.

(d) Recovery of costs and attorney fees. In the case of any successful action under subsection (a), (b), or (c), the costs of the action, together with a reasonable attorney's fee as determined by the court, shall be added to any damages awarded by the court under such subsection. . . .

(f) Jurisdiction of courts; time for maintenance of action; exceptions. Any action under this section may be brought in the appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction. No such action shall be brought later than two years from the date of the occurrence of the violation . . . .

## CLASS ALLEGATIONS

48.     Plaintiffs bring this claim on behalf of two classes, Homestart and Indymac.

49.     The Homestart class consists of (a) all Hispanic and African-American persons with Illinois addresses, (b) who obtained a loan from any lender through Homestart, (c) and paid Homestart direct compensation of not less than 1% of the loan principal or $2,000, whichever is greater, (d) where Homestart received a yield spread premium of not less than 1% of the loan principal or $2,000, whichever is greater, (e) where the loan was closed on or after a date two years prior to the filing of this action.

50.     The Indymac class consists of (a) all Hispanic and African-American persons with Illinois addresses, (b) who obtained a loan from Indymac through a broker, (c) which broker was paid direct compensation of not less than 1% of the loan principal or $2,000, whichever is greater, (d) where Indymac paid the broker a yield spread premium of not less than 1% of the loan principal or $2,000, whichever is greater, (c) where the loan was closed on or after a date two years prior to the filing of this action.

51.     Each class is so numerous that joinder is impracticable. On information and belief, there are more than 50 members of the class.

9

52. There are questions of law and fact common to the members of the class, which common questions predominate over any questions that affect only individual class members. The predominant common question is whether the payment and receipt of yield spread premiums results in loan terms which are intended to discriminate or have the effect of discriminating against Hispanic or African-American borrowers.

53. Plaintiffs' claim is typical of the claims of the class members. All are based on the same factual and legal theories.

54. Plaintiffs will fairly and adequately represent the interests of the class members. Plaintiffs have retained counsel experienced in consumer credit cases.

55. A class action is superior to other alternative methods of adjudicating this dispute. Individual cases are not economically feasible. The nature of the claim is such that proof of the classwide impact of yield spread premiums is necessary.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and the classes and against defendants for:

        a.     Appropriate damages;

        b.     Attorney's fees, litigation expenses and costs.

        c.     Such other or further relief as the Court deems appropriate.

## COUNT III – ILLINOIS CONSUMER FRAUD ACT

56. Plaintiffs incorporate paragraphs 1-31. This claim is against Indymac and Homestart.

57. Defendants Homestart and Indymac engaged in unfair practices, in violation of §2 of the Illinois Consumer Fraud Act, 815 ILCS 505/2, by engaging in the discriminatory conduct that gives rise to the Fair Housing Act and ECOA violations.

58. Plaintiffs were damaged as a result.

## CLASS ALLEGATIONS

59. Plaintiffs bring this claim on behalf of two classes, Homestart and

10

Indymac.

    60.    The Homestart class consists of (a) all Hispanic and African-American persons with Illinois addresses, (b) who obtained a loan from any lender through Homestart, (c) and paid Homestart direct compensation of not less than 1% of the loan principal or $2,000, whichever is greater, (d) where Homestart received a yield spread premium of not less than 1% of the loan principal or $2,000, whichever is greater, (e) where the loan was closed on or after a date 3 years prior to the filing of this action.

    61.    The Indymac class consists of (a) all Hispanic and African-American persons with Illinois addresses, (b) who obtained a loan from Indymac through a broker, (c) which broker was paid direct compensation of not less than 1% of the loan principal or $2,000, whichever is greater, (d) where Indymac paid the broker a yield spread premium of not less than 1% of the loan principal or $2,000, whichever is greater, (e) where the loan was closed on or after a date 3 years prior to the filing of this action.

    62.    Each class is so numerous that joinder is impracticable. On information and belief, there are more than 50 members of the class.

    63.    There are questions of law and fact common to the members of the class, which common questions predominate over any questions that affect only individual class members. The predominant common question is whether the payment and receipt of yield spread premiums results in loan terms which are intended to discriminate or have the effect of discriminating against Hispanic or African-American borrowers.

    64.    Plaintiffs' claim is typical of the claims of the class members. All are based on the same factual and legal theories.

    65.    Plaintiffs will fairly and adequately represent the interests of the class members. Plaintiffs have retained counsel experienced in consumer credit cases.

    66.    A class action is superior to other alternative methods of adjudicating this dispute. Individual cases are not economically feasible. The nature of the claim is such that

proof of the classwide impact of yield spread premiums is necessary.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and the classes and against defendants for:

        a.    Appropriate damages;

        b.    Attorney's fees, litigation expenses and costs.

        c.    Such other or further relief as the Court deems appropriate.

### COUNT IV -- TRUTH IN LENDING ACT

67.    Plaintiffs incorporate paragraphs 1-31. This claim is against all defendants except Homestart.

### RIGHT TO RESCIND

68.    Because the transaction was secured by plaintiffs' home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by 15 U.S.C. §1635 and 12 C.F.R. §226.23. Section 226.23 provides:

**(a) Consumer's right to rescind.**

**(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47**

**(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.**

**(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act. [15 U.S.C. §1635(f)]**

12

(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.

(b) Notice of right to rescind. In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

(1) The retention or acquisition of a security interest in the consumer's principal dwelling.

(2) The consumer's right to rescind the transaction.

(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(4) The effects of rescission, as described in paragraph (d) of this section.

(5) The date the rescission period expires. . . .

(f) Exempt transactions. The right to rescind does not apply to the following:

(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].

(2) A credit plan in which a state agency is a creditor.

## GROUNDS FOR RESCISSION

69.    In connection with the loan, Indymac failed to provide the required disclosures of the plaintiff's right to cancel within three days, in violation of 15 U.S.C. §1635 and 12 C.F.R. §226.23, or the required financial disclosures, in violation of 15 U.S.C. §1637 and 12 C.F.R. §226.18, because none of the documents were delivered to plaintiffs in a form they could keep until after the rescission period expired.

70.    Notice of rescission has been given to defendants.

71.    The loan has not been rescinded.

72.    Under 15 U.S.C. §1641(c), the right to rescind may be exercised against any assignee, including Citimortgage.

73.    15 U.S.C. §1635(g) provides:

13

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiff requests that the Court enter judgment in favor of

plaintiffs and against defendants for:

        a.      A judgment voiding plaintiffs' mortgage, capable of recordation in

the public records, and binding on defendants;

        b.      If appropriate, statutory damages for failure to rescind;

        c.      Attorney's fees, litigation expenses and costs.

        d.      Such other or further relief as the Court deems appropriate.

Daniel A. Edelman

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
Tara L. Goodwin
Michelle R. Teggelaar
Al Hofeld, Jr.
EDELMAN, COMBS, LATTURNER
     & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

**JURY DEMAND**

Plaintiffs demand trial by jury.

Daniel A. Edelman

14

## <u>NOTICE OF LIEN</u>

Please be advised that we claim a lien upon any recovery herein for such amount as a court awards.

_____
Daniel A. Edelman

Daniel A. Edelman
EDELMAN, COMBS, LATTURNER
    & GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

T:\19374\Pleading\Complaint_Pleading.wpd

15

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CARTER WARE and THELMA WARE, | ) | |
| on behalf of themselves and the classes | ) | |
| defined herein, | ) | |
| | ) | 07 CV 1982 |
| Plaintiffs, | ) | |
| | ) | Judge Elaine E. Bucklo |
| v. | ) | |
| | ) | Magistrate Judge Mason |
| INDYMAC BANK, FSB; | ) | |
| HOMESTART MORTGAGE CORPORATION; | ) | |
| CITIMORTGAGE, INC.; | ) | |
| MORTGAGE ELECTRONIC REGISTRATION | ) | |
| SYSTEMS, INC., and | ) | |
| DOES 1-5, | ) | **JURY DEMANDED** |
| Defendants. | ) | |

**MOTION TO WITHDRAW REPRESENTATION OF PLAINTIFFS**
**CARTER WARE AND THELMA WARE**

Counsel for plaintiff, Daniel A. Edelman, Cathleen M. Combs and James O. Latturner of EDELMAN, COMBS, LATTURNER & GOODWIN, LLC. ("Counsel") respectfully request that this Court grant them leave to withdraw their appearances on behalf of plaintiffs Carter Ware and Thelma Ware pursuant to Rule 83.17 of the Northern District of Illinois.

In support of this motion, Counsel state the following:

1.    Plaintiffs have discharged EDELMAN, COMBS, LATTURNER & GOODWIN, LLC. as attorneys for Ware v. Indymac Bank, FSB, et al. (N.D.Ill Case No.: 07 C 1982)(See attached Exhibit A).

2.    Responsibility as counsel for plaintiffs will be transferred to Al Hofeld, Jr.

1

of The Law Offices of Al Hofeld, Jr., LLC.

WHEREFORE, Counsel respectfully requests that the Court enter an order

permitting the withdrawal of the appearances of Daniel A. Edelman, Cathleen M. Combs and

James O. Latturner as counsel for plaintiffs in this matter.

Respectfully submitted,

s/Cathleen M. Combs
Cathleen M. Combs

Daniel A. Edelman
Cathleen M. Combs
James O. Latturner
EDELMAN, COMBS, LATTURNER & GOODWIN, LLC.
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200

## CERTIFICATE OF SERVICE

I, Cathleen M. Combs, hereby certify that on February 27, 2008, I filed the foregoing documents with the Clerk of the Court using the CM/ECF System. Notice of this filing will be sent by electronic mail to all counsel of record by operation of the Court's electronic filing system. Parties may access this filing through the Court's system. I further certify that true and correct copies were additionally sent *via* fax and US Mail to parties without an email address.

Todd A. Gale
tgale@dykema.com

Richard Eric Gottlieb
rgottlieb@dykema.com

Renee Lynn Zipprich
rzipprich@dykema.com

David M. Schultz
dschultz@hinshawlaw.com

Jennifer W. Weller
jweller@hinshawlaw.com


In addition, I had a copy of this document sent *via* fax and U.S. mail to:

Al Hofeld, Jr.
Law Offices of Al Hofeld, Jr., LLC
208 S. La Salle St., Suite #1650
Chicago, IL 60604
(F) 312-346-3242

s/Cathleen M. Combs
Cathleen M. Combs

# EXHIBIT A

February 25, 2008

Daniel A. Edelman
Edelman, Combs, Latturner & Goodwin, LLC
120 S. LaSalle Street, Suite #1800
Chicago, IL 60604
Fax: (312) 419-0379

       Re:   Ware v. Indymac, Homestart

Dear Mr. Edelman:

With this letter, my wife and I hereby discharge your firm as our attorneys in our case, Ware v. Indymac and Homestart, 07 C 1982 (N.D.Ill.), effective immediately. As such, this letter voids our contingency fee agreement with your firm.

Since before our case was filed, we have worked closely with Mr. Al Hofeld, Jr., and no one else. He is very familiar with the case and the people involved. In addition, we know and trust Mr. Hofeld and believe he is doing a good job on the case. Congressman Danny Davis spoke very highly of him at a community meeting we attended last summer. Now that we have discovered that he has left the firm and opened his own law practice, we want him to continue to represent us in our case.

Please do not contact us under any circumstances to discuss this matter, whether by phone, personal visit, facsimile or any other manner. I do not expect any attempt by anyone acting on your behalf to contact us. If you do not respect our wishes and our contract with my new attorneys, I will report your conduct to the appropriate authority and inform Mr. Hofeld that you are trying to interfere with our contract.

Please turn over my complete case file to the Law Offices of Al Hofeld, Jr., 208. S. LaSalle, Suite #1650, Chicago, IL, 60604, immediately. We understand there are deadlines set by the court, and we do not want any delay in the prosecution of our case.

Sincerely,

Carter Ware

2615 N. Oak Park Avenue
Chicago, IL 60607

Thelma Ware

# EXHIBIT E

BONNETT, FAIRBOURN, FRIEDMAN
& BALINT, P.C.
Andrew S. Friedman (to seek *pro hac vice*)
afriedman@bffb.com
Wendy J. Harrison (CA 151090)
wharrison@bffb.com
2901 North Central Avenue, Suite 1000
Phoenix, Arizona 85012
(602) 274-1100

Additional counsel listed on signature page

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID ULLOA, | ) No. **CV08-1312 SVW (CWx)** |
| Plaintiff, | ) |
| | ) **NOTICE OF VOLUNTARY** |
| | ) **DISMISSAL WITHOUT** |
| v. | ) **PREJUDICE** |
| | ) |
| INDYMAC BANK, F.S.B., | ) |
| Defendant. | ) |
| | ) |

1    TAKE NOTICE that pursuant to Federal Rule of Civil Procedure 41(a),

2  Plaintiff David Ulloa, by and through undersigned counsel, hereby voluntarily

3  dismisses this action without prejudice. No answer has been filed by Defendant in

4  this action.

5    DATED this 18th day of April, 2008.

6                                    BONNETT, FAIRBOURN, FRIEDMAN, &
                                     BALINT, P.C.
7

8     /s Wendy J. Harrison
                                     Andrew S. Friedman (to seek *pro hac vice*)
9                                    afriedman@bffb.com
                                     Wendy J. Harrison (CA SBN 151090)
10                                   wharrison@bffb.com
                                     2901 North Central Avenue, Suite 1000
11                                   Phoenix, Arizona 85012
                                     (602) 274-1100
12

13                                   CHAVEZ & GERTLER, L.L.P.
14                                   Mark A. Chavez (CA SBN 90858)
                                     mark@chavezgertler.com
15                                   Jonathan Gertler (CA SBN 111531)
                                     jon@chavezgertler.com
16                                   Nance F. Becker (CA SBN 99292)
17                                   nance@chavezgertler.com
                                     42 Miller Avenue
18                                   Mill Valley, California 94941
19                                   (415) 381-5599
20

21                                   COUGHLIN STOIA GELLER RUDMAN
                                     & ROBBINS LLP
22                                   John J. Stoia, Jr. (CA SBN 141757)
23                                   johns@csgrr.com
                                     Theodore J. Pintar (CA SBN 131372)
24                                   tedp@csgrr.com
25                                   655 West Broadway, Suite 1900
                                     San Diego, CA 92101
26                                   (619) 231-1058
27

28                                   *Attorneys for Plaintiff*

# EXHIBIT F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CARTER WARE and THELMA WARE,<br>on behalf of themselves and the classes<br>defined herein, | ) ) ) | |
| | ) | 07 CV 1982 |
| Plaintiffs, | ) ) | |
| v. | ) ) | Judge Bucklo |
| | ) | Magistrate Judge Mason |
| INDYMAC BANK, FSB;<br>HOMESTART MORTGAGE CORPORATION;<br>CITIMORTGAGE, INC.;<br>MORTGAGE ELECTRONIC REGISTRATION<br>SYSTEMS, INC., and<br>DOES 1-5, | ) ) ) ) ) ) | |
| | ) | **JURY DEMANDED** |
| Defendants. | ) | |

### SECOND AMENDED COMPLAINT – CLASS ACTION

### INTRODUCTION

1.      Plaintiffs Carter Ware and Thelma Ware bring this action against a mortgage broker and lender to secure redress for discriminatory lending practices. Plaintiffs also seek rescission of two loans for violation of the Truth in Lending Act, 15 U.S.C. §1601 et seq. ("TILA") and damages for violations of the Illinois Consumer Fraud Act, 815 ILCS 505/2, the Credit Repair Organizations Act, 15 U.S.C. § 1679 et seq. and for breach of fiduciary duty.

### JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction under 28 U.S.C. §§1331 (general federal question), 1337 (interstate commerce), and 1367 (supplementary jurisdiction), 15 U.S.C. §1640 (TILA), 42 U.S.C. §3613 (Fair Housing Act), and 15 U.S.C. §1691e (Equal Credit Opportunity Act).

1

3. Defendants all transact business in the District and are deemed to reside here.

## PARTIES

4. Plaintiffs Carter Ware and Thelma Ware are husband and wife. They own and reside in a home at 2615 N. Oak Park Ave., Chicago, IL 60707.

5. Plaintiffs are African-American.

6. Defendant IndyMac Bank, FSB ("Indymac") is a bank with its principal offices in California. It does business in Illinois and has offices at 20 N. Martingale Rd., Schaumburg, IL 60173-2412. It is engaged in the business of making and servicing residential mortgage loans and makes more than 26 such loans per year.

7. Defendant Homestart Mortgage Corporation ("Homestart") is an Illinois corporation with its principal office at 11 South LaSalle St., Suite 700, Chicago, IL 60603. It is engaged in the business of a mortgage broker and lender.

8. Defendant Citimortgage, Inc. ("Citimortgage") is a New York corporation with its principal place of business in Missouri. It does business in Illinois. Its registered agent and office are CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, Illinois 60604. It is engaged in the business of originating, purchasing, owning and servicing mortgages.

9. Defendant Mortgage Electronic Registration Systems, Inc. ("MERS") is a corporation that holds title to mortgages. It does business in Illinois. Its registered agent and office are CT Corporation System, 208 S. LaSalle St., Suite 814, Chicago, Illinois 60604. MERS holds title to the mortgages that resulted from the

2

transaction complained of herein. MERS thus claims rights with respect to the transaction at issue herein and is a party necessary to be joined if feasible.

10. Plaintiffs are currently making payments to Indymac on the loans at issue. MERS holds title to the mortgages. On information and belief, Indymac is the beneficial owner of the loans. If it is not, the beneficial owners are named as Does 1-5.

## FACTS RELATING TO PLAINTIFFS

### Fraud In the Inducement: Inadequate Disclosure

11. Prior to March 25, 2005, plaintiffs were solicited by defendant Homestart and Jerri Benefield, an agent of Homestart, a mortgage broker, for a refinance mortgage loan. Homestart had already refinanced plaintiffs once in March, 2004. Plaintiffs trusted Benefield.

12. In connection with the March 25, 2005 loan, plaintiffs provided Benefield with documentation that supported their statements about their income and assets.

13. On or about March 25, 2005, plaintiffs obtained a $313,500 loan through Homestart secured by a mortgage on their residence, for the purpose of refinancing prior debts. Homestart had obtained broker fees totaling $4,438.75 from plaintiffs in connection with this transaction. In addition, Homestart had obtained a "yield spread premium," described below, of $3,448.50 from Ohio Savings Bank, to which the loan was immediately transferred.

14. In October, 2005, Benefield again contacted Mr. Ware and solicited him for a refinance mortgage loan.

15. During the application process for this "no doc" loan, Benefield

3

orally asked plaintiffs for, and plaintiffs orally provided her with, information concerning their employment, income, assets, home and other pertinent matters. Plaintiffs were truthful at all times.

16.     At closing on or about November 1 and 2, 2005, Homestart brokered two no-documentation loans through defendant Indymac. Plaintiffs were not informed that they were being given two loans, that one of them would have a prepayment penalty or that the other would have a balloon payment.

17.     Although the loan documents purport to have been signed at a title company on November 1, 2005, they were in fact signed at plaintiffs' home over a period of two days, believed to be November 1 and 2, 2005.

18.     At that time, Benefield rushed plaintiffs through the closing, telling them where to sign as she carried on a conversation on her cell phone and without explaining the documents or loan terms to plaintiffs.

19.     No copies of the Truth in Lending financial disclosures or notices of right to cancel were furnished to plaintiffs on either day of the closing. The person conducting the closing did not bring extra sets of loan documents, and plaintiffs did not have a copier at their home. The person conducting the closing therefore sent a copy of the loan documents by U.S. mail, with plaintiffs receiving them after the three-day rescission period expired.

20.     The following are documents relating to the larger loan:

        a.      A note, Exhibit A;

        b.      A mortgage, Exhibit B;

        c.      A settlement statement, Exhibit C;

4

     d.    A Truth in Lending statement, Exhibit D;

     e.    The three-day notice of right to cancel required by the

Federal Reserve Board, Exhibit E.

     f.    An itemization of amount financed, Exhibit F.

    21.    The following are documents relating to the smaller loan:

     a.    A note, Exhibit G;

     b.    A mortgage, Exhibit H;

     c.    A settlement statement, Exhibit I;

     d.    A Truth in Lending statement, Exhibit J;

     e.    The three-day notice of right to cancel required by the

Federal Reserve Board, Exhibit K.

     f.    An itemization of amount financed, Exhibit L.

    22.    Plaintiffs needed and used all of these loans for personal, family or

household purposes.

    23.    The larger November 1, 2005 loan, # 100055401222131015, was

in the amount of $280,000, with a note rate of 6.5%, adjustable from December 2010,

and an APR of 6.990%, secured by a first mortgage on the Wares' residence and

containing a prepayment penalty. Thelma Ware signed the note and both Thelma and

Carter Ware signed the mortgage.

    24.    The smaller November 1, 2005 loan, #100055401222134332, was

in the amount of $49,000, with a fixed note rate of 7.75% and an APR of 8.017% and a

balloon payment of $37,646, payable after 15 years, secured by a second mortgage on the

Wares' residence. Thelma Ware signed the note and both Thelma and Carter Ware

signed the mortgage.

25.     On the pre-printed loan applications that Benefield and/or Homestart prepared and had plaintiffs sign at the closings for both the March and November, 2005 loans (Exhibits M and N), Benefield and/or Homestart intentionally falsified information about plaintiffs' employment, income and assets. Plaintiffs were unaware of this until after they contacted their current counsel.

26.     For instance, when Benefield and/or Homestart created the application for the March, 2005 loan, Mrs. Ware was employed full-time as security guard for the TSA at O'Hare Airport and was earning less than 1/3 of the $9,200 gross monthly income stated on the application. Further, plaintiffs purchased the home for $141,000, not $250,000, as stated on the application (Exhibit M).

27.     In addition, when Benefield and/or Homestart created the application for the November, 2005 loan, Mrs. Ware was unemployed and told Benefield so. Neither she nor both plaintiffs had combined income anywhere near the $9,100 Benefield and/or Homestart reported on that application (Exhibit N).

28.     Benefield and Homestart falsified the information for the purpose of making the loan, creating the appearance that plaintiffs qualified for a higher loan amount, which in turn increased the amounts of Benefield's and Homestart's percentage-based, commission and broker fees, respectively.

29.     For the same purpose, on information and belief Homestart significantly inflated the appraised value of plaintiffs' home or knew that the value had been inflated.

30.     At Homestart's request, Stephen P. Grossi appraised the home and

6

prepared an appraisal report for Homestart on October 3, 2005 that states that plaintiffs' home was worth $350,000.

### Discrimination On Account of Race

31.     In connection with the larger loan in the November, 2005 transaction, plaintiffs paid Homestart a $4,200 "loan origination fee," a $520 "processing fee" and a $50 "Credit Report" (Exhibit C, lines 801, 804, 812). In connection with the smaller loan, plaintiffs paid Homestart a $500 "loan origination fee," and a $295.00 "Processing Fee" (Exhibit I, lines 801, 810). Total direct broker compensation for the transaction was $5,565. All of the broker fees were financed.

32.     The $5,565 in total direct broker compensation was greater (as a percentage of principal loan amount), on average, than Homestart charged in broker compensation to its Caucasian borrowers. Indymac's loan pricing policies not only permitted but fostered this discrepancy in the loans it originated during the class period, both through Homestart and the other mortgage brokers it did business with.

33.     In addition, Indymac paid Homestart a "yield spread premium" of $7,000 for the larger loan (Exhibit C, line 808) and $245 for the smaller loan (Exhibit I, line 808).

34.     Similarly, Indymac paid both larger (i.e., as a percentage of loan principal) yield spread premiums, on average, and paid yield spread premiums more frequently in connection with loans it originated to its African-American borrowers (as compared loans it originated to Caucasians).

35.     A "yield spread premium" (or "YSP") is a payment by a lender to a broker based on the extent to which the broker increases the interest rate above the base

or "par" interest rate. The par interest rate is the minimum rate at which the lender is willing to make the loan, based on an objective analysis of the applicant's qualifications for credit.

36. For example, if the broker increases the interest rate on the loan to .50% above "par," the lender will pay a "yield spread premium" of, e.g., 0.5% of the principal amount of the loan to the broker. The amount of YSP the lender pays is usually a percentage of the principal amount of the loan that is equal to the percentage of increase in the rate obtained by the broker. E.g., in exchange for the broker securing a .5% increase in rate above par on a loan of $300,000, the lender would pay a YSP of $1,500.

37. Indymac designed, established and implemented the YSP incentive structure for its mortgage brokers, including the formulas according to which it would pay YSPs, in order to originate loans at higher interest rates. (Generally, the YSP formulas are communicated to brokers in lenders' "rate sheets" or similar forms.)

38. The lender's payment of a YSP to the broker and the broker's imposition of a higher interest rate - and the determination of the amounts of those quantities - are unrelated to the borrower's qualifications or credit risk, as determined by analysis of objective factors such as credit scores, debt-to-income and loan-to-value ratios.

39. In this and other ways, Indymac delegated authority to its brokers to engage in the subjective mark up of interest rates, without regard to credit qualifications or risk. Indymac also permitted and encouraged brokers to charge additional points and fees in direct broker compensation. Indymac profits greatly from these policies and practices.

40.     Indymac's payment and Homestart's receipt of YSPs disproportionately and adversely affect African-American borrowers such as plaintiffs. Defendants, on average, subjected plaintiffs and other African-Americans to higher, direct broker fees and/or to greater and/or more frequently imposed yield spread premiums.

41.     Because payment of YSPs result in interest rates increases and because direct broker fees are financed, defendants' practices necessarily mean that African-Americans, on average, paid more in broker fees, subsequent finance charges and received higher interest rates from defendants on account of their race.

42.     These results are known and intended by defendants. Patterns of disparity by race in mortgage loan interest rates and in broker compensation have been the subject of numerous academic and industry studies and reports, as well as federal agency actions, in recent years. On notice of these concerns, defendants continued their lucrative practices anyway.

43.     As a result of defendants' loan pricing practices, plaintiffs were induced to sign loan documents providing for a loan that was unnecessarily expensive and which was made on less favorable terms, on average, than loans defendants brokered or made to their Caucasian customers.

44.     There is no legitimate business reason justifying the discriminatory effect of defendants' practices of imposing on plaintiffs and other minorities, regardless of qualifications, higher interest rates and/or greater broker fees on average than they imposed on Caucasian borrowers.

45.     Alternative pricing practices exist that would not have the same

9

disparate impact on plaintiffs and other African-Americans.

46. Defendants' falsification of plaintiffs financial and asset information has also made it difficult for plaintiffs to refinance to escape the unfavorable terms.

47. Plaintiffs are continuing to make payments on the larger loan to Indymac. Plaintiffs were directed to make payments on the smaller loan to Citimortgage, then Indymac.

48. On information and belief, Indymac now owns plaintiffs' loans.

49. In the event Indymac does not own plaintiffs' loans, the actual owners or holders are named as Does 1-5.

## COUNT 1 – FAIR HOUSING ACT

50. Plaintiffs incorporate paragraphs 1-49. This claim is against Indymac and Homestart.

51. The Fair Housing Act, 42 U.S.C. §3605, provides:

**Discrimination in residential real estate-related transactions**

**(a) In general. It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.**

**(b) "Residential real estate-related transaction" defined. As used in this section, the term "residential real estate-related transaction" means any of the following:**

**(1) The making or purchasing of loans or providing other financial assistance—**

**(A) for purchasing, constructing, improving, repairing, or maintaining a dwelling; or**

10

(B) secured by residential real estate.

(2) The selling, brokering, or appraising of residential real property.

(c) Appraisal exemption. Nothing in this title prohibits a person engaged in the business of furnishing appraisals of real property to take into consideration factors other than race, color, religion, national origin, sex, handicap, or familial status.

52.     Defendants Indymac and Homestart violated the Fair Housing Act by paying and receiving, respectively, greater and/or more frequent yield spread premiums in connection with loans made to African-Americans, which necessarily increases the rates charged to such borrowers. Indymac and Homestart also encouraged the charging of and charged, respectively, greater direct broker fees to African-American borrowers relative to their Caucasian customers.

53.     The Fair Housing Act, 42 U.S.C. §3613, provides:

§ 3613. Enforcement by private persons

(a) Civil action.

(1) (A) An aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice, or the breach of a conciliation agreement entered into under this title, whichever occurs last, to obtain appropriate relief with respect to such discriminatory housing practice or breach. . . .

(c) Relief which may be granted.

(1) In a civil action under subsection (a), if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages, and subject to subsection (d), may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in

11

such practice or ordering such affirmative action as may be appropriate).

(2) In a civil action under subsection (a), the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee and costs. The United States shall be liable for such fees and costs to the same extent as a private person. . . .

## CLASS ALLEGATIONS

54.     Plaintiffs bring this claim on behalf of two classes, Homestart and Indymac.

55.     The Homestart class consists of plaintiffs and all African-American consumers who obtained a home mortgage loan through Homestart in Illinois between April 11, 2005 (the filing date of this action) and the date of judgment who paid, on average, more in direct broker fees and/or whose loans were subject to greater and/or a higher incidence of yield spread premiums than Homestart's Caucasian customers.

56.     The Indymac class consists of plaintiffs and all African-American consumers who obtained a home mortgage loan from Indymac in Illinois between April 11, 2005 (the filing date of this action) and the date of judgment who paid, on average, more in direct broker fees and/or whose loans were subject to greater and/or a higher incidence of yield spread premiums than Indymac's Caucasian customers.

57.     Each class is so numerous that joinder is impracticable.  On information and belief, there are more than 50 members of the class.

58.     There are questions of law and fact common to the members of the class, which common questions predominate over any questions that affect only individual class members.  The predominant common questions are: whether African-Americans paid more in direct broker fees and whether the payment and receipt of

12

greater and/or more frequent yield spread premiums results in loan terms which are intended to discriminate or have the effect of discriminating against African-American borrowers.

59.     Plaintiffs' claim is typical of the claims of the class members. All are based on the same factual and legal theories.

60.     Plaintiffs will fairly and adequately represent the interests of the class members. Plaintiffs have retained counsel experienced in mortgage cases and class actions.

61.     A class action is superior to other alternative methods of adjudicating this dispute. Individual cases are not economically feasible. The nature of the claim is such that proof of the class-wide impact of direct-broker fees and yield spread premiums is necessary.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and the classes and against defendants for:

a.     Declaratory relief;

b.     Injunctive relief;

c.     Appropriate damages;

d.     Attorney's fees, litigation expenses and costs; **and**

e.     Such other or further relief as the Court deems appropriate.

## COUNT II – EQUAL CREDIT OPPORTUNITY ACT

62.     Plaintiffs incorporate paragraphs 1-49. This claim is against Indymac and Homestart.

63.     The Equal Credit Opportunity Act, 15 U.S.C. §1691, provides:

13

(a) Activities constituting discrimination. It shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction—

> (1) on the basis of race, color, religion, national origin, sex or marital status, or age (provided the applicant has the capacity to contract) . . . .

64.     Defendants Indymac and Homestart violated the ECOA

by paying and receiving, respectively, greater and/or more frequent yield spread

premiums in connection with loans made to African-Americans, which necessarily

increases the rates charged to such borrowers. Indymac and Homestart also encouraged

the charging of and charged, respectively, greater direct broker fees to African-American

borrowers relative to their Caucasian customers.

65.     The Equal Credit Opportunity Act, 15 U.S.C. §1691e, further

provides:

**Civil liability**

(a) Individual or class action for actual damages. Any creditor who fails to comply with any requirement imposed under this title shall be liable to the aggrieved applicant for any actual damages sustained by such applicant acting either in an individual capacity or as a member of a class.

(b) Recovery of punitive damages in individual and class action for actual damages; exemptions; maximum amount of punitive damages in individual actions; limitation on total recovery in class actions; factors determining amount of award. Any creditor, other than a government or governmental subdivision or agency, who fails to comply with any requirement imposed under this title shall be liable to the aggrieved applicant for punitive damages in an amount not greater than $ 10,000, in addition to any actual damages provided in subsection (a), except that in the case of a class action the total recovery under this subsection shall not exceed the lesser of $ 500,000 or 1 per centum of the net worth of the creditor. In determining the amount of such damages in any action, the court shall consider, among other relevant factors, the amount of any actual damages awarded, the frequency and persistence of failures of compliance by

14

the creditor, the resources of the creditor, the number of persons adversely affected, and the extent to which the creditor's failure of compliance was intentional.

(c) Action for equitable and declaratory relief.  Upon application by an aggrieved applicant, the appropriate United States district court or any other court of competent jurisdiction may grant such equitable and declaratory relief as is necessary to enforce the requirements imposed under this title.

(d) Recovery of costs and attorney fees.  In the case of any successful action under subsection (a), (b), or (c), the costs of the action, together with a reasonable attorney's fee as determined by the court, shall be added to any damages awarded by the court under such subsection. . .
.

(f) Jurisdiction of courts; time for maintenance of action; exceptions. Any action under this section may be brought in the appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction. No such action shall be brought later than two years from the date of the occurrence of the violation . . . .

## CLASS ALLEGATIONS

66.     Plaintiffs bring this claim on behalf of two classes, Homestart and Indymac.

67.     The Homestart class consists of plaintiffs and all African-American consumers who obtained a home mortgage loan through Homestart in Illinois between April 11, 2005 (the filing date of this action) and the date of judgment who paid, on average, more in direct broker fees and/or whose loans were subject to greater and/or a higher incidence of yield spread premiums than Homestart's Caucasian customers.

68.     The Indymac class consists of plaintiffs and all African-American consumers who obtained a home mortgage loan from Indymac in Illinois between April 11, 2005 (the filing date of this action) and the date of judgment who paid, on average, more in direct broker fees and/or whose loans were subject to greater and/or

15

a higher incidence of yield spread premiums than Indymac's Caucasian customers.

69.     Each class is so numerous that joinder is impracticable.  On information and belief, there are more than 50 members of the class.

70.     There are questions of law and fact common to the members of the class, which common questions predominate over any questions that affect only individual class members.  The predominant common questions are:  whether African-Americans paid more in direct broker fees and whether the payment and receipt of greater and/or more frequent yield spread premiums results in loan terms which are intended to discriminate or have the effect of discriminating against African-American borrowers.

71.     Plaintiffs' claim is typical of the claims of the class members.  All are based  on the same factual and legal theories.

72.     Plaintiffs will fairly and adequately represent the interests of the class members.  Plaintiffs have retained counsel experienced in mortgage cases and class actions.

73.     A class action is superior to other alternative methods of adjudicating this dispute.  Individual cases are not economically feasible.  The nature of the claim is such that proof of the class-wide impact of direct-broker fees and yield spread premiums is necessary.

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and the classes and against defendants for:

a.     Declaratory relief;

b.     Injunctive relief;

16

    c.      Appropriate damages;

    d.      Attorney's fees, litigation expenses and costs; and

    e.      Such other or further relief as the Court deems appropriate.

## COUNT III – ILLINOIS CONSUMER FRAUD ACT – CLASS CLAIM

### [dismissed by the Court]

## COUNT IV - ILLINOIS CONSUMER FRAUD ACT - INDIVIDUAL CLAIM

74.     Plaintiffs incorporate paragraphs 1-49. This claim is against Homestart and Indymac.

75.     Defendants Homestart and Indymac engaged in unfair and deceptive practices, in violation of §2 of the Illinois Consumer Fraud Act, 815 ILCS 505/2, by (a) falsely inflating plaintiffs' financial and asset information on their loan application and (b) having plaintiffs sign an application containing false information and putting them at risk for prosecution.

76.     Defendants engaged in such conduct in the course of trade and commerce.

77.     Defendant Indymac knew about the inflated income and asset information or ratified it later. On information and belief, shortly before or after the November, 2005 transactions it conducted its own internal review of plaintiffs' application materials submitted to it by Homestart.

78.     Defendants engaged in such conduct with the intent to injure plaintiffs.

79.     Plaintiffs were damaged as a result.

80.     Defendants' conduct caused plaintiffs' injuries.

17

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and the classes and against defendants for:

a.　　Appropriate damages;

b.　　Attorney's fees, litigation expenses and costs.

c.　　Such other or further relief as the Court deems appropriate.

## COUNT V – TRUTH IN LENDING ACT - INDIVIDUAL CLAIM

**[Plaintiffs' allegations of inadequate notices of right to cancel
were dismissed by the Court]**

81.　　Plaintiffs incorporate paragraphs 1-49. This claim is against all defendants, except Homestart.

## RIGHT TO RESCIND

82.　　Because the transaction was secured by plaintiffs' home, and was not entered into for purposes of the initial acquisition or construction of that home, it was subject to the right to cancel provided by 15 U.S.C. §1635 and 12 C.F.R. §226.23. Section 226.23 provides:

**(a) Consumer's right to rescind.**

> **(1) In a credit transaction in which a security interest is or will be retained or acquired in a consumer's principal dwelling, each consumer whose ownership interest is or will be subject to the security interest shall have the right to rescind the transaction, except for transactions described in paragraph (f) of this section.[fn]47**

> **(2) To exercise the right to rescind, the consumer shall notify the creditor of the rescission by mail, telegram or other means of written communication. Notice is considered given when mailed, when filed for telegraphic transmission or, if sent by other means, when delivered to the creditor's designated place of business.**

18

(3) The consumer may exercise the right to rescind until midnight of the third business day following consummation, delivery of the notice required by paragraph (b) of this section, or delivery of all material disclosures,[fn]48 whichever occurs last. If the required notice or material disclosures are not delivered, the right to rescind shall expire 3 years after consummation, upon transfer of all of the consumer's interest in the property, or upon sale of the property, whichever occurs first. In the case of certain administrative proceedings, the rescission period shall be extended in accordance with section 125(f) of the Act. [15 U.S.C. §1635(f)]

(4) When more than one consumer in a transaction has the right to rescind, the exercise of the right by one consumer shall be effective as to all consumers.

(b) <u>Notice of right to rescind.</u> In a transaction subject to rescission, a creditor shall deliver 2 copies of the notice of the right to rescind to each consumer entitled to rescind. The notice shall be on a separate document that identifies the transaction and shall clearly and conspicuously disclose the following:

(1) The retention or acquisition of a security interest in the consumer's principal dwelling.

(2) The consumer's right to rescind the transaction.

(3) How to exercise the right to rescind, with a form for that purpose, designating the address of the creditor's place of business.

(4) The effects of rescission, as described in paragraph (d) of this section.

(5) The date the rescission period expires. . . .

(f) <u>Exempt transactions.</u> The right to rescind does not apply to the following:

(1) A residential mortgage transaction [defined in 15 U.S.C. §1602(w) as one where a "security interest is created or retained against the consumer's dwelling to finance the acquisition or initial construction of such dwelling"].

(2) A credit plan in which a state agency is a creditor.

19

## GROUNDS FOR RESCISSION

83.    In connection with the loan, the TILA Disclosure Statement that Indymac provided to plaintiffs failed to properly disclose the schedule of payments, in violation of 15 U.S.C. § 1602(u) and § 1638(a)(6); 12 C.F.R. 226.18(g), and 12 C.F.R. Pt. 226, Supp. 1, para. 18(g)(4)(i).

84.    Notice of rescission has been given to defendants.

85.    The loan has not been rescinded.

86.    Under 15 U.S.C. §1641(c), the right to rescind may be exercised against any assignee, including Citimortgage.

87.    15 U.S.C. §1635(g) provides:

**Additional relief**

**In any action in which it is determined that a creditor has violated this section, in addition to rescission the court may award relief under section 1640 of this title for violations of this subchapter not relating to the right to rescind.**

WHEREFORE, plaintiff requests that the Court enter judgment in favor of plaintiffs and against defendants for:

a.    A judgment voiding plaintiffs' mortgage, capable of recordation in the public records, and binding on defendants;

b.    If appropriate, statutory damages for failure to rescind;

c.    Attorney's fees, litigation expenses and costs;

d.    Such other or further relief as the Court deems appropriate.

## COUNT VI – CREDIT REPAIR ORGANIZATIONS ACT - INDIVIDUAL CLAIM

88.    Plaintiffs incorporate paragraphs 1-49. This claim is against

20

Homestart.

89.     FMT violated the CROA by filling out plaintiffs' loan application to overstate plaintiffs' income and assets.

90.     CROA §1679b provides:

**1679b.  Prohibited practices**

**(a) In general.  No person may--**

> **(1) make any statement, or counsel or advise any consumer to make any statement, which is untrue or misleading (or which, upon the exercise of reasonable care, should be known by the credit repair organization, officer, employee, agent, or other person to be untrue or misleading) with respect to any consumer's credit worthiness, credit standing, or credit capacity to-- ...**

> > **(B) any person--**

> > > **(i) who has extended credit to the consumer; or**

> > > **(ii) to whom the consumer has applied or is applying for an extension of credit . . . .**

91.     CROA § 1679g provides:

**1679g. Civil liability**

**(a) Liability established.  Any person who fails to comply with any provision of this title [15 USC §§1679 et seq.] with respect to any other person shall be liable to such person in an amount equal to the sum of the amounts determined under each of the following paragraphs:**

> **(1) Actual damages. The greater of--**

> > **(A) the amount of any actual damage sustained by such person as a result of such failure . . . .**

> **(2) Punitive damages.**

> > **(A) Individual actions. In the case of any action by an individual, such additional amount as the court may allow. . . .**

21

WHEREFORE, plaintiffs request that the Court enter judgment in favor of plaintiffs and against Homestart for:

      a.    Compensatory and punitive damages;

      b.    Attorney's fees, litigation expenses and costs; and

      c.    Such other or further relief as the Court deems appropriate.

## COUNT VII - BREACH OF FIDUCIARY DUTY

92.    Plaintiffs incorporate paragraphs 1–49. This claim is against Homestart.

93.    One who undertakes to find and arrange financing for another becomes the latter's agent for that purpose and owes a fiduciary duty to act in the interest of the principal and make full disclosure of all material facts.

94.    Homestart undertook to serve as plaintiffs' mortgage broker.

95.    Homestart engaged in conduct that was fraudulent and adverse to the interest of plaintiffs.

96.    In connection with the loan, defendants violated their fiduciary duty as mortgage broker by, among other things:

      (A)    flipping or refinancing plaintiffs three times in 18 months, each time charging them exorbitant fees and imposing high rates in exchange for payments from lenders;

      (B)    conspiring in and not disclosing to plaintiffs the inflated appraisal;

      (C)    falsifying plaintiffs' other financial asset and employment information on their loan application; and

22

(D)    having plaintiffs sign a loan application containing false

information and putting them at risk of prosecution.

97.    Plaintiffs were damaged as a result.

98.    The conduct of defendant was deliberately oppressive, corrupt and

dishonest.  Substantial punitive damages are warranted.

WHEREFORE, plaintiffs request that the Court enter judgment in

favor of plaintiffs and against defendants for:

a.    compensatory and punitive damages;

b.    costs;

c.    cancellation of plaintiffs' loan; and

d.    such other or further relief as the Court deems

appropriate.

Respectfully submitted,

Al Hofeld, Jr.
Al Hofeld, Jr.

Al Hofeld, Jr.
LAW OFFICES OF AL HOFELD, JR., LLC
and the Social Justice Project, Inc.
208 S. LaSalle Street, #1650
Chicago, Illinois  60604
(312) 345-1004
(312) 346-3242 (FAX)
al@alhofeldlaw.com

# EXHIBIT G



Slip Copy                                                                                                    Page 1
Slip Copy, 2007 WL 772946 (N.D.Ill.)
**(Cite as: Slip Copy, 2007 WL 772946)**


C Timebase Pty Ltd. v. **Thomson** Corp.
N.D.Ill.,2007.
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois,Eastern
Division.
**TIMEBASE** PTY LTD., Plaintiff,
v.
The **THOMSON** CORPORATION, Defendant.
**No. 07 C 460.**


March 9, 2007.

Joseph Nevi Hosteny, III, Arthur Anthony Gasey,
Niro, Scavone, Haller & Niro, Ltd., Chicago, IL, for
Plaintiff.
Barry F. Irwin, Kirkland & Ellis LLP, Chicago, IL,
Calvin L. Litsey, Chad M. Drown, David J.F. Gross,
Faegre & Benson LLP, Minneapolis, MN, for
Defendant.


***MEMORANDUM OPINION AND ORDER***

GEORGE W. LINDBERG, Senior U.S. District
Judge.
**\*1** Defendant The Thomson Corp. ("Thomson") [FN1]
moves this court pursuant to 28 U.S.C. § 1404(a) to
transfer jurisdiction of this case to the United States
District Court of Minnesota. For the reasons set forth
below, the motion is granted.

> FN1. In a footnote, Thomson states that it is
> not the proper defendant to this suit and that
> plaintiff should have named West
> Publishing Corp. and West Services, Inc. as
> defendants. This issue is not before the court
> and was not briefed by the parties.

*I. RELEVANT FACTS*

Plaintiff Timebase Pty Ltd. ("Timebase") is an
Australian company, with its principal place of
business in Sydney, Australia. Timebase owns, by
assignment, United States Patent No. 6,233,592 (the
"'592 patent") and has sued Thomson pursuant to 35
U.S.C. § 271 for alleged infringement of that patent.
Thomson is a Canadian corporation that sells
publishing services and products throughout the

United States, including both the Northern District of
Illinois and the District of Minnesota. In its
complaint, Timebase does not specify which
Thomson product(s) allegedly infringes the '592
patent.

In its motion to transfer, Thomson takes the position
that this suit involves its PastStat Locator product
because that is the product Timebase identified in the
parties' pre-suit discussions. The PastStat Locator is a
component of Westlaw.com, an online research tool
available nationwide. In its response brief to the
motion to transfer, Timebase identifies the PastStat
Locator, Graphical Statutes and RegulationsPlus
products, which are all components of Westlaw.com,
as allegedly infringing the '592 patent. However,
Timebase does not argue that the inclusion of the
Graphical Statutes and Regulations Plus products in
the suit alters the facts relevant to the resolution of
this motion. Therefore, for purposes of this motion,
the court will limit its analysis to the PastStat
Locator. This is appropriate because Timebase failed
to identify the alleged infringing product(s) in its
complaint, Thomson limited the analysis in its
motion to transfer to the PastStat Locator, and the
relevant facts are the same regardless of whether the
suit is limited to the PastStat Locator, or also includes
the other two Westlaw.com components.

The research, design and development of the PastStat
Locator occurred in Minnesota. Further, the
associated research, design and development
documentation and the central hardware and software
necessary to operate the PastStat Locator are located
there. Although PastStat Locator's necessary
hardware and software are physically located in
Minnesota, the product itself is an online tool that is
marketed, sold and used throughout the United
States. Thomson's party and non-party witnesses are
also in Minnesota. Thomson identified eighteen
relevant witnesses, fifteen employees and three
former employees, who reside in the Minneapolis/St.
Paul metropolitan area. Timebase identified seven
additional possible witnesses for Thomson. Six of
them live in Minnesota, maintain a residence in
Minnesota, or live within the subpoena power of a
Minnesota federal court.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Timebase does not have any witnesses who reside in the United States. There is also no evidence that Timebase has relevant documentation, or other evidence located anywhere in the United States, much less the Northern District of Illinois. Finally, representatives from Timebase traveled to Minnesota, not the Northern District of Illinois, to conduct pre-suit discussions with representatives from Thomson.

## II. LEGAL ANALYSIS

**\*2** Section 1404(a) provides: "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."In other words, a transfer is appropriate if: (1) venue is proper in both the transferor and transferee courts; (2) transfer will serve the convenience of the parties and witnesses; and (3) transfer is in the interest of justice. *See Boyd v. Snyder, 44 F.Supp.2d 966, 968 (N.D.Ill.1999).* Whether to transfer a case is within the sound discretion of the transferor court. *Coffey v. Van Dorn Iron Works, 796 F.2d 217, 219-20 (7th Cir.1986).* The party requesting transfer bears the burden of demonstrating that the transferee forum is clearly more convenient than the transferor forum. *Id.*

Both parties concede that venue is proper in this court and the District of Minnesota. Therefore, the court proceeds directly to an analysis of the second factor, whether transfer will serve the convenience of the parties and witnesses. This factor weighs strongly in favor of transfer. In accessing the convenience of the parties and witnesses, the Court considers five sub-factors. *See Hanley v. Omarc, Inc., 6 F.Supp.2d 770, 774 (N.D.Ill.1998).* First, the court looks to the plaintiffs' chosen forum, which is normally accorded deference. In this case, the deference is minimal because plaintiff does not reside in the Northern District of Illinois. *Childress v. Ford Motor Co., 03 C 3656, 2003 WL 23518380 at \*3 (N.D.Ill.Dec.17, 2003).*

The next factor, the situs of the material events, is irrelevant because this is a patent case. *See Sitrick v. FreeHand Systems, Inc., No. 02 C 1568, 2003 WL 1581741, at \*3 (N.D.Ill. Mar.27, 2003).* The third factor, the convenience of the witnesses, strongly favors transfer. There is not a single relevant witness located in the Northern District of Illinois. In fact, all

of Timebase's witnesses reside outside of the United States. If this case proceeds to trial, regardless of the forum, each of Timebase's witnesses will have to travel internationally. For purposes of convenience, whether the their ultimate destination is Chicago or Minneapolis does not appear material. Alternatively, all but one of the twenty-five relevant Thomson witnesses, as identified by both Timebase and Thomson, live in Minnesota, maintain a residence in Minnesota, or live within the subpoena power of a Minnesota federal court. Further, at least three of those witnesses are non-party witnesses who would be within the subpoena power of a Minnesota federal court, but would not be within the subpoena power of this court. Minnesota is clearly more convenient for Thomson's relevant witnesses and is not any less convenient for Timebase's witnesses than the Northern District of Illinois.

The last two sub-factors, the relative ease of access to sources of proof in both forums and the convenience of the parties in litigating in each respective forum, also weigh in favor of transfer. No sources of proof are located in Illinois and all of Thomson's evidence is in Minnesota. Thomson's relevant research, testing and design documentation is in Minnesota, along with the central hardware and software necessary to operate the PastStat Locator. Further, Thomson's employees and the people most knowledgeable about this case are located in Minnesota. If this case remains in the Northern District of Illinois, Thomson would have to transport its sources of proof outside of Minnesota.

**\*3** Timebase will have to transport its sources of proof regardless of the forum. All of Timebase's sources of proof are located outside of the United States, presumably in Australia and Europe, although Timebase did not provide the exact location. Timebase's counsel is located in the Northern District of Illinois, however, the court does not consider the convenience of a party's counsel in a § 1404(a) transfer analysis. *See Chicago, Rock Island & Pac. R.R. Co. v. Igoe, 220 F.2d 299, 304 (7th Cir.1955); China Industries (USA), Inc. v. New Holland Tire, Inc., 2006 WL 2290975 at 2 (N.D.Ill.2006).* There is no evidence that litigation before this court, as opposed to a court in Minnesota, would be more convenient for Timebase. However, there is substantial evidence that it would be more convenient for Thomson to litigate this case in Minnesota.

Slip Copy                                                                                          Page 3
Slip Copy, 2007 WL 772946 (N.D.Ill.)
**(Cite as: Slip Copy, 2007 WL 772946)**

Finally, the court must consider whether transfer is in the interest of justice. The interest of justice component of a § 1404(a) analysis concerns the "efficient administration of the court system."*Coffey, 796 F.2d at 221*. In making this determination, the court considers each proposed forum court's familiarity with the applicable law, the speed at which the case will proceed to trial, and the desirability of litigating the case in each locale. *See Amoco Oil Co. v. Mobil Oil Corp., 90 F.Supp .2d 958, 961 (N.D.Ill.2000)*. Patent infringement is a question of federal law. This court and the District of Minnesota are equally familiar and capable of deciding questions of federal law, thus this factor is neutral to the § 1404(a) analysis.

Next, the court considers which proposed district will provide the parties with the fastest progression to trial. The two most relevant statistics are the median months from filing to disposition of a case and the median months from filing to trial. *Amoco, 90 F.Supp.2d at 962*. In 2005, the median months from filing to disposition was 7.5 for the District of Minnesota and 6.9 for the Northern District of Illinois. In 2006, that statistic increased dramatically to 23.8 in the District of Minnesota and remained relatively stable at 6.5 in this court. That 2006 statistic was an aberration for the District of Minnesota, caused by the termination of a large multi-district litigation. The median months from filing to trial in 2005 was 23 months in the District of Minnesota and 27 in the Northern District of Illinois. That statistic was 26.4 for both districts in 2006. The relevant statistics for both forums are similar, however, they are slightly more favorable in this court, thus minimally weighing against transfer.

The last interest of justice related factor, the desirability of litigating the case in each proposed forum, favors transfer. This case has absolutely no relevant connection to this district. Not a single party, witness, or source of proof is located in the Northern District of Illinois. Further, the PastStat Locator is an online tool that is marketed, sold and used throughout the country. The fact that it is marketed, sold and used in this district does not weigh against transfer because that fact is true of every other federal district in the United States. Alternatively, this case has considerable relevance to the District of Minnesota. Not only is the PastStat Locator marketed, sold and

used there, but Thomson's employees, relevant witnesses and sources of proof are located in Minnesota. Additionally, the PastStat Locator was created in Minnesota and the central hardware and software necessary for its operation are there.

### III. CONCLUSION

**\*4** On these facts, the court finds that transfer to Minnesota pursuant to § 1404(a) is appropriate. The lack of any relevant connection between this district and this litigation and the presence of a strong connection to the District of Minnesota strongly outweighs the minimal deference accorded Timebase's choice of forum and the fact that this court may provide for a slightly faster disposition of the case.

ORDERED: Defendant's motion to transfer venue to the District of Minnesota [10] is granted.

N.D.Ill.,2007.
Timebase Pty Ltd. v. Thomson Corp.
Slip Copy, 2007 WL 772946 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT H



Agha v. **Secretary** of **Army**
C.A.9 (Cal.),1990.
NOTICE: THIS IS AN UNPUBLISHED
OPINION.(The Court's decision is referenced in a
"Table of Decisions Without Reported Opinions"
appearing in the Federal Reporter. Use FI CTA9 Rule
36-3 for rules regarding the citation of unpublished
opinions.)
United States Court of Appeals, Ninth Circuit.
Ali T. **AGHA**, Plaintiff-Appellant,
v.
**SECRETARY** OF **ARMY**, Defendant-Appellee.
**No. 89-15213.**

Submitted Nov. 2, 1990.FN*
Decided Dec. 5, 1990.

Appeal from the United States District Court for the
Northern District of California; Spencer M. Williams,
District Judge, Presiding.
N.D.Cal.

AFFIRMED.

Before SCHROEDER, WIGGINS and LEAVY,
Circuit Judges.

MEMORANDUM FN**

**\*1** Ali T. Agha appeals the district court's denial of
his motion for appointment of counsel in his
employment discrimination case. An order denying
appointment of counsel is immediately appealable as
a collateral order exception to the final judgment rule.
*Bradshaw v. Zoological Soc'y,* 662 F.2d 1301, 1305
(9th Cir.1981). Therefore, we have jurisdiction of Mr.
Agha's timely appeal under 28 U.S.C. § 1291 (1982),
and we affirm.

The district court may appoint counsel for a Title VII
plaintiff in such circumstances as the court deems
just. 42 U.S.C. § 2000e-5(f)(1). The court must assess
(1) the plaintiff's financial condition; (2) the
plaintiff's efforts to secure counsel; and (3) whether
the plaintiff's claims have merit. *Bradshaw,* 662 F.2d
at 1318. We review the district court's refusal to
appoint counsel for an abuse of discretion. *Id.*

In the underlying action, Mr. Agha argues that the
information in his employee file upon which the
denial of employment was based is false information.
He argues that the true facts provide no legitimate
support for a denial of employment and that the
denial was therefore discriminatory. The district court
denied Mr. Agha's motion to appoint counsel in the
case because it found that Mr. Agha's claim lacked
merit.FN1 A review of all the evidence, including the
Army's Report of Investigation and an EEOC finding
of no discrimination, supports the finding that Mr.
Agha's case lacks merit. The District Court did not
abuse its discretion. We AFFIRM.

FN** This disposition is not appropriate for
publication and may not be cited to or by the
courts of this circuit except as provided by
9th Cir.R. 36-3.

FN* The panel finds this case appropriate
for submission without argument pursuant to
Fed.R.App.P. 34(a) and 9th Cir.R. 34-4.

FN1. Mr. Agha filed a case closely related to
this one in the Northern District of
California in early 1986. No. C-85-20693-
WAI. Mr. Agha's motion for appointment of
counsel in that case was denied by the
district court on September 28, 1986. This
court affirmed that order in an unpublished
opinion in 1988. *Agha v. Secretary of the
Army,* No. 86-2710, Slip Op. (9th Cir. May
24, 1988). In the interim, this case was filed
in the Eastern District of California on
August 20, 1987, stating substantially the
same facts and arguments as in the earlier
case. No. CIV-S-87-1385-EJG-JFM. When
the district judge ordered a transfer of venue
to the Northern District in this case, the
judge wrote:

The court's review of these complaints
discloses that all of these matters arise
from the same nucleus of operative fact-
the circumstances surrounding termination
of plaintiff's employment at the Defense

921 F.2d 279                                                                              Page 2
921 F.2d 279, 1990 WL 208723 (C.A.9 (Cal.))
**(Cite as: 921 F.2d 279, 1990 WL 208723)**

      Language Institute and his unsuccessful attempts to gain reinstatement to his position there.... The only difference between those actions and the instant one is that this one covers a slightly different time period. Under these circumstances the filing of the instant action here in the Eastern District of California not only smacks of forum shopping, it counsels for transfer in the interests of justice to the potential witnesses and to preserve judicial economy.

      Order Granting Defendant's Motion to Change Venue, *Agha v. Secretary of the Army* (E.D.Cal. July 18, 1988) (No. S-87-1385-EJG).

C.A.9 (Cal.),1990.
Agha v. Secretary of Army
921 F.2d 279, 1990 WL 208723 (C.A.9 (Cal.))

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT I



Campbell Software, Inc. v. Kronos Inc.
N.D.Ill.,1996.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois.
CAMPBELL SOFTWARE, INC. and Matthew
Tomlinson, Plaintiffs,
v.
KRONOS INCORPORATED, Defendant.
No. 95 C 7348.

March 19, 1996.

*MEMORANDUM OPINION AND ORDER*

CONLON, District Judge.
**\*1** Plaintiffs Campbell Software, Inc. ("Campbell") and Matthew Tomlinson (collectively "plaintiffs") sue defendant Kronos Incorporated ("Kronos") for declaratory relief pursuant to 28 U.S.C. § 2201. Plaintiffs seek a declaration that a proprietary rights and confidentiality agreement ("the agreement") purportedly entered into between Tomlinson and Kronos in 1990 is unenforceable or that Tomlinson did not violate the agreement. Subject matter jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332(a). Kronos moves to transfer this case for consolidation with a prior-filed related action between the parties pending in the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. § 1404(a), or alternatively to answer the complaint *instanter.*Plaintiffs oppose the motion to transfer and request that this court: (a) grant Kronos leave to file its answer *instanter* and (b) stay these proceedings pending resolution of venue and jurisdictional issues raised by pleadings filed by the parties in the Massachusetts action.

*BACKGROUND*

Campbell is an Illinois corporation with its principal place of business in Evanston, Illinois. Complaint ("Compl.") ¶ 1. Campbell primarily designs, develops, manufactures, markets and services computer software relating to workforce management, labor scheduling and business forecasting. Affidavit of Michael Campbell ("Campbell Aff.") ¶ 2. Labor scheduling software

forecasts sales and related labor needs and creates schedules utilizing the forecasts and information regarding available labor resources. Second Affidavit of Matthew Tomlinson ("Second Tomlinson Aff.") ¶ 2. In the fiscal year ending December 31, 1994, Campbell earned approximately $3.5 million in sales. Campbell Aff. ¶ 2.

Kronos is a Massachusetts corporation with its principal place of business in Waltham, Massachusetts. Compl. ¶ 3; Third Affidavit of Matthew Tomlinson ("Third Tomlinson Aff."), Ex. A. Kronos has 21 sales offices throughout the United States, including one in Chicago, Illinois. Third Tomlinson Aff. ¶ 2; Ex. A. In its last fiscal year, Kronos earned approximately $126 million in sales. Second Tomlinson Aff. ¶ 2. Kronos manufactures hardware and software for computerized time clocks that provide information from which employee paychecks are generated. *Id.* Kronos earns approximately $1 million in sales relating to labor scheduling software. *Id.; see* Second Affidavit of Aron Ain ("Second Ain Aff.") ¶ 6. Kronos and Campbell are direct competitors in the labor scheduling software industry. *See* Supplemental Affidavit of Scott Martiny ("Martiny Supp. Aff.") ¶ 6.

Tomlinson is an Illinois resident. Second Tomlinson Aff. ¶ 1. Tomlinson was employed by Kronos in Chicago, Illinois as a sales representative between August 1983 and August 1985, as a sales manager between August 1985 and August 1987, and as a district manager between August 1987 and November 1995. *Id.* at ¶ 2. As district manager of Kronos' Chicago branch office, Tomlinson managed sales, services and administrative functions. *Id.* at ¶ 3. The Chicago branch is comprised of the Chicago metropolitan area, including 15 counties in northern Illinois and four adjacent counties in Indiana. *Id.*

**\*2** During his employment with Kronos, Tomlinson periodically travelled to Kronos corporate headquarters in Massachusetts to consult with Kronos personnel and to receive training. Second Ain Aff. ¶ 3. Tomlinson also had less direct contact with Massachusetts: he submitted quarterly sales reports to his superiors in Massachusetts; he submitted monthly

Not Reported in F.Supp.                                                                                          Page 2
Not Reported in F.Supp., 1996 WL 124457 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 124457)**

expense reports for reimbursement to Massachusetts; he participated in monthly telephone calls with Kronos' credit personnel located in Massachusetts to review credit status of customers; and he received paychecks from and generated revenues for Kronos.*Id.* ¶ 3.

Tomlinson and Kronos executed the agreement in Illinois in April 1990. Second Tomlinson Aff. ¶ 4; Compl. Ex. A. The agreement contains a choice-of-law provision that states it is to be interpreted in accordance with Massachusetts law. Compl. Ex. A at 3. In the agreement, Tomlinson acknowledged Kronos develops confidential information that may give Kronos an advantage. *Id.* at 1. Tomlinson agreed to "never, directly or indirectly, use, publish, disseminate or otherwise disclose any Confidential Information without the prior written consent of the Company's chief executive officer."*Id.* Tomlinson further agreed to restrictions on his employment after leaving Kronos for any reason, absent Kronos' approval, including engaging in activities similar to his responsibilities as Kronos' Chicago district manager for companies in direct or indirect competition with Kronos. *Id.* at 2. The agreement-not-to-compete extended throughout the United States and "any other areas in which the Company's products are sold," for 24 months. *Id.* Finally, if a lawsuit commences to enforce the agreement, Tomlinson consented without limitation to jurisdiction of the court in the place where his subsequent employer is incorporated or has a principal place of business. *Id.* at 3.

On November 7, 1995, Tomlinson voluntarily resigned from Kronos effective November 21, 1995, to become Campbell's Eastern Region Vice President. Second Tomlinson Aff. ¶ 1, 5; Affidavit of Aron Ain ("Ain Aff.") ¶ 15. Tomlinson began working for Campbell on November 27, 1995. Second Tomlinson Aff. ¶ 1. Tomlinson's duties are direct sales and sales management for accounts located in the region east of Ohio to and along the eastern seaboard. *Id.;* Campbell Aff. ¶ 3.

On December 12, 1995, Kronos filed a complaint seeking a temporary restraining order and preliminary injunction against Campbell and Tomlinson in the United States District Court for the District of Massachusetts ("the Massachusetts action"). Affidavit of Jonathan D. Rosenfeld

("Rosenfeld Aff.") ¶ 2. The complaint alleges Tomlinson breached the agreement, violated the Massachusetts trade secrets statute, and breached his common law duty of loyalty. Kronos further alleged that Campbell tortiously interfered with the agreement. Campbell was served with the Massachusetts complaint on December 13, 1995.*Id.* Tomlinson was served with the Massachusetts complaint on December 14, 1995. *Id.*

**\*3** On December 14, 1995, Campbell and Tomlinson filed this declaratory judgment action against Kronos in this court ("the Illinois action"). Campbell and Tomlinson did not disclose in the Illinois complaint that Kronos had previously filed the related Massachusetts action. Rather, Campbell and Tomlinson alleged that "Kronos has indicated to Tomlinson and Campbell that it believes the [agreement] is enforceable ... [and] that it will seek damages ...." Compl. ¶ 13. Plaintiffs further alleged, "[g]iven Kronos' stated intention to attempt to enforce the [agreement] against Tomlinson and, thereby, enjoin his employment with Campbell ... and to claim money damages against Tomlinson and Campbell, there exists an actual case or controversy ...."*Id.* ¶ 16.Kronos was served with the Illinois complaint on December 15, 1995. Def. Motion at 4.

On December 26, 1995, Tomlinson and Campbell filed a motion to dismiss the Massachusetts action for lack of personal jurisdiction, or alternatively to transfer the case to this court pursuant to 28 U.S.C. § 1404(a).*See* Pl. Ex. A. On December 28, 1995, the Massachusetts court granted Kronos' motions for a temporary restraining order and to preserve documents and evidence. Rosenfeld Aff. ¶ 3. The Massachusetts court barred Tomlinson from working for Campbell pending the Massachusetts action's resolution. The temporary restraining order was extended until the Massachusetts court could conduct a preliminary injunction hearing scheduled for March 11, 1996. *Id.*

On January 4, 1996, Tomlinson and Campbell filed a motion to postpone, to conduct expedited discovery and to combine a hearing on the preliminary injunction with a trial on the merits. *Id.* at 4. Tomlinson and Campbell served discovery on Kronos in the Massachusetts action. Pl. Motion at 2. On January 19, 1996, the Massachusetts court held a discovery conference and ruled that the preliminary

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

injunction hearing would be consolidated with a trial on the merits of Kronos' request for injunctive relief. *See* Pl. Motion at 2-3; Rosenfeld Aff. ¶ 5. The Massachusetts court scheduled the trial on March 11, 1996. Rosenfeld Aff. ¶ 5. The court further ordered expedited discovery, with all depositions to occur in Massachusetts. Rosenfeld Aff. ¶ 5. Thus, Tomlinson and Campbell withdrew their motion to dismiss or to transfer. Pl. Motion at 3; Pl. Ex. A. Subsequently, the Massachusetts court ruled the motion to dismiss or to transfer was moot. Pl. Motion at 3; Pl. Ex. A.

On February 13, 1996, Tomlinson and Campbell filed their respective answers to the Massachusetts complaint. *See* Pl. Ex. B, C. Despite filing several motions with the Massachusetts court, conducting discovery and consenting to a trial on the merits, Tomlinson and Campbell each asserted affirmative defenses that the Massachusetts court lacked personal jurisdiction and was an improper venue. Pl. Ex. B at 12; Pl. Ex. C at 10.

Plaintiffs assert they filed an agreed motion to stay the Illinois proceedings on January 26, 1996. *See* Pl. Motion at 3; Pl. Ex. D. However, the motion was not properly filed and is not part of this district's official files. On January 30, 1996, this court entered an order setting a discovery schedule and placing the Illinois action on the July 1996 trial calendar. *See* Order, No. 95 C 7348 (N.D. Ill. Jan. 30, 1996). The parties have failed to notify this court of the outcome of the Massachusetts court's March 11 hearing, or whether the Massachusetts hearing was postponed.

### DISCUSSION

**\*4** Kronos moves to transfer this action to the District of Massachusetts. Kronos asserts that transfer is warranted to avoid unnecessary duplicative litigation by consolidating this action with the first-filed Massachusetts action. *Keppen v. Burlington Northern R. Co.,* 749 F. Supp. 181 (N.D. Ill. 1990); *Countryman v. Stein Roe & Farnham,* 681 F. Supp. 479 (N.D. Ill. 1987); *Zurich Ins. Co. v. Raymark Indus., Inc.,* 672 F. Supp. 1102 (N.D. Ill. 1987). Moreover, the Massachusetts court is the more appropriate forum for interpreting an agreement governed by Massachusetts law. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508 (1947); *Dunn v. Soo Line R. Co.,* 864 F. Supp. 64, 67 (N.D. Ill. 1994). Finally, the consent to jurisdiction clause in the agreement

merely provided an additional forum where jurisdiction is proper; it does not require the litigation be maintained in this court. *Heller Financial, Inc. v. Nutra Food, Inc.,* 655 F. Supp. 1432, 1434 (N.D. Ill. 1987).

Plaintiffs respond the convenience of the parties favor this court because Kronos has a Chicago office, Tomlinson resides in Chicago and Campbell is an Illinois corporation headquartered in Evanston, Illinois. The relative financial strengths of the companies purportedly favors this court. *Galonis v. National Broadcasting Co., Inc.,* 498 F. Supp. 789, 793 (D.N.H. 1980); Wright, Miller & Cooper, *Federal Practice and Procedure § 3849 (1995).* According to plaintiffs, the convenience of the witnesses and interests of justice allegedly favor continuing this litigation in this court. *New Medico Associates, Inc. v. Kleinhenz,* 750 F. Supp. 1145 (D. Mass. 1990).

Section 1404(a) provides the court may transfer any suit to another district "for the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). Transfer under § 1404(a) is appropriate only if: (1) venue is proper in the transferor district; (2) venue is proper in the transferee district; and (3) transfer is for the convenience of parties and witnesses and in the interest of justice. *Coleman Co., Inc. v. Black & Decker Corp.,* No. 95 C 7379, 1996 WL 41484 (N.D. Ill., Jan. 31, 1996); *Applexion S.A. v. The Amalgamated Sugar Co.,* No. 95 C 858, 1995 WL 404843 (N.D. Ill. July 7, 1995); *FUL Inc., v. Ottawa Univ.,* No. 92 C 7756, 1993 WL 47294 (N.D. Ill. Feb. 22, 1993). The first-filed action is preferred unless, "considerations of judicial and litigant economy, and the just and effective disposition of disputes, require otherwise." *Black & Decker Corp.,* 1996 WL 41484, at \*5 (citation omitted). The court should not countenance the simultaneous litigation of essentially identical claims in two federal courts. *Applexion,* 1995 WL 404843, at \*2 (citing *Asset Allocation & Mgt. Co. v. Western Employers Ins. Co.,* 892 F.2d 566, 573 (7th Cir. 1989)). Special circumstance must militate in favor of proceeding with the later suit instead of the first-filed action. *Applexion,* 1995 WL 404843, at \*3. The decision whether to transfer venue ultimately lies within the court's discretion. *See Source Services Corp. v. Technisource, Inc.,* No. 95 C 1420, 1995 WL 493499, at \*1 (N.D. Ill., Aug. 9, 1995).

Not Reported in F.Supp.                                                                                    Page 4
Not Reported in F.Supp., 1996 WL 124457 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 124457)**

**\*5** The parties do not discuss the first two factors. Venue is clearly proper in this forum: Campbell is an Illinois corporation headquartered in Evanston, Illinois, Tomlinson is an Illinois resident, and Kronos has a branch office located in Chicago. Venue is also proper in Massachusetts. Kronos is a Massachusetts corporation. Campbell does not contest that it services clients headquartered in Massachusetts. *See* Second Ain Aff. ¶ 2. Finally, Tomlinson previously had frequent and regular contact with Kronos headquarters in Massachusetts, and as Campbell's eastern region vice president, he is responsible for servicing accounts located in Massachusetts. Moreover, Campbell and Tomlinson have answered the Massachusetts complaint, filed pleadings, conducted discovery and consented to the Massachusetts court's jurisdiction for purposes of a consolidated preliminary injunction hearing and a hearing on the merits of a permanent injunction. Accordingly, this court finds venue to be proper in this jurisdiction and in Massachusetts.

A. *Interests of Justice*

The interests of justice concern the efficient functioning of the courts. The court does not consider the private interests of the parties. *Source Services, 1995 WL 493499, at \*3.* An important consideration in weighing the interests of justice is the possibility of consolidation with related litigation. *Coffey v. Van Dorn Iron Works, 796 F.2d 217, 221 (7th Cir. 1986)* ("related litigation should be transferred to a forum where consolidation is feasible"); *Keppen, 749 F. Supp. at 183-84;Countryman, 681 F. Supp. at 484;Zurich Ins., 672 F. Supp. at 1104.* This factor is even more persuasive when the related litigation was filed first. *Coleman Co., 1996 WL 41484, at \*5.*

Plaintiffs do not even acknowledge that the Massachusetts action pre-dates this action. The Illinois complaint alleges Kronos intends to enforce the agreement, but fails to disclose that Kronos actually instituted the Massachusetts action. It is clear plaintiffs filed this declaratory action immediately after service of the Massachusetts complaint in order to select a more preferable forum.[FN1]Moreover, plaintiffs simply state that staying these proceedings will resolve the dual litigation problem. Thus, plaintiffs fail to effectively rebut Kronos' argument that transfer is in the interest of justice because of the

possibility of consolidating this case with the preexisting Massachusetts action.

Scarce judicial resources should not be exhausted when there is pre-existing litigation involving the same parties, issues and facts. The Massachusetts and Illinois actions involve the same parties, concern the enforceability of the same agreement and whether Tomlinson violated it, and are premised on the same factual occurrences. Thus, the two actions should be consolidated.

Furthermore, it is in the interest of justice that the consolidation take place in the District of Massachusetts. First, because the agreement is to be construed under Massachusetts law, it is in the interest of justice that a Massachusetts court familiar with Massachusetts law interpret the agreement.*Gulf Oil, 330 U.S. at 508;Dunn, 864 F. Supp. at 67;Van Gelder v. Talyor, 621 F. Supp. 613, 620 (N.D. Ill. 1985).* Familiarity with the governing law is important because plaintiffs raise numerous arguments as to the enforceability of the covenant not to compete. Second, the Massachusetts action is broader than the Illinois action -- besides breach of contract, it also concerns breaches of a Massachusetts statute and common law causes of action by both Tomlinson and Campbell. Third, the Massachusetts action is further along procedurally: the Massachusetts court has already entered a temporary restraining order enjoining Tomlinson from working with Campbell; the parties have conducted expedited discovery; and the Massachusetts court scheduled a combined hearing on the propriety of issuing a preliminary injunction and the merits of permanent injunctive relief on March 11, 1996. Indeed, the parties are submitting affidavits in this court that were prepared for the Massachusetts litigation.[FN2]On the other hand, Kronos has not filed its answer to the Illinois complaint. Accordingly, the interests of justice strongly favor transferring this case to Massachusetts.

B. *Convenience Of The Parties And Witnesses*

**\*6** Both parties contend their preferred forum is more convenient. Plaintiffs rely heavily on the "consent to jurisdiction" provision of the agreement. That clause does not persuade this court that this case should remain in Illinois. First, in *Heller Financial, Inc. v. Nutra Food, Inc.,* the court construed a similar

Not Reported in F.Supp.                                                                                                      Page 5
Not Reported in F.Supp., 1996 WL 124457 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1996 WL 124457)**

provision as "simply adding an additional forum wherein jurisdiction was proper and litigation could proceed."*Heller Financial, 655 F. Supp. at 1434.* Second, the clause specifically states that without limitation, Tomlinson consented and submitted to the jurisdiction of the court where his subsequent employer was located. Kronos did not consent or submit to any jurisdiction. The significance of the clause would be greater if Tomlinson argued Illinois was an inconvenient forum. However, in the context of these proceedings, the clause does not bear much weight.

The parties' relative financial strength is a factor this court considers. *See Adams Apple Distributing L.P. v. Powell,* No. 95 C 6270, 1996 WL 34469, at *4 (N.D. Ill. Jan. 26, 1996). Kronos is in a better position financially to litigate this case in a less convenient forum. Kronos earned $126 million in sales in the fiscal year ending December 1994, compared with Campbell's $3.5 million in earnings. Kronos has a branch office in Chicago, while Campbell does not have an office in Massachusetts. This factor favors retaining jurisdiction.

Plaintiffs also effectively point out that numerous witnesses reside in Chicago, Illinois. Most of these witnesses are either Kronos or Campbell employees. Defendants identify fewer witnesses located close to Massachusetts. Plaintiffs' general argument that the Massachusetts court lacks compulsory process over plaintiffs' potential witnesses residing in Chicago is unpersuasive. The lack of compulsory process is not persuasive unless a potential witness demonstrates a reluctance to testify. *Source Services, 1995 WL 493499, at *3.* Neither party offers evidence concerning a particular witness' reluctance to testify. Overall, the convenience of witnesses weighs against transfer.

## C. Balance

The most significant factor in this case is the interest of justice and the efficient operation of the courts. Although convenience factors may favor this district, they do not outweigh the interest of justice. There is ongoing, pre-existing litigation in Massachusetts concerning the identical issues and parties. Massachusetts law governs the agreement's construction and should be applied by a Massachusetts court. Plaintiffs filed a motion to

transfer the Massachusetts action to Illinois, but withdrew it in favor of a hearing on the merits in the Massachusetts court. Their attempt to have this court interpret the agreement by filing this declaratory action was in clear disregard of the interest of justice. The conservation of scarce resources that can be achieved by consolidating the two actions is of primary importance. The possibility of two courts reaching conflicting results also is a significant consideration. Thus, Kronos' motion to transfer this case to the District of Massachusetts must be granted.

*CONCLUSION*

**\*7** Defendant Kronos Incorporated's motion to transfer venue is granted. Kronos' alternative motion to file its answer *instanter* [12-2] is moot. This case is transferred to the United States District Court for the District of Massachusetts.

> FN1. This court will not accord any deference to the chosen forum because of plaintiffs' transparent attempt at forum-shopping.

> FN2. In fact, plaintiffs' brief appears to be no more than a regurgitation of their motion to transfer filed in the Massachusetts action. Plaintiffs fail to cite any Seventh Circuit cases, instead relying on Massachusetts, New Hampshire and New York cases.

N.D.Ill.,1996.
Campbell Software, Inc. v. Kronos Inc.
Not Reported in F.Supp., 1996 WL 124457 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT J

Westlaw.

Not Reported in F.Supp.                                                                                                Page 1
Not Reported in F.Supp., 1990 WL 186776 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1990 WL 186776)**

**H**Roots Partnership v. Lands' End, Inc.
N.D.Ill.,1990.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern Division.
The **ROOTS** PARTNERSHIP, individually and on behalf of all others similarly situated, Plaintiff,
v.
**LANDS' END**, INC., Gary C. Comer, Richard C. Anderson, Paul C. Kramer, and, David L. Schlotterback, Defendants.
No. 90 C 1310.

Nov. 14, 1990.

*MEMORANDUM OPINION AND ORDER*

ROVNER, District Judge.

*I. INTRODUCTION*

**\*1** This is a class action brought under the Securities Exchange Act. Plaintiff, Roots Partnership ("Roots"), alleges that defendants, Lands' End, Inc. ("Lands' End") and certain of its present and former officers, fraudulently misrepresented the financial status of Lands' End in a scheme to artificially inflate the value of Lands' End stock. Pending before the Court is Lands' End motion for change of venue pursuant to 28 U.S.C. § 1404(a). For the reasons set forth below, the Court grants Lands' Ends motion and transfers the action to the Western District of Wisconsin.[FN1]

*II. FACTS*

Roots, a partnership organized under Missouri Law, filed this action against Lands' End alleging violations under § 10(b) and § 20 of the Securities Exchange Act, 15 U.S.C. § 78aa (1990), as well as common law fraud and negligent misrepresentation. Lands' End, a Delaware corporation with its principal place of business in Dodgeville, Wisconsin, manufactures and sells clothing and accessories through its stores and catalogs. Virtually all of Lands' End's activities occur in Dodgeville, including the administrative, financial, operations, quality assurance, merchandising and personnel functions of the business. Until recently, Lands' End maintained a Chicago office which housed some of its marketing and investor relations staff. This office was scheduled to be closed as of August, 1990.

Roots purchased Lands' End stock on or about July 25, 1989. Roots states that during the class period ten million shares of Lands' End stock was purchased by approximately 1000 geographically dispersed class members. Roots alleges that the value of the stock at the time of purchase was highly inflated due to Lands' End's material misrepresentations regarding its financial health and prospects. Specifically, Roots alleges that Lands' End overstated its assets through certain published reports and news releases, and that Lands' End's officers (individual defendants in this action) sold their Lands' End stock on the basis of material non-public information which artificially inflated the market value of Lands' End stock.

*III. ANALYSIS*

*A. Statutory Authority to Transfer.*

Lands' End has moved to transfer this action, pursuant to 28 U.S.C. § 1404(a), to the Western District of Wisconsin, where its headquarters is located. Section § 1404(a) provides:

For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

In order to prevail upon the motion to transfer, Lands' End must establish that venue is proper in both this district and in the proposed transferor district and that the transfer serves the convenience of the parties and witnesses and the interest of justice. *Vanguard Financial Services Corp. v. Johnson,* 736 F.Supp. 832, 837 (N.D.Ill.1990) (Rovner, J.); *Trademasters International, Inc. v. Borer,* 687 F.Supp. 434, 435 (N.D.Ill.1988) (Bua, J). The decision whether or not to transfer an action rests within the sound discretion of the district court. *Heller Financial, Inc. v. Midwhey Powder Co.,* 883 F.2d 1286, 1293 (7th Cir.1989); *Vanguard,* 736 F.Supp. at 837.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**\*2** Jurisdiction in this action is predicated on section 27 of the Securities Exchange Act. That section provides, in relevant part, that any "suit or action ... may be brought in any such district or in the district wherein the defendant is found or is an inhabitant or transacts business." 15 U.S.C. § 78aa. Thus, venue is proper in both this district and in the Western District of Wisconsin because Lands' End transacts business in both districts and two of the individually named defendants in this action maintain residences in both Wisconsin and Illinois. *See Waites v. First Energy Leasing Corp., 605 F.Supp. 219, 221-22 (N.D.Ill.1985)* (Bua, J.). Accordingly, disposition of Lands' End's motion rests on the other criteria of § 1404(a): the convenience of the parties and witnesses and the interest of justice.

*B. Weight to be Assigned Roots' Choice of Venue.*

Roots argues that its choice of forum should be accorded paramount weight in deciding this motion. However, as set forth below, the Court finds that Roots' venue selection should be weighed equally along with all the other relevant § 1404(a) factors, because Roots does not reside in this district nor does the underlying litigation have a significant connection to this district.

Roots makes three arguments in support of its contention that the Court should defer to its choice of venue:

1) because the Securities Exchange Act provides broad venue options, a plaintiff's choice of venue should be given determinative weight;

2) a plaintiff's venue choice in class actions is usually afforded substantial deference; and

3) Roots has significant contacts with this district. None of these arguments is persuasive.

Roots urges first that because the Securities Exchange Act provides very broad venue options, the plaintiff's choice of forum is an important factor warranting deference. Otherwise, Roots argues, the special venue provisions of the act would be rendered meaningless if a defendant were able to transfer the action to a forum inconvenient to the plaintiff.[FN2]

Although the venue provisions of the Securities Exchange Act are broad, transfer is nonetheless appropriate if a preponderance of all the factors typically considered in transfer analysis indicate that transfer is appropriate. *See Blumenthal v. Management Assistance Inc., 480 F.Supp. 470, 472 (N.D.Ill.1979)* (Roszkowski, J.) (although § 78aa permits plaintiff to select a forum, that choice is nonetheless subject to § 1404(a) considerations where plaintiff's choice substantially inconveniences the parties and witnesses and fails to serve the interest of justice). *See also Anderson v. Thompson, 634 F.Supp. 1201, 1205 (D.Mont.1986).* Section 1404(a) considerations are especially relevant where the plaintiff's choice of forum lacks significant contact with the underlying action. *Paul v. Lands' End, Inc., 742 F.Supp. 512, 514-15 (N.D.Ill.1990)* (Bua, J.);[FN3] *Waites, supra, 605 F.Supp. at 222* (securities case wherein court granted transfer because defendants' activities in Chicago did not contribute to an alleged tax fraud scheme). *See also Bianco v. Texas Instruments, Inc., 627 F.Supp. 154, 165 (N.D.Ill.1985)* (Grady, J.) (securities action in which plaintiff's choice of forum given considerable weight but transfer nonetheless deemed appropriate for the convenience of the parties and witnesses and the interest of justice). Thus, even assuming that the plaintiff's choice of venue should be given substantial consideration in a securities action, it is still possible for the defendant to overcome that factor if it can establish that the other § 1404(a) factors counsel in favor of transfer. *Bianco, 627 F.Supp. at 165.* As discussed below, in this case the other § 1404(a) factors indicate transfer is appropriate because Roots does not reside, the underlying litigation has little connection with this forum and the material witnesses and documents are located in Wisconsin. Accordingly, the Court will weigh Roots' choice of forum equally along with the other considerations pertinent in deciding whether transfer is appropriate.

**\*3** Roots also argues that because this is a class action, its choice of forum should be given substantial weight. Roots cites three decisions from the Eastern District of Pennsylvania which purport to support its argument.[FN4] However, this Court, as well as other courts in this district, have held that a plaintiff's choice of forum in a class action or derivative suit should actually be accorded less weight. *See Genden v. Merrill, Lynch, Pierce, Fenner*

*and Smith,* 621 F.Supp. 780, 782 (N.D.Ill.1985)
(Rovner, J.) (where nationwide class has "no unique
local interest or contact" with transferor district, less
deference given to plaintiff's choice of forum). *See
also Schenet v. Anderson,* 1986 WL 13751 (N.D.Ill.
Nov. 28, 1986) (Hart, J.) (plaintiff's choice of forum
in a class action to be given less weight because "any
shareholder in the affected class who subsequently
chooses to appear might be faced with similar
inconveniences, depending on where the action
proceeds"). *Blake Construction Co. v. International
Harvester Co.,* 521 F.Supp. 1268, 1271-72
(N.D.Ill.1981) (Shadur, J.); *Blumenthal,* 480 F.Supp.
at 472.

Roots indicates that the putative class in this case
consists of some 1000 geographically dispersed
members. Roots has not stated that any of these class
members purchased Lands' End stock in this district
or are otherwise located in this district. Thus, as the
Court cannot presently ascertain the convenience or
inconvenience posed by any particular forum to the
putative class members, the fact that Roots chose to
file the class action in this district carries no special
weight.

Roots also argues that the Northern District of Illinois
has significant contacts with the underlying litigation,
because Lands' End disseminated the alleged
misrepresentations and material omissions of fact
regarding its financial health from its Chicago
office.[FN5] The Court disagrees. Although the Chicago
office might have been the conduit for some of the
alleged misrepresentations, it is clear that the ultimate
source of the information regarding Lands' End's
financial status emanated from its Dodgeville
headquarters. Documents relating to Roots'
allegations, including financial and accounting
records, forecasts, budgets, accounting policies,
operating results, reports to regulatory agencies,
inventory levels, orders and pricing, are all located in
Dodgeville. Moreover, it appears that the investor
relations office in Chicago was not directly involved
in Roots' purchase of Lands' End stock because Roots
decided to purchase Lands' End stock after receiving
a stock tip in Missouri from one of Roots' partners.
*See* Defendants' Reply Brief, McEvoy Deposition at
pp. 34-36. Thus, the fact that Lands' End once had
contacts with this district or held meetings in this
district is immaterial at this stage in the proceedings,
as all information or persons material to the

allegations are presently located in Dodgeville. For
this reason and the other reasons discussed above, the
Court concludes that Roots' choice of venue in this
action is a factor meriting consideration, but it should
not be treated as dispositive of the motion to transfer.

*C. Convenience to the Parties.*

**\*4** The Court will not grant a transfer if it merely
shifts the inconvenience from one party to the other.
*Hako Minuteman, Inc. v. Advance Machine Co.,* 1990
WL 70845 (N.D.Ill. May 9, 1990) (Rovner, J.);
*Central States v. Brown,* 587 F.Supp. 1067, 1070
(N.D.Ill.1984) (Bua, J.). There must be a clear
balance of inconvenience to one of the parties in
order for the Court to transfer an action. *Bianco,* 627
F.Supp. at 164-5. It is unclear to the Court how this
district is convenient to either party in this action.
Roots does not conduct business in the Northern
District of Illinois, it did not purchase Lands' End
stock in this district, and Roots does not maintain that
any of the putative class members reside in this
district. Conversely, Lands' End, although it does
transact business in Illinois, has shown in its
affidavits that all party witnesses relating to Roots'
allegations are located in Wisconsin. For instance,
employees of the Lands' End finance department, the
persons most likely to respond to allegations
regarding any misrepresentations Lands' End made
about its financial health, reside in Dodgeville,
Wisconsin. In addition, Land's End merchandising
staff, who are also located in Dodgeville, are the most
likely witnesses to address Roots' allegations
regarding product requests, sales and inventory.
Finally, although Lands' End once housed a small
investor relations staff in the Chicago house, those
employees have now been relocated to Dodgeville.

Because all of the relevant documents are apparently
located in Wisconsin, it is clear that transferring this
action to Wisconsin will be convenient to both parties
insofar as discovery is concerned. Roots has stated
that it is prepared to go to Lands' End's Dodgeville
headquarters to depose witnesses and examine
documents. However, Roots will only have to travel
to one forum in this matter if the action is transferred,
as opposed to having to travel to both districts if the
suit is maintained in Illinois. Furthermore, as stated
*supra* at pg. 6, n. 3, a related class action against
Lands' End is also pending in the Western District of
Wisconsin. It is likely that discovery in these two

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 4
Not Reported in F.Supp., 1990 WL 186776 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1990 WL 186776)**

cases will overlap to some degree. Thus, efficiency considerations weigh in favor of transfer. *See Waites, 605 F.Supp. at 223;Schenet, 1986 WL 13751.*

Accordingly, the Court finds that the convenience of the parties merits transfer because the Lands' End employees and documents relevant to the suit are located in Wisconsin, and Roots has virtually no connection with this district and would be no more inconvenienced in having to litigate this action in Wisconsin than it would be in Illinois.

*D. Convenience to the Witnesses.*

In assessing the convenience of the witnesses, the Court considers the number of potential witnesses located in the transferor and transferee districts, the nature and quality of their testimony, the cost of obtaining the attendance of a willing witness, and the witnesses' amenability to compulsory process. *See Hako, 1990 WL 70845;Waites, 605 F.Supp. at 222;Central States, 587 F.Supp. at 1070.* With respect to convenience to the witnesses, the Court finds that these considerations weigh in favor of transfer.

**\*5** As stated previously, the majority of witnesses central to this action are Lands' End employees, all of whom are located in Wisconsin. Lands' End has set forth the names of employees and how their respective employment responsibilities will have a bearing on the issues in this suit. However, Lands' End acknowledges that at this stage of the proceedings it does not know exactly which of these employees will actually testify. Roots states that it intends to seek testimony from several individuals and companies in Illinois who provided services to Lands' End during the class period, as well as former Lands' End employees who might reside in this district. Specifically, Roots plans to call Lands' End's outside marketing and design firms, bank, and Chicago underwriter, as well as certain stock market analysts located in Chicago. Roots has not specifically identified these parties by name, and has merely indicated that these prospective witnesses might have information relevant to the alleged misrepresentations which were disseminated through the Chicago office of Lands' End. Roots also observes that these witnesses would not be subject to compulsory service of process if the case were transferred to Wisconsin.

In assessing convenience to the witnesses, the Court primarily considers those witnesses who are central to the litigation. *Waites, 605 F.Supp. at 222* ("[t]he principal witnesses are those material to the court's decision on a motion to transfer venue under § 1404(a)"). Although neither party has stated with any great specificity what the testimony of its material witnesses might be, Lands' End has specified which of its employees are most likely to provide material information whereas Roots' prospective Chicago witnesses remain unidentified and do not appear to play as significant a role.[FN6]*See Paul, 742 F.Supp. at 514.* Roots has failed to specifically identify by name any of its witnesses who may not subject to compulsory process nor has it demonstrated with any great specificity the importance of their testimony at trial.[FN7] Thus, it appears that these non-party witnesses do not have a pivotal role in the outcome of this litigation given Roots' inability to identify these parties or indicate what their testimony is likely to be. Although the Court acknowledges that live testimony is preferred, in this instance Roots would not be unduly prejudiced if it had to present the testimony of its Chicago witnesses through the use of their deposition testimony.

Conversely, Lands' End's witnesses, although not subject to compulsory process, are party witnesses so if the action were maintained here these witnesses would voluntarily appear. Nonetheless, Lands' End would be inconvenienced by having to transport these employees to this district. Given the number of Lands's End employees and their evident importance in resolving the underlying dispute, convenience to the witnesses weighs in favor of transfer.

*E. Interest of Justice.*

In determining whether the interest of justice supports transfer, the Court considers the following factors:

**\*6** 1. the relative ease of access to sources of proof;

2. the accessibility of the premises;

3. the amenability of unwilling witnesses to service of process;

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 5
Not Reported in F.Supp., 1990 WL 186776 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1990 WL 186776)**

4. the cost of attendance at trial of willing witnesses;

5. the relation of the community in which the court and jurors serve to the issues being litigated;

6. the likelihood of a speedy trial; and

7. in a diversity action, the relative familiarity of the courts with the state law governing the action.

*Kinney v. Anchorlock, 736 F.Supp. 818, 829 (N.D.Ill.1990)* (Rovner, J.); *Letter-Rite, Inc. v. Computer Talk, Inc., 605 F.Supp. 717, 720 n. 3 (N.D.Ill.1985)* (Shadur, J.). After reviewing these factors, the Court concludes that the interest of justice favors transfer.

All of the documents related to this litigation are located at Lands' End's Wisconsin headquarters. Although Roots has expressed its willingness to travel to Wisconsin for discovery purposes, without question it will be more economical and efficient for Roots to travel to Wisconsin alone for discovery as well as court appearances, rather than having to travel to both this district and Wisconsin during the course of this litigation. Any discovery Roots intends to do in Chicago is minimal compared to the amount and materiality of the discovery which must take place in Wisconsin. Furthermore, as mentioned previously, *see supra* at p. 6, n. 3, the *Paul* suit against Lands' End has been transferred to the Western District of Wisconsin. Lands' End would be inconvenienced by having to defend similar cases in two different forums. Thus, considerations of efficiency and economy during the discovery process favor transfer. *See Waites, 605 F.Supp. at 223* ("[a]s a general rule, cases should be transferred to districts where related actions are pending"); *Schenet, 1986 WL 13751.*[FN8]

With respect to Roots witnesses who may not be subject to compulsory process, as noted previously, *supra* at pp. 12-13, Roots would not be unduly prejudiced if it had to use the deposition testimony of witnesses not subject to compulsory process. Thus, this factor does not weigh significantly against transfer.

The cost of transporting willing witnesses to trial militates in favor of transfer. Lands' End's employees, who constitute the majority of key witnesses in this action, would have to travel to this district in order to testify if the action remains here. Conversely, Roots has not stated that it plans to call any party witnesses who would need to be transported to Wisconsin if the action is transferred, nor does Roots state that it would be overly burdened by transporting any of its non-party witnesses who might testify despite a lack of compulsory process. Thus, with respect to the cost of transporting willing witnesses, there will be little or no inconvenience to Roots if the case was transferred. This factor strongly weighs in favor of transfer.

As noted previously, *supra* at pp. 8-9, the underlying litigation in this action has little connection with this forum. Any of the alleged misrepresentations made by Lands' End ultimately emanated from its headquarters in Wisconsin, even though some of that information may have reached the public through Lands' End Chicago office. Moreover, Roots does not allege that any of its class members reside in this district or bought Lands' End stock here. Because Lands' End's alleged misrepresentations originated in Wisconsin, the Western District of Wisconsin, rather than this district, has an interest in determining the outcome of this suit.

**\*7** With respect to congestion of the respective districts' dockets, Lands' End notes that the *1989 Federal Court Management Statistics* indicate that this district has 382 pending cases per judge, whereas Wisconsin has 198 cases pending per judge over a twelve month period ending June 30, 1989. However, the average number of weighted filings per judge is usually considered the most pertinent statistic with respect to docket congestion. *Kinney, 736 F.Supp. at 831;Letter-Rite, Inc., 605 F.Supp. at 722.* That factor reflects a substantial disparity as well. In this district there were approximately 603 weighted filings per judge in the year ending June 30, 1989, as compared to 482 weighted filings per judge in Wisconsin. *1989 Federal Court Management Statistics* at 101 and 107. Thus, it is apparent that this action will have a faster resolution if transferred to the Western District of Wisconsin.

Finally, the relative familiarity of the courts with the applicable state law does not preclude transfer. At the heart of Roots' complaint are the alleged violations of the Securities Exchange Act violations. Thus, either court will be applying federal securities law. Roots

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 6
Not Reported in F.Supp., 1990 WL 186776 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1990 WL 186776)**

has also asserted pendent state law claims alleging negligent misrepresentation and common law fraud. Neither party addresses which state's substantive law will apply with respect to those claims, although it would appear unlikely that Illinois law would govern. The mere presence of pendent state law claims does not preclude transfer. *Schenet,* 1986 WL 13751;*Blake Const. Co.,* 521 F.Supp. at 1273. Furthermore, as it is unclear at this point which state law will govern, this factor neither supports nor precludes transfer. *Kinney,* 736 F.Supp. at 831.

On balance, the interest of justice factors considered above weigh in favor of transferring this action to the Western District of Wisconsin.

## IV. CONCLUSION

For the reasons set forth above, the Court has concluded that convenience of the parties and witnesses and the interest of justice require that this case be transferred to the Western District of Wisconsin.

> **FN1.** Also pending before the Court are motions to dismiss for improper venue and lack of personal jurisdiction brought by two of the individual defendants in this action. In addition, Roots' motion for class certification is pending before the Court. Because the Court has decided to transfer this action, it declines to consider these motions for reasons of judicial economy in order to permit the judge who will hear the case to decide the existing substantive issues.

> **FN2.** For this proposition, Roots largely relies on cases from other districts. Although Roots argues that the Seventh Circuit adheres to the notion that a plaintiff's choice of forum in a securities case should be afforded paramount consideration, Roots fails to cite to any Seventh Circuit precedent.

> To support this argument Roots does cite one case from this district, *Peterson v. United States Steel Corp.,* 624 F.Supp. 44, 45 (N.D.Ill.1985) (Nordberg, J.), to support its assertion that the policy

underlying the Securities Exchange Act's venue provision mandates that the plaintiff's choice of forum be the determinative factor. However, in *Peterson* the court also stated that a plaintiff's choice of forum may be given less deference where the plaintiff does not reside in the forum. *Id.* at 45. Furthermore, Roots cites *Girsch v. Jepson,* 355 F.Supp. 1104 (E.D.Pa.1973), for the proposition that transferring a suit brought under the Securities Exchange Act would virtually eliminate a plaintiff's choice of forum. However, in *Girsch,* one of the plaintiffs lived in the forum. 355 F.Supp. at 1106. That is not true here. Thus, the cases upon which Roots relies are not controlling.

> **FN3.** The *Paul* litigation is a class action against Lands' End brought by plaintiffs who purchased Lands' End stock in a different time period than the class period in this suit, between February 6, 1990, and March 14, 1990. Judge Bua transferred the *Paul* action to the Western District of Wisconsin.

> **FN4.** Two of the cases Roots cites, *Carty v. Health-Chem Corp.,* 567 F.Supp. 1 (E.D.Pa.1982) and *Residex Corp. v. Farrow,* 374 F.Supp. 715 (E.D.Pa.1974), are distinguishable from the present action because in those cases the respective plaintiffs either purchased stock in the chosen forum or resided in that forum. Roots also cites *Girsch v. Jepson,* 355 F.Supp. 1104 (E.D.Pa.1973), for the proposition that a plaintiff's choice of forum in derivative and class actions suits is entitled to substantial weight. However, it is clear that *Girsch* is an exception in the Eastern District of Pennsylvania where courts have generally held that in such suits the plaintiff's choice of forum is entitled to less weight. *Blender v. Sibley,* 396 F.Supp. 300, 302, n. 3 (E.D.Pa.1975) (Pennsylvania district courts unanimous in concluding that plaintiff's choice of forum in class action or a derivative suit should be given less weight). Furthermore, the court in *Girsch* found that

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1990 WL 186776 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp., 1990 WL 186776)**

transfer would actually be more inconvenient to the moving defendant. 355 F.Supp. at 1107.

FN5. In particular, Roots states that Lands' End's 1989 SEC filings were issued from Chicago, its 1989 Annual Report was produced in Chicago, Board of Directors' meetings took place in Chicago, an analysts' meeting took place in Chicago, and Lands' End disseminated news releases from Chicago.

FN6. For instance, Roots states that it plans to obtain the testimony of Lands' End Chicago catalog consultants because Lands' End might have informed them that demand for its products was down or that inventory was accumulating. Such proffered testimony is speculative and tenuous at best.

FN7. Roots asserts that it is unable to identify these witnesses because Lands' End has failed to respond to interrogatories requesting this information. However, according to Lands' End it filed supplemental responses to these questions in *Paul v. Lands' End, Inc., 742 F.Supp. 512,* in which plaintiffs are represented by the same counsel who represent Roots in this class action. In any case, even assuming the validity of Roots' argument, it still does not appear that Roots' prospective witnesses are as important as the witnesses Lands' End has identified.

FN8. As neither party has stated that any premises need inspection that factor is not a relevant consideration here.

N.D.Ill.,1990.
Roots Partnership v. Lands' End, Inc.
Not Reported in F.Supp., 1990 WL 186776 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT K



Slip Copy                                                                                                           Page 1
Slip Copy, 2008 WL 268986 (N.D.Cal.), 2008-1 Trade Cases P 76,054
**(Cite as: Slip Copy, 2008 WL 268986)**

Madani v. **Shell Oil** Co.
N.D.Cal.,2008.

United States District Court,N.D. California.
Mike M. **MADANI**, Plaintiff,
v.
**SHELL OIL** COMPANY, Defendant.
**No. C07-04296 MJJ.**

Jan. 30, 2008.

Bradley K. Beasley, Boesche McDermott LLP, Tulsa, OK, Daniel R. Shulman, Jeremy L. Johnson, Gray, Plant, Mooty, Mooty & Bennett, P.A., Minneapolis, MN, James M. Dombroski, Attorney at Law, Petaluma, CA, Jeffery Kenneth Perkins, Law Offices of Jeffrey K. Perkins, John Haslet Boone, Law Offices of John H. Boone, Joseph M. Alioto, Joseph Michelangelo Alioto, Jr., Alioto Law Firm, Richard Alexander Saveri, Saveri & Saveri Inc., San Francisco, CA, Thomas Paul Bleau, Los Angeles, CA, for Plaintiff.

Stuart Neil Senator, Munger Tolles & Olson, Los Angeles, CA, for Defendant.

**ORDER GRANTING DEFENDANTS' MOTION FOR TRANSFER OF VENUE**

MARTIN J. JENKINS, District Judge.

**INTRODUCTION**

**\*1** Before the Court is Defendants' Joint Motion For Transfer Of Venue. (Docket No. 23.)For the following reasons, the Court **GRANTS** the Motion.[FN1]

> FN1. Because the Court finds that, in the interests of justice, decisions on the merits of this case should be made by the United States District Court for the Central District of California, the Court does not reach or resolve Defendants' simultaneously-filed motion to dismiss. (Docket No. 26.)

**FACTUAL BACKGROUND**

In this action, twenty named plaintiffs seek to represent a class of persons similarly situated-approximately 25,000 Shell and Texaco branded dealers nationwide who purchased gasoline from January 1998 through October 2001 from either of two joint ventures, Equilon and Motiva, that Defendants formed. Plaintiffs contend that the formation of the two joint ventures violated Section 7 of the Clayton Act, and that Defendants' agreement to fix the price of Shell and Texaco gasoline sold by the joint ventures violated Section 1 of the Sherman Act under the Rule of Reason.

This is not, however, the first time that the Defendants' operation of the joint ventures has been challenged under the antitrust laws. The same counsel representing Plaintiffs in this action previously sought to represent a nearly identical nationwide class of Shell and Texaco branded dealers against the same Defendants in the *Dagher v. Saudi Refining, Inc.,* Case No. CV-99-06114 GHK, in the Central District of California.[FN2]In *Dagher,* the plaintiffs pursued a claim for *per se* illegal price fixing under Section 1 of the Sherman Act, but their counsel (the same counsel here) disavowed any reliance on a Rule of Reason claim for the same alleged misconduct.

> FN2. Plaintiffs in this action, however, have expressly excluded the named plaintiffs in the *Dagher* litigation from the putative class here.

After Judge King denied in part the defendants' motion to dismiss in *Dagher,* the parties engaged in considerable discovery. On cross-motions for summary judgment in 2002, Judge King granted summary judgment to the defendants, ruling that it was not *per se* illegal for a joint venture to set the selling price of its own gasoline. The Ninth Circuit reversed the ruling on *per se* illegality as to Shell and Texaco in 2004, but a unanimous Supreme Court reversed the Ninth Circuit in 2006 and upheld Judge King's grant of summary judgment.

Plaintiffs in this action, who were members of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

putative class that counsel sought to certify in *Dagher*, now seek to assert the very Rule of Reason claim that was disavowed by the plaintiffs in the *Dagher* action.

## LEGAL STANDARD

Defendants' motion to transfer venue to the Central District of California is governed by 28 U.S.C. § 1404(a), which provides, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought."Ordinarily, a plaintiff's choice of forum is accorded substantial weight, and courts will not grant a motion under section 1404(a) unless the "convenience" or "justice" factors tip strongly in favor of transfer. *Florens Container v. Cho Yang Shipping,* 245 F.Supp.2d 1086, 1092 (N.D.Cal.2002); *see also Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 257, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981); *Decker Coal Co. v. Commonwealth Edison Co.,* 805 F.2d 834, 843 (9th Cir.1986). A motion for transfer pursuant to section 1404(a) lies within the discretion of the Court. *See Jones v. GNC Franchising, Inc.,* 211 F.3d 495, 498 (9th Cir.2000). The decision whether to grant such a motion turns on the facts of the particular case. *See id.*

## ANALYSIS

*2 There is no dispute that this action could have been brought in the Central District. The appropriateness of transfer, therefore, depends on the convenience of the parties and witnesses, and the interests of justice. "The question of which forum will better serve the interest of justice is of predominant importance on the question of transfer, and the factors involving convenience of parties and witnesses are in fact subordinate."*Wireless Consumers Alliance v. T-Mobile USA, Inc.,* 2003 WL 22387598 at *4 (N.D.Cal. Oct.14, 2003).

**I. Convenience Factors.**

**A. Convenience Of The Litigants.**

The Court finds that retaining this litigation in this district, rather than transferring it, would be mildly more convenient for the litigants.

As Plaintiffs point out, several of the named plaintiffs reside in the Northern District, and therefore would find it more convenient to litigate the case here. "A lead plaintiff has important responsibilities in managing class actions."*Van Slyke v. Capital One Bank,* 503 F.Supp.2d 1353, 1363 (N.D.Cal.2007). The force of this argument is somewhat undercut by the fact that several of the named plaintiffs also reside in the Central District. Plaintiffs do not introduce any evidence that the named plaintiffs residing in the Northern District will play a larger role in the litigation than other named plaintiffs. Nonetheless, Plaintiffs' lead attorney also resides in this district, and one of the Defendants, Chevron, has its headquarters in the Northern District. Though the claim of any one plaintiff that a forum is appropriate merely because it is his home is considerably weakened when there are thousands of potential plaintiffs,[FN3] the Court nonetheless finds that the convenience of the parties mildly supports retaining the case in the Northern District.

> FN3.*See Lou v. Belzberg,* 834 F.2d 730, 739 (9th Cir.1987); *Hoefer v. U.S. Dep't of Commerce,* 2000 WL 890862 at *2 (N.D.Cal. June 28, 2000); *cf. Koster v. (American) Lumbermens Mut. Cas. Co.,* 330 U.S. 518, 524, 67 S.Ct. 828, 91 L.Ed. 1067 (1947).

**B. Convenience of Third-Party Witnesses.**

As to convenience of third-party witnesses, Plaintiffs concede that this factor is neutral. Most witnesses would have to travel out-of-town to get to the courthouse, regardless of whether or not this case is transferred. *See Wireless Consumers Alliance,* 2003 WL 22387598 at *4.

**II. Interests Of Justice.**

**A. Judicial Efficiency.**

The Court finds that concerns of judicial efficiency counsel strongly in favor of transfer. Judicial resources are conserved when an action is adjudicated by a court that has already "committed judicial resources to the contested issues and is familiar with the facts of the case."*Samsung Elec. Co.*

*v. Rambus, Inc.,* 386 F.Supp.2d 708, 722 (E.D.Va.2005). Here, in the event of a transfer, the action would almost certainly be reassigned to Judge King under related case procedures. Judge King presided over *Dagher* for more than three years, issued detailed written orders regarding the merits of that case, and is presumably more familiar than this Court with underlying factual contentions that are common to both actions. Judge King is in the best position to determine substantive issues raised in the present litigation, including the threshold question, raised by Defendants' pending motion to dismiss, of whether the pendency of *Dagher* tolled what would otherwise be a statute of limitations bar on the present lawsuit.[FN4] Judge King will also be better positions to address downstream issues, including res judicata issues and the substantive merits of the claims. This Court, in contrast, would have to invest significant time and resources to reach a similar level of familiarity. The interests of justice therefore strongly support transfer here. *See Hoefer,* 2000 WL 890862 at *3 (transfer warranted to district where earlier action had been litigated because keeping case "would entail a significant waste of time and energy and would involve duplicative effort by this court"); *Wireless Consumers Alliance,* 2003 WL 22387598 at *5-6 (transfer warranted to district where earlier action had been litigated, to "avoid the risk of conflicting rulings" and to "save judicial resources").

FN4. For example, Judge King is in a better position that this Court to analyze, for purposes of the class action tolling doctrine, whether counsel's express disclaimer of any Rule of Reason claim in the *Dagher* case put putative class members, including the named plaintiffs in this litigation, on notice that they needed to take steps to preserve their Rule of Reason claim. Judge King is also in a better position to calculate the exact amount of tolling, if any, available to Plaintiffs, based on the full *Dagher* record, which is not before this Court.

**\*3** The Court finds unpersuasive Plaintiffs' efforts to minimize the factual overlap between the *per se* claims brought in *Dagher* and the Rule of Reason claims brought here. While the legal theories may differ-and may require Plaintiffs to prove elements not at issue in the *Dagher* litigation-the underlying facts concerning the joint ventures and Defendants'

conduct are largely the same.[FN5]

FN5. The Court sees no reason to seriously entertain Plaintiffs' speculation that Judge King's memeory of the *Dagher* case has rapidly faded with the passage of time.

**B. Forum Shopping.**

The Court is persuaded, on this record, that there is a high likelihood that Plaintiffs' counsel are attempting to forum shop. The same counsel, seeking to represent a nearly identical class, filed a earlier lawsuit premised on the same allegedly unlawful activity in the Central District. After expressly disavowing the Rule of Reason claim, and then receiving unfavorable rulings from that Court, the same counsel now seek to assert a Rule of Reason claim in an action filed in this district. Plaintiffs filed the action in this district even though their tolling theory to overcome the statute of limitations bar depends on the pendency of the *Dagher* litigation. The Court can reasonably draw an inference from such conduct that Plaintiffs' counsel are engaged in forum-shopping. *See Alexander v. Franklin Res., Inc.,* 2007 WL 518859 at *4 (N.D.Cal. Feb.14, 2007). Although Plaintiffs have identified some connections that the Northern District has to the dispute, including the locations of defendant Chevron, of Plaintiffs' lead counsel, and of some of the alleged injuries, none of these connections were absent in the earlier *Dagher* litigation. Plaintiffs have not offered any satisfactory explanation for their decision to ***change*** their choice of forum when these factors have not changed.

Discouraging forum-shopping provides a strong reason to transfer this case to the Central District. *See Wireless Consumers Alliance,* 2003 WL 22387598 at *6 ("evidence of plaintiff's attempt to avoid a particular precedent from a particular judge weighs heavily in the context of [the interests of justice] prong and would often make the transfer of venue proper")."If there is any indication that plaintiff's choice of forum is the result of forum shopping, plaintiff's choice will be accorded little deference ."*Williams v. Bowman,* 157 F.Supp.2d 1103, 1116 (N.D.Cal.2001). Accordingly, the Court finds that Plaintiffs' choice of forum is entitled to little or no deference here.

**CONCLUSION**

Despite the slight benefit that litigating this matter would have for the convenience of the litigants, the judicial efficiency and forum-shopping considerations discussed above are more than sufficient to tip the scale, decisively, in favor of transfer. "[T]he 'interests of justice' consideration is the most important factor a court must consider, and may be decisive in a transfer motion even when all the other factors point the other way." *London & Hull Mar. Ins. Co. v. Eagle Pac. Ins. Co.,* 1996 WL 479013 at \*3 (N.D.Cal. Aug.14, 1996). For the foregoing reasons, the Court **GRANTS** the motion and **ORDERS** the case transferred to the United States District Court for the Central District of California. The Clerk is **DIRECTED** to transfer this case, forthwith.

**\*4 IT IS SO ORDERED.**

N.D.Cal.,2008.
Madani v. Shell Oil Co.
Slip Copy, 2008 WL 268986 (N.D.Cal.), 2008-1 Trade Cases P 76,054

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.